# Nos. 23-3142 & 23-3355

IN THE

# United States Court of Appeals

FOR THE NINTH CIRCUIT

▶▶◀◀

STONE BREWING CO., LLC,

*Plaintiff-Appellee,*

v.

MILLERCOORS LLC,

*Defendant-Appellant.*

On Appeal From The United States District Court
For The Southern District Of California
Hon. Roger T. Benitez, District Judge
Case No. 3:18-cv-00331-BEN

## APPELLANT'S OPENING BRIEF

Kathleen M. Sullivan
Moon Hee Lee
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

William B. Adams
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000

Jonathan C. Bunge
Daniel R. Lombard
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
191 North Wacker Drive, Suite 2700
Chicago, IL 60606
(312) 705-7400

*Counsel for Defendant-Appellant*

February 15, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellant MillerCoors LLC—which has changed its legal name to Molson Coors Beverage Company USA LLC—states that it is a direct wholly-owned subsidiary of Molson Coors Beverage Company f/k/a Molson Coors Brewing Company. No publicly held corporation owns 10% or more of MillerCoors LLC's stock other than its parent company, Molson Coors Beverage Company.

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ..................................................... I

PRELIMINARY STATEMENT ......................................................... 1

JURISDICTIONAL STATEMENT .......................................................... 4

ISSUES PRESENTED .................................................................. 5

STATEMENT OF THE CASE ............................................................. 5

    A.    1989-2010: MillerCoors's Launch Of Keystone Light—Quality Economy Beer—And Use Of "Stone(s)" To Promote It ..................... 5

    B.    1996-1998: SBC's Formation And Production Of Stone IPA Craft Beer ....................................................... 10

    C.    2010: SBC's Cease-And-Desist Letter And MillerCoors's Responses ..................................................... 12

    D.    2010-2018: MillerCoors's Continued Use Of "Stone(s)" To Promote Keystone Light ....................................... 13

    E.    2017: MillerCoors's Keystone Light Packaging Refresh ................. 15

    F.    2018: SBC's Tardy Lawsuit ........................................... 17

    G.    The Proceedings Below ............................................... 18

        1.    The Pretrial Rulings ......................................... 18

        2.    The Trial And $56 Million Damages Award ..................... 20

        3.    The Post-Trial Rulings ....................................... 23

SUMMARY OF ARGUMENT ............................................................. 25

STANDARD OF REVIEW ................................................................ 27

ARGUMENT .......................................................................... 29

I.    MILLERCOORS WAS ENTITLED TO SUMMARY JUDGMENT ON ITS LACHES DEFENSE ...................................................... 29

    A.    SBC's 7.5-Year Delay Establishes A Strong Presumption That Laches Bars Its Trademark Infringement Claim ................... 29

    B.    SBC's 7.5-Year Delay Was Highly Prejudicial To MillerCoors ........ 34

ii

II. MILLERCOORS WAS ENTITLED TO JMOL ON SBC'S TRADEMARK INFRINGEMENT CLAIM ...................................35

    A. MillerCoors's Prior Use Of The STONE Mark Precludes Infringement As A Matter Of Law ......................................36

    B. The Evidence Of Likelihood Of Source Confusion Was Insufficient As A Matter Of Law ......................................38

        1. No Actual Confusion ......................................40

        2. Marks Are Not Similar......................................44

        3. Distinct Customer Bases ......................................46

        4. Other Factors......................................49

III. ALTERNATIVELY, MILLERCOORS WAS ENTITLED TO A NEW TRIAL ON SBC'S TRADEMARK INFRINGEMENT CLAIM .......50

    A. The District Court Abused Its Discretion By Not Undertaking A Pretrial *Daubert* Assessment For SBC's Marketing Experts.............51

    B. The Testimony Of SBC's Marketing Experts Was Inadmissible .......53

        1. The Survey Evidence Should Have Been Excluded.................54

        2. Palmatier's "Brain Node" And Regression Testimony Should Have Been Excluded ......................................58

IV. AT THE VERY LEAST, THE $56 MILLION DAMAGES AWARD SHOULD HAVE BEEN REDUCED ......................................61

    A. SBC Cannot Recover Past Lost Profits.................61

    B. SBC Cannot Recover Future Lost Profits ......................................63

    C. SBC Cannot Recover Corrective Advertising Expenses Above The 25% Cap......................................66

CONCLUSION ......................................68

REQUEST FOR ORAL ARGUMENT ......................................70

CERTIFICATE OF SERVICE ......................................73

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adray v. Adry-Mart, Inc.*,
  76 F.3d 984 (9th Cir. 1996) ...............................................................67

*AECOM Energy & Construction, Inc. v. Morrison Knudsen Corp.*,
  851 F. App'x 20 (9th Cir. 2021) .........................................................65

*Aliign Activation Wear, LLC v. Lululemon Athletica Canada, Inc.*,
  2022 WL 3210698 (9th Cir. 2022) .....................................................40

*Americana Trading Inc. v. Russ Berrie & Co.*,
  966 F.2d 1284 (9th Cir. 1992) ............................................................42

*AMF Inc. v. Sleekcraft Boats*,
  599 F.2d 341 (9th Cir. 1979) ..............................................................38

*Art Attacks Ink, LLC v. MGA Ent. Inc.*,
  581 F.3d 1138 (9th Cir. 2009) ............................................................41

*Estate of Barabin v. AstenJohnson, Inc.*,
  740 F.3d 457 (9th Cir. 2014) ........................................28, 52, 53, 59

*Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*,
  561 F.2d 1365 (10th Cir. 1977) ..........................................................66

*Brookfield Comm'cns, Inc. v. W. Coast Ent. Corp.*,
  174 F.3d 1036 (9th Cir. 1999) ............................................................36

*Carter-Wallace, Inc. v. Procter & Gamble Co.*,
  434 F.2d 794 (9th Cir. 1970) ..............................................................57

*Chance v. Pac-Tel Teletrac Inc.*,
  242 F.3d 1151 (9th Cir. 2001) ............................................................37

*City of Pomona v. SQM N. Am. Corp.*,
  866 F.3d 1060 (9th Cir. 2017) ................................................51, 52, 53

iv

*Cohn v. Petsmart, Inc.*,
 281 F.3d 837 (9th Cir. 2002) .........................................................45, 56

*Cooper v. Brown*,
 510 F.3d 870 (9th Cir. 2007) ...................................................................56

*Daubert v. Merrell Dow Pharms, Inc.*,
 43 F.3d 1311 (9th Cir. 1995) ...................................................................60

*Daubert v. Merrell Dow Pharms., Inc.*,
 509 U.S. 579 (1993).................................................................................54

*Dreamwerks Prod. Grp. v. SKG Studio*,
 142 F.3d 1127 (9th Cir. 1998) .................................................................58

*Eat Right Foods Ltd. v. Whole Foods Market, Inc.*,
 880 F.3d 1109 (9th Cir. 2018) ..................................27, 29, 30, 34, 38

*Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*,
 779 F. App'x 471 (9th Cir. 2019) .............................................................35

*Edge Wireless, LLC v. U.S. Cellular Corp.*,
 2004 WL 16619992 (D. Or. July 23, 2004).............................................43

*Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*,
 762 F.3d 829 (9th Cir. 2014) ...................................................................28

*Falcon Stainless Inc. v. Rino Cos.*,
 572 F. App'x 483 (9th Cir. 2014) .............................................................40

*Golden West Brewing Co. v. Milonas & Sons*,
 104 F.2d 880 (9th Cir. 1939) ...................................................................31

*Grasshopper House, LLC v. Clean & Sober Media, LLC*,
 2021 WL 3702243 (9th Cir. Aug. 20, 2021) ...........................................60

*Grupo Gigante SA De CV v. Dallo & Co.*,
 391 F.3d 1088 (9th Cir. 2004) ....................................27, 32, 33, 34, 35

*H&R Block, Inc. v. Block Inc.*,
 58 F.4th 939 (8th Cir. 2023) ....................................................39, 42, 46

*HM Elecs., Inc. v. R.F. Techs., Inc.*,
2015 WL 1757804 (S.D. Cal. Apr. 17, 2015) .................................................66

*Ironhawk Techs. v. Dropbox*,
2 F.4th 1150 (9th Cir. 2021) ...............................................................58

*Jack Daniel's Properties, Inc. v. VIP Prods. LLC*,
599 U.S. 140 (2023).........................................................................54

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
304 F.3d 829 (9th Cir. 2002) ..............................................29, 31, 34

*Kibler v. Hall*,
843 F.3d 1068 (6th Cir. 2016) ...............................................41

*Lakeside-Scott v. Multnomah Cnty.*,
556 F.3d 797 (9th Cir. 2009) .................................................28

*Lindy Pen Co. v. Bic Pen Corp.*,
725 F.2d 1240 (9th Cir. 1984) .....................................44, 46, 63, 64, 66

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*,
658 F.3d 936 (9th Cir. 2011) .................................................28

*M2 Software, Inc. v. Madacy Enter. Corp.*,
421 F.3d 1073 (9th Cir. 2005) ...........................39, 43, 47, 49, 55, 56

*Marketquest Grp. v. BIC Corp.*,
862 F.3d 927 (9th Cir. 2017) .....................................................58, 66

*McClaran v. Plastic Indus., Inc.*,
97 F.3d 347 (9th Cir. 1996) .........................................................64, 65

*Miller v. Glenn Miller Prod., Inc.*,
454 F.3d 975 (9th Cir. 2006) ...............................................34

*Mukhar v. Cal. State Univ., Hayward*,
319 F.3d 1073 (9th Cir. 2003) .................................................52, 53

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*,
638 F.3d 1137 (9th Cir. 2011) .................................35, 38, 47, 48, 50

*Norm Thompson Outfitters, Inc. v. General Motors Corp.*,
448 F.2d 1293 (9th Cir. 1971) ................................................................46

*Official Airline Guides, Inc. v. Goss*,
6 F.3d 1385 (9th Cir. 1993) ................................................................55

*One Industries LLC v. Jim ONeal Distributing Inc.*,
578 F.3d 1154 (9th Cir. 2009) ................................................................40

*Oracle Corp. v. SAP AG*,
765 F.3d 2014 (9th Cir. 2014) ........................................................29, 61

*Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*,
894 F.3d 1015 (9th Cir. 2018) ...........................................29, 30, 34, 35

*Playboy Enters., Inc. v. Welles*,
279 F.3d 796 (9th Cir. 2002) ................................................................57

*Polar Bear Prods., Inc. v. Timex Corp.*,
384 F.3d 700 (9th Cir. 2004) ................................................................65

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
752 F.3d 807 (9th Cir. 2014) ........................................................52, 59

*Rolex Watch, U.S.A., Inc. v. Michel Co.*,
179 F.3d 704 (9th Cir. 1999) ................................................................66

*RSI Corp. v. IBM Corp.*,
2012 WL 3277136 (N.D. Cal. Aug. 9, 2012) ..........................................33

*Sengoku Works Ltd. v. RMC Int'l, Ltd.*,
96 F.3d 1217 (9th Cir. 1996) ................................................................36

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs*,
251 F.3d 814 (9th Cir. 2001) ................................................................61

*Starter Corp. v. Converse, Inc.*,
170 F.3d 286 (2d Cir. 1999) ................................................................57

*Stone Creek, Inc. v. Omnia Italian Design, Inc.*,
875 F.3d 426 (9th Cir. 2017) ................................................................28

*Surfvivor Media, Inc. v. Survivor Prods.*,
    406 F.3d 625 (9th Cir. 2005) ............................................... 38, 39, 42, 43, 44, 49

*Tillamook Cnty. Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*,
    465 F.3d 1102 (9th Cir. 2006) .....................................................27, 30, 31, 32, 33

*Toyota Motor Sales, U.S.A. v. Tabari*,
    610 F.3d 1171 (9th Cir. 2010) ....................................................................48

*U-Haul Int'l, Inc. v. Jartran, Inc.*,
    793 F.2d 1034 (9th Cir. 1986) ....................................................................67

*United States v. Bacon*,
    979 F.3d 766 (9th Cir. 2020) (en banc) ...........................................53

*United States v. Valencia-Lopez*,
    971 F.3d 891 (9th Cir. 2020) .........................................28, 51, 52, 59

*Visa Int'l Serv. Ass'n v. JSL Corp.*,
    610 F.3d 1088 (9th Cir. 2010) ....................................................................57

*W. Des Moines State Bank v. Hawkeye Bancorporation*,
    722 F.2d 411 (8th Cir. 1983) ....................................................................66

*Water Pik, Inc. v. Med-Sys., Inc.*,
    726 F.3d 1136 (10th Cir. 2013) ..................................................................56

## Statutes

15 U.S.C. § 1114 ...............................................................................................35

15 U.S.C. § 1117(a)(2) ......................................................................................63

15 U.S.C. § 1121 .................................................................................................4

28 U.S.C § 1291 ..................................................................................................4

28 U.S.C. §§ 1331, 1338 .....................................................................................4

## Rules

Rule 50 ..........................................................................................................23, 61

Rule 50(a) ...........................................................................................................23

viii

Rule 50(b) ...................................................................................................23

Fed. R. Civ. P. 56(f) ................................................................................18, 29

Rule 59 ...............................................................................23, 24, 51, 61

Fed. R. Evid. 702 .........................................................................55, 58, 59

Fed. R. Evid. 702(b)-(d) ...............................................................................59

## PRELIMINARY STATEMENT

This is an appeal of a $56 million final judgment of the U.S. District Court for the Southern District of California (Benitez, J.), after jury trial, in a trademark dispute between Plaintiff-Appellee Stone Brewing Co., LLC ("SBC") and Defendant-Appellant MillerCoors LLC. The judgment is predicated on a finding that MillerCoors's marketing and refreshed packaging of Keystone Light ***economy beer*** infringed the STONE mark that SBC uses for its Stone IPA ***craft beer***—even though MillerCoors has used "Stone(s)" in connection with the sale and marketing of Keystone Light since before SBC was even founded; even though those beers have huge price differentials, serve distinct customer bases, and are sold in different parts of the country; and even though the parties' marks, as they appear in the marketplace, look nothing alike:



As one witness explained, it would make "no sense at all" for MillerCoors to try to confuse consumers into thinking SBC made Keystone Light.

The district court expressly "disagree[d] with [the] jury's verdict" and stated that, "had it been in the position of fact-finder in this case," it would "***not*** have concluded that a reasonably prudent consumer would be confused by refreshed Keystone Light packaging." 1-ER-30 (emphasis added); 1-ER-12. The court nevertheless deemed itself constrained to uphold the verdict and its outsized damages award—which is one of the largest, if not the largest, compensatory jury award for trademark infringement in this Circuit—because there was more than "zero" evidence of actual confusion, and, in the court's view, the parties' marks are nearly identical and both are used with beer. 1-ER-14-15. The law demands more, and in fact no reasonable jury could conclude that a reasonably prudent consumer would likely be confused into thinking that craft brewer SBC is the source of Keystone Light economy beer. That error, as well as others, warrant reversal or at least vacatur and remand.

*First*, the district court erred in granting summary judgment to SBC on MillerCoors's laches defense. SBC first accused MillerCoors of infringing the STONE mark in 2010, but it waited until 2017—after MillerCoors refreshed the look of its Keystone Light beer can and secondary packaging—to file suit. MillerCoors's refresh provided no basis to restart the laches clock. And the 7.5-year delay was highly prejudicial to MillerCoors, which rejected SBC's 2010 cease-and-desist demand and then continued to invest significant resources

building on the use of "Stone(s)." The court should not have let the case proceed to a jury.

*Second*, the district court erred in upholding the jury's finding of trademark infringement. No reasonable jury could conclude that SBC was the senior use of the STONE mark or that a reasonably prudent consumer would likely be confused that SBC is the source of Keystone Light beer. SBC could not present a single consumer who was actually confused into thinking that the source of economy beer bearing blue-and-white KEYSTONE LIGHT branding, displaying a prominent Coors Brewing Company heritage seal house mark, and featuring a Colorado mountain background, was the same as that of green-and-black Stone IPA featuring gargoyles.

*Third*, MillerCoors is entitled, at a minimum, to a new trial because the district court abdicated its gatekeeping role and permitted SBC to present irrelevant and unreliable testimony of its marketing experts, David Stewart and Robert Palmatier. The *Squirt* survey and other studies based on misleading images of Keystone Light were neither relevant (they could not address MillerCoors's use of the mark in the marketplace) nor reliable (they could not properly measure likelihood of confusion). The court also abused its discretion in allowing—without permitting pre-trial *Daubert* challenge—Palmatier to offer opinions about reprogramming the so-called "brain nodes" in consumers' minds and related

3

issues, which he was not qualified by to provide and which, in any case, were *ipse dixit* based on an unreliable methodology.

*Finally*, the district court improperly deferred to the jury's unprecedented damages award, which should be reduced or remitted to $10,467,500 (or, alternatively, $36,947,500). There was insufficient evidence to support an award of past lost profits based on MillerCoors's supposed infringement of the STONE mark. SBC's theory was based on the *association*, rather than *confusion*, of Keystone Light beer's attributes with Stone IPA. Any award of future lost profits was entirely speculative and likewise improper as a matter of law. And the court wrongly allowed SBC to seek corrective advertising damages equal to MillerCoors's advertising expenditures, disregarding accepted caps on such damages. These errors led to a grossly excessive award.

For these reasons and as further explained below, the Court should reverse or vacate the judgment.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this action alleging Lanham Act violations pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338. This Court has jurisdiction over this appeal of the final judgment and the post-trial orders, the last of which was entered on September 28, 2023, pursuant to 28 U.S.C § 1291.

*See* 1-ER-2.  MillerCoors timely filed its notice of appeal on October 24, 2023.
*See* 11-ER-2350.

## ISSUES PRESENTED

1.     Whether MillerCoors was entitled to summary judgment on its laches
defense, where SBC did not file its trademark infringement claim until 7.5 years
after it first accused MillerCoors of infringing the STONE mark.

2.     Whether MillerCoors was entitled to judgment as a matter of law on
SBC's trademark infringement claim, where (a) the undisputed facts established
MillerCoors as the senior user of the STONE mark, and (b) the evidence was
insufficient to establish a likelihood of source confusion.

3.     Whether the case should be remanded for new trial because the
district court's failure to exclude irrelevant and unreliable testimony from SBC's
marketing experts was highly prejudicial to MillerCoors.

4.     Whether the $56 million damages award should be reversed in
substantial part or at the very least remanded for new trial unless SBC accepts a
remittitur.

## STATEMENT OF THE CASE

**A.     1989-2010: MillerCoors's Launch Of Keystone Light—Quality Economy Beer—And Use Of "Stone(s)" To Promote It**

In 1989, MillerCoors's predecessor, Coors Brewing Company, created
Keystone beer in Golden, Colorado.  10-ER-2130-2137.  It aimed to provide an

5

accessible and affordable quality beer for consumers that focused on reasonable price and value. 10-ER-2130-2146; 6-ER-1126-1127. By 1991, Keystone "Everyman's beer" was available in the grocery aisles of all fifty states and was winning medals at the Great American Beer Festival. 5-ER-768. That same year, the U.S. Patent and Trademark Office ("PTO") issued MillerCoors a certificate of registration of the KEYSTONE mark. 5-ER-767.

Since the early 1990s, MillerCoors has marketed and packaged Keystone Light using "Stone(s)," which is a nickname Keystone drinkers gave it. 4-ER-747-748 (MillerCoors retired employee Whitley); 10-ER-2147-2148. MillerCoors embraced that nickname and continued to place variations of "Stone(s)" to refer to "Keystone" on marketing and packaging materials. 3-ER-531-532, 4-ER-606-607 (SBC co-founder Wagner).

In the early 1990s, MillerCoors launched several marketing campaigns for Keystone Light with national brands like Planters Peanuts, Pretzel Stix, and NASCAR that prominently featured Keystone's nickname "Stone(s)." These campaigns invited consumers, in 1991-1994 to grab some "STIX AND STONES"; in 1992-1993 to "ROLL WITH THE 'STONE"; in 1993 to "Gimme the 'Stone"; and in 1994 to "Start Your Party With The 'Stone." These slogans all referred to Keystone Light:



| 1991-1994 "STIX AND STONES" (5-ER-897) | 1992-1993 "Roll with the 'STONE" (5-ER-898) |
|---|---|
| 1993 "Gimme the 'Stone" (5-ER-770) | 1994 "Start Your Party With The 'Stone" (5-ER-775) |

*See also* 5-ER-769 ("PARTY WITH THE 'STONE" in 1994-1996); 5-ER-773 (collaboration with Planters); 10-ER-2149-2156.

By 1994, MillerCoors's official merchandizing also referred to Keystone Light as "THE 'STONE." 10-ER-2157-2168; 5-ER-774; 5-ER-899; 5-ER-900; 5-

ER-771; 5-ER-772; *see* 10-ER-2206 (MillerCoors archivist Harris); 10-ER-2222-2240.

Starting in at least 1995, Keystone's "Stone" nickname also appeared in grocery store aisles nationwide when packaging for value packs of Keystone Light prominently displayed "30 'STONES." 10-ER-2169-2180; 5-ER-776-777. Over the decades, MillerCoors continued to use "Stone(s)" or "30 'STONES" on Keystone Light packaging (though in some years, the packaging did not change):

| 1995 (5-ER-777) | 1996 (5-ER-778) | 1998 (5-ER-779) |
|---|---|---|
| 2000 (5-ER-780) | 2001 (5-ER-783) | 2002 (5-ER-784) |



| 2003 (5-ER-785-786) | 2004 (5-ER-787, 5-ER-788) | 2005 (5-ER-789-790) |
|---|---|---|
| 2007 (5-ER-791-792) | 2008 (5-ER-793-794) | 2009 (2-ER-181-185) |
| 2011 (5-ER-798) | 2012 (5-ER-799) | 2013 (5-ER-801) |
| 2014 (5-ER-802) | 2017 (before the April Refresh) (5-ER-1289) | |

*See* 10-ER-2206-2207 (Harris); 10-ER-2209-2221; ER3-ER-531-532 & 4-606-607 (former SBC CEO Engels stating his "understanding … that this idea of '30 'Stones' was always used … as a tagline or supporting message promotionally for Keystone").

In addition to using "Stone(s)," Keystone Light's packaging and branding consistently featured the words "Keystone Light" and the Coors Brewing Company heritage seal, a house mark showing the source as MillerCoors. 5-ER-907-913; 5-ER-914-929. These items were set against the graphic background of the Colorado mountains—where MillerCoors created Keystone Light—and the packaging almost always used a blue-and-white color palette. 5-ER-907-913; 5-ER-914-929.

### B. 1996-1998: SBC's Formation And Production Of Stone IPA Craft Beer

By the time SBC was established in 1996, MillerCoors had marketed Keystone using "Stone(s)" for at least five years. 10-ER-2205-2240. Notwithstanding that prior use, SBC decided to include "Stone"—a common beer brewing technique included in myriad beer and brewery names—in the name of its Stone IPA craft beer. 7-ER-1436-1462, 7-ER-1544; 3-ER-454-455. SBC applied to register the STONE mark in 1996. 9-ER-1970-1971. The PTO published the application in 1997 and granted the registration in 1998. 9-ER-1970-1971.

The similarities between the packaging of Keystone Light and Stone IPA end with the shared word, "stone." Instead of Colorado mountain ranges, Stone IPA features gargoyles and uses a green-and-black color palette. 3-ER-449-450 (SBC co-founder Koch) (agreeing "gargoyle" image was "an icon that would look different right off the bat to somebody wandering down the beer aisle, looking at six-packs"). SBC's products have eclectic packaging that does not look like Keystone Light's packaging:

| Stone IPA (9-ER-1887-1893) | Stone Tropic of Thunder Lager (9-ER-1887-1893) | Arrogant Bastard Ale (9-ER-1887-1893) |
|---|---|---|
| | | |

In contrast to MillerCoors's decision to create Keystone Light as a quality economy beer, Stone IPA is a craft beer that is sold primarily in restaurants and is priced for those who are willing to pay more to experience the strong taste of craft beer. 2-ER-339 (Koch); 3-ER-497-498 (SBC CEO Stipp); 7-ER-1381, 7-ER-1382; *compare* 7-ER-1350-1354 (Stone IPA consumers are "[c]raft die-hard customers")

11

*with* 5-ER-937 (economy buyers "disproportionately value-conscious vs. the average consumer"); 2-ER-241 (MillerCoors CEO Hattersley) (economy buyers do math to "make sure that they're getting the best value").

### C. 2010: SBC's Cease-And-Desist Letter And MillerCoors's Responses

By April 2010, if not earlier, SBC knew about MillerCoors's use of "Stone(s)." *See* 3-ER-528-530 (Wagner). That month, SBC's co-founder Steve Wagner emailed his co-founder Greg Koch and noted "the 'Stones' reference" in Keystone's marketing. 7-ER-1325; *see* 3-ER-528-530 (Wagner); 3-ER-376-378 (Koch).

Later that month, SBC's attorney sent a cease-and-desist letter to MillerCoors. 5-ER-901-902; 10-ER-2181-2183. The letter confirmed SBC's awareness that "MillerCoors LLC is marketing its Keystone product under the brands Stone, Stones, and Hold My Stones." 5-ER-901-902; 10-ER-2181-2183. It also accused MillerCoors of trademark infringement—the same claim SBC asserted in this case—and maintained "MillerCoors use of 'STONE,' 'STONES,' and 'HOLD MY STONES' for beer is likely to cause consumer confusion in the trade and among the purchasing public." 5-ER-901-902; 10-ER-2181-2183.

MillerCoors's attorney responded the next month, stating that MillerCoors "disagree[d] with [SBC's] assessment that MillerCoors's use of 'STONES' and 'HOLD MY STONES' results in a likelihood of confusion with [SBC's] rights."

12

5-ER-903-906; 10-ER-2184-2188. That letter also stated that MillerCoors does not believe it "infringes upon the rights of [SBC]," and that "MillerCoors will not make any changes in its promotion of Keystone Light beer." 5-ER-903-906; 10-ER-2184-2188; 2-ER-276-281 (MillerCoors marketing employee Wexelbaum).

Upon receipt of a follow-up letter, MillerCoors's attorney responded the same way in July 2010, stating: "[W]e cannot advise MillerCoors to discontinue its current use of 'STONES.'" 10-ER-2189-2190. Four months later, in November 2010, MillerCoors's attorney repeated again MillerCoors's intent to continue using "Stone(s)." 10-ER-2191-2192 ("MillerCoors, LLC is not interested in an agreement with [SBC] for the reasons set forth in our May 10, 2010 letter"). MillerCoors did not hear from SBC again until SBC filed this lawsuit in 2018.

## D. 2010-2018: MillerCoors's Continued Use Of "Stone(s)" To Promote Keystone Light

MillerCoors continued to use "Stone(s)" in its marketing and packaging of Keystone beer after November 2010. 10-ER-2206 (Harris); 10-ER-2222-2240. For example, MillerCoors launched the popular "Keith Stone" campaign for Keystone in 2010, 10-ER-2193-2194, and did not cease the campaign in response to SBC's letter. From 2010 through 2013, actor Keith Stone starred nationwide in "television, digital, packaging, [and] point of sale," with his signature catchphrase "HOLD MY STONES" to promote Keystone beer. *See* 2-ER-281-282 (Wexelbaum); *see also* 10-ER-2193-2194; 5-ER-796.

13



5-EX-797.

MillerCoors also continued to use "Stone(s)" on Keystone packaging and other advertising after 2010, including its "Hunt for the Great White 'Stone" promotion in 2015 and 2016, encouraging consumers during hunting season to search its value packs for the elusive white Keystone Light can and to share it on social media. *See, e.g.*, 10-ER-2195-2204; 5-ER-800-801, 5-ER-803-806; 7-ER-1465-1470; 2-ER-287-288 (Wexelbaum) (discussing use of "stones" by Keystone in 2007-2021 and "30 stones" advertising from 2012-2017); 2-ER-295-302 (Wexelbaum) (similar in 2013, including "Stone Handed Games"); 2-ER-307-310 (similar in 2015, including Chuck Testa and Stone Hunt).

Over these many years, SBC remained silent about MillerCoors's use of "Stone(s)." *See* 2-ER-280-281 (Wexelbaum); 3-ER-380-385 (Koch); 3-ER-532-533 (Wagner).

### E.     2017: MillerCoors's Keystone Light Packaging Refresh

Given SBC's silence as MillerCoors used "Stone(s)" in multi-year campaigns and packaging for Keystone Light, MillerCoors believed that SBC no longer intended to claim MillerCoors's use of "Stone(s)" infringed SBC's trademark rights.  2-ER-280-281 (Wexelbaum).

Further, in reliance on SBC's inaction, MillerCoors devoted considerable time and resources to developing refreshed packaging and marketing that rolled out in 2017.  6-ER-1111-1112; 6-ER-1014-1075 (same as exhibits in support of MillerCoor's summary judgment motion (11-ER-2370)).  That was "an expensive endeavor."     2-ER-79-271 (Wexelbaum); *see* 3-ER-521-522 (MillerCoors marketing employee Robberson); 6-ER-1111-1112; 60-ER-1014-1075.

MillerCoors refreshed Keystone Light's packaging in order to stand out against what had become a stale and homogenous look in the economy beer aisle, allowing Keystone Light to better compete with its primary competitors, other economy beer products such as Natural Light and Busch Light.  3-ER-510, 3-ER-515-516 (Robberson); 2-ER-227-228 (Hattersley).

Although MillerCoors wanted Keystone Light packaging to look modern to differentiate itself in the "sea of sameness" in the economy beer aisle, *see* 5-ER-930-1012; 6-ER-1014-1075; 6-ER-1182-1244, MillerCoors did not abandon Keystone's historic personality and brand assets.  3-ER-521-522 (Robberson).  The

refreshed packaging that launched nationwide in April 2017 contained the same brand components to signal to consumers that Keystone was "made by the Coors Brewing Company." 2-ER-233-235 (Hattersley). The refreshed packaging retained the same blue-and-white color scheme, the Colorado mountain imagery, and the same brand assets that had been present on earlier packaging: the Coors Brewing Company heritage seal, the "Keystone Light" identifier, and the "30 Stones" nickname.

| 2017: Before the Refresh (6-ER-1265) | 2017: After the Refresh (6-ER-1265) |
|---|---|



*See* 6-ER-1076-1125; 5-ER-914-929; 3-ER-506-507 (Robberson); 2-ER-261 (Wexelbaum).[1]

---

[1] In September 2020, the PTO accepted MillerCoors's renewal of its KEYSTONE trademark with a specimen showing a refreshed Keystone Light can and 30-pack featuring 30 'STONES. 7-ER-1463-1470, 9-ER-1880.

The refreshed packaging looked like the next version of Keystone Light's decades-old packaging, and nothing like Stone IPA's branding:



6-ER-1126; 6-ER-1267; 9-ER-1887-1893. That makes sense because MillerCoors did not seek to leverage SBC's STONE mark when it refreshed the Keystone Light packaging. 2-ER-246-247 (Hattersley) (it would make "no sense at all" for MillerCoors to try to confuse consumers into thinking SBC made Keystone); 2-ER-315-316 (Wexelbaum) (MillerCoors had no concerns Keystone packaging and advertising would cause confusion with SBC products). Indeed, MillerCoors does not view SBC (or any other craft brand) as a competitor of Keystone Light. 2-ER-227-228 (Hattersley); 5-ER-907-913; 5-ER-930-1012.

**F. 2018: SBC's Tardy Lawsuit**

Despite the stark differences between Keystone Light and Stone IPA, and after having remained silent for *7.5 years*, SBC filed this lawsuit in February 2018. 121-ER-2358. Suddenly facing a "slowdown" as the craft-beer industry had become more crowded (9-ER-1901; 2-ER-345 (Koch)]; 3-ER-489-490 (Stipp)]),

17

SBC asserted the same claim it had raised in 2010: that MillerCoors's use of "Stone(s)" is likely to cause consumer confusion as to the source of Keystone Light. 11-ER-2324. In addition to federal and state trademark infringement claims, SBC asserted a trademark dilution claim (that would have required it to prove its mark was "famous"), and a state statutory unfair competition claim. 11-ER-2344-2345.[2] MillerCoors answered the complaint and asserted, among other things, a laches affirmative defense. 10-ER-2241.

### G. The Proceedings Below

#### 1. The Pretrial Rulings

In March 2020, the district court resolved the parties' motions for summary judgment, denying them in substantial part. 1-ER-40. The one exception was that the court granted summary judgment to SBC on MillerCoors's laches defense—despite only MillerCoors having moved on that defense.[3] The court concluded that SBC had not unreasonably delayed in filing its lawsuit because its trademark infringement claim was limited to MillerCoors's "use of [the STONE] mark in connection with its Keystone Light refresh in 2017, not any prior use of the mark." 1-ER-66.

---

[2] SBC voluntarily dismissed its dilution claim before trial. 10-ER-2051-2052.

[3] SBC had moved for summary judgment on *its* laches defense against MillerCoors's counterclaims but did not seek summary judgment on *MillerCoors's* laches defense to its own claims. *See* 11-ER-2370-2371. In granting summary judgment to the non-moving party, the district court failed to provide notice required by Fed. R. Civ. P. 56(f).

A month earlier, the district court also denied MillerCoors's motion to exclude the testimony of SBC's marketing expert David Stewart.  1-ER-101-104. MillerCoors had maintained that Stewart's consumer *Squirt*, association, and recognition surveys were not relevant or reliable because they failed to use Keystone Light images or taglines as they appeared in the marketplace.  Instead, the surveys showed doctored images of cans that are taken up by the word "STONE," obscuring everything else including the Keystone Light label, Coors Brewing Company heritage seal house mark, and background mountain imagery. 8-ER-1574-1735; 8-ER-1736-1762; 3-ER-598.  Nonetheless, the court concluded, without analysis, that those deficiencies went to weight, not admissibility.  1-ER-101-104.

On the eve of the then-scheduled trial, after expert disclosures and *Daubert* motion deadlines had passed, SBC sought to substitute Stewart with Palmatier, stating that Stewart was unable to testify at trial.  10-ER-2104.  The district court permitted the substitution over MillerCoors's objections.  10-ER-2079; 10-ER-2080.  At that time, SBC represented that Palmatier would "adopt and endorse" Stewart's opinions and deposition testimony and contribute "limited supplementary opinions" solely to reflect "new developments since expert reports were issued in Summer 2019."  10-ER-2108.  The court denied MillerCoors any

opportunity to file a *Daubert* motion to exclude any new testimony by Palmatier. 1-ER-38 ("No new *Daubert* motions will be allowed."); 10-ER-2071-2073.

### 2. The Trial And $56 Million Damages Award

At trial, SBC did not offer testimony of anyone who was actually confused by the post-refresh Keystone packaging. Its own witnesses disavowed having knowledge of any instance of a customer buying Keystone Light thinking it was Stone IPA. *See* 3-ER-538 (Wagner); 4-ER-721 (SBC damages expert Distler); 3-ER-585 (SBC marketing expert Palmatier).

SBC instead relied on social media posts and survey evidence to support the existence of actual confusion. But the social media posts were authored by individuals who were told by SBC that Keystone Light was ***not*** created by SBC. SBC co-founder Koch sent a video message to his thousands of followers about SBC's claims against MillerCoors and asked for help in this litigation. 3-ER-389 3-ER-394-395 (Koch); 9-ER-1953 (poster asking SBC whether "your lawyers can use this"). In response, Stone IPA fans submitted these made-for-litigation posts— most of which were dated ***after*** SBC filed this lawsuit—claiming to be "confused." *See* 8-ER-1808; 8-ER-1809; 8-ER-1803-1804. The laughing emoji used to tag a post as a joke (9-ER-1960; 3-ER-434-435) or the hashtag "#TrueStoneVsKeystone" (3-ER-424-425 (Koch)) revealed the poster did not actually believe Keystone Light comes from SBC. In fact, a Nielsen study on

consumer-purchasing patterns showed the opposite: Since MillerCoors's packaging refresh, SBC has not lost customers to Keystone and Keystone has not picked up customers from SBC. 6-ER-1129-1130; 7-EX-1809; 4-ER-714-715 (Distler).

Another social media post showed an image of a sign on Keystone Light packaging saying it does not contain "beer from Stone Brewing." 8-ER-1805. Even though SBC's co-founder Koch admitted that he did not know "who wrote it," or where the sign came from, 3-ER-424-425, SBC presented it as evidence that Keystone Light retailers were confused. SBC also presented a text message asking whether SBC was "making big cans now" (even though the recipient responded "Lmao"—signaling he knew the question was in jest) and a picture of Keystone Light packs under a "Stone Brewing" sign in a warehouse (even though SBC's witness testified it is "common for Millercoors products to be stored right next to the stone products"). 8-ER-1806; 4-ER-677 (SBC store rep Moore).

SBC's marketing expert Palmatier presented opinions based on irrelevant and unreliable studies. Those opinions included Palmatier's regression analysis and a so-called "brain node" analysis, in which he testified that Keystone Light's refreshed packaging will subconsciously "reprogram" consumers' "brain nodes" to link (or associate) what he claimed were certain negative attributes of Keystone Light with SBC's products. 3-ER-547-549, 3-ER-553, 3-ER-564, 3-ER-588-590.

21

Palmatier is not a brain or neuroscientist and has no experience or education in neurology, neuropsychology, anatomy, or any field associated with the brain. 3-ER-593.

SBC's damages presentation likewise focused on the purported negative "association" in consumers' minds between SBC's products and Keystone, rather than source confusion. 8-ER-1574-1735; 8-ER-1736-1762; 8-ER-1763-1802; 3-ER-558-559, 3-ER-579-580 (Palmatier); 4-ER-645, 4-ER-655, 4-ER-660 (Palmatier); 4-ER-720-721 (Distler). SBC's damages expert Carrie Distler conceded that "there may not necessarily be substitution between the two products." 4-ER-721. Yet she assumed that "*every lost sale[] by Stone Brewing Company is due to the Keystone re-fresh*." 4-ER-708-709 (Distler). And in doing so she disregarded the numerous contemporaneous alternate factors—from the rapid increase of craft beers to the COVID-19 pandemic that shuttered restaurants serving them—that could plausibly explain at least a portion of the decline in sales. SBC requested (1) $32.8 million in past lost profits, (2) $141.5 million in future lost profits, and (3) $41.9 million for corrective advertising. 4-ER-691 (Distler).

At the end of the three-week trial, the jury found MillerCoors liable for trademark infringement, awarded SBC $56 million in damages, and expressly found that the infringement was not willful. 2-ER-217. The district court subsequently denied all other claims, counterclaims, and defenses, and entered

judgment in favor of SBC on its claims for trademark infringement and false designation of origin.  1-ER-34-37; 1-ER-26.[4]

### 3. The Post-Trial Rulings

Following the jury's verdict, the district court denied MillerCoors's Rule 50 and Rule 59 motions.

*First*, as to the Rule 50(a) motion, the court expressly "disagree[d] with [the] jury's verdict," explaining that "had it been in the position fact-finder in this case," it would "not have concluded that a reasonably prudent consumer would be confused by refreshed Keystone Light packaging."  1-ER-30.  The court "recognized that [MillerCoors] presented strong evidence, particularly testimony that showed the structural flaws with [SBC's] survey evidence," and it was not "convince[d] that the Keystone Light refresh was responsible for [SBC's] decline in sales."  1-ER-31-32.  But the court concluded that "a reasonable jury could have reached the conclusion it did" (1-ER-30), and it declined to "second guess [the jury's] determination" (1-ER-31).

*Second*, the court denied MillerCoors's Rule 50(b) motion because "reviewing the *Sleekcraft* factors and the evidence presented, the Court cannot say the verdict was unreasonable."  1-ER-15.  The court acknowledged its "difference of opinion [to] that of the jury" (1-ER-21), but concluded that sufficient evidence

---

[4] The trademark infringement and false designation of origin claims rise and fall together.  1-ER-26.

supported the verdict because it could not say "there was <u>zero</u> evidence of actual confusion," the marks are "nearly" identical, and the goods are "very closely related—both being beer" (1-ER-14-15).

*Third*, the court declined to grant a new trial under Rule 59 based on the improper admission of Palmatier's expert testimony. 1-ER-21-24. Although the court had failed to perform its gatekeeping function in advance of that testimony, the court concluded that MillerCoors was not prejudiced because it had the opportunity to cross-examine Palmatier about the methodology of his "brain node" theory (1-ER-23) and his regression analysis was not "so incomplete that it is inadmissible" (1-ER-24).

*Finally*, though the district court "agreed with MillerCoors that [SBC]'s damages *request* was 'fantasy land'" (1-ER-21), the court declined to vacate or to offer a remittitur on the jury's $56 million damages award. The court concluded that SBC's damages theory was based on trademark infringement rather than dilution, any future lost profits the jury awarded were permissible under the Lanham Act, and corrective advertising damages could be coextensive with a defendant's advertising expenditures. 1-ER-16-20.

The district court also denied SBC's motions for disgorgement of profits, treble damages, attorneys' fees, and a permanent injunction. 2-ER-115; 2-ER-109.

## SUMMARY OF ARGUMENT

The Court should be reverse or at least vacate the judgment for any of several reasons:

**I.** The district court erred in granting summary judgment to SBC on MillerCoors's laches defense. SBC knew about MillerCoors's use of the STONE mark no later than 2010 but did not sue until 7.5 years later. Because that was more than 3.5 years beyond the limitations period for the analogous state law claim, there is a strong presumption that laches apply. The district court wrongly started the clock much later, in 2017, when MillerCoors refreshed Keystone Light packaging. SBC's prolonged inaction prejudiced MillerCoors, which, in reliance of that silence, made significant investments in updating its brand.

**II.** The district court erred in denying MillerCoors's motion for judgment as a matter of law.

*First*, no reasonable jury could conclude other than that MillerCoors is the senior user of the STONE mark, having used "Stone(s)" to promote and sell Keystone Light since at least 1995. That first use in commerce was before SBC was formed, sold Stone IPA, or applied for a registration of the STONE mark.

*Second*, no reasonable jury could find it likely that a reasonably prudent consumer would think craft brewer SBC was the source of MillerCoors's Keystone Light economy beer. SBC presented no evidence of actual consumer confusion,

25

and third-party market research confirmed that no Keystone Light sales came at the expense of SBC products. The STONE and KEYSTONE LIGHT marks look nothing alike, particularly in context of how consumers would see them in the marketplace. Stone IPA and Keystone Light, moreover, have distinct and non-overlapping customer bases, with craft-beer drinkers being especially discerning and thus unlikely to be confused as to the source of Keystone Light. SBC did not make a strong showing as to these or any other factors that could support a finding of infringement.

**III.** If the judgment is not reversed outright, MillerCoors is entitled to a new trial both because the district court abdicated its gatekeeping role as to SBC's marketing experts and because, in doing so, it admitted irrelevant, unreliable and highly prejudicial expert testimony on issues central to liability and damages. The court belatedly recognized that SBC's surveys had serious "structural flaws" including because they used altered images of Keystone Light but erroneously treated that issue as one of weight, not admissibility. And other expert opinions, such as the "brain node" theory, were classic junk science, with no apparent methodology at all.

**IV.** At the very least, the $56 million compensatory damages award should be reduced or remitted to either $10,467,500 or $36,947,500. *First*, SBC sought past lost profits based solely on dilution-related harm, which is irrelevant as

a matter of law in this infringement case. But even if some past lost profits could be awarded here, the maximum possible recovery would be $26,240,000 because SBC's request wrongly included profits attributable to a brand ("Arrogant Bastard") that indisputably does not use the STONE mark. *Second*, SBC's request for future lost profits was entirely speculative and thus improper as a matter of law. *Third*, the jury should not have been permitted to award corrective advertising damages up to MillerCoors's total advertising expenditures and instead any such award should have been subject to the accepted 25% cap—*i.e.*, $10,467,500. Any other award would grossly overcompensate SBC.

## STANDARD OF REVIEW

***Summary Judgment and Laches*:** This Court "appl[ies] a hybrid standard of review" to a summary judgment order resolving a laches defense, *Eat Right Foods Ltd. v. Whole Foods Market, Inc.*, 880 F.3d 1109, 1115 (9th Cir. 2018), "with certain aspects of the district court's laches determination being reviewed de novo and others being reviewed for either abuse of discretion or clear error." *Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1101 (9th Cir. 2004). Here, "[d]e novo review is … appropriate," to the extent the Court considers "the question of when the statute of limitations begins to run for an action at law" "[i]n an analogous circumstance." *Tillamook Cnty. Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102, 1109 (9th Cir. 2006).

***JMOL on Likelihood of Confusion and Damages***:  This Court reviews *de novo* the district court's statements of the law on likelihood of confusion.  *See Stone Creek, Inc. v. Omnia Italian Design, Inc.*, 875 F.3d 426, 431 (9th Cir. 2017).  This Court also "review[s] de novo a district court's decision to grant or deny judgment as a matter of law."  *Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, 658 F.3d 936, 941 (9th Cir. 2011) (reversing JMOL denial); *see Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d 829, 842 (9th Cir. 2014) (reviewing *de novo* JMOL order on Lanham Act actual damages).  Although this Court "view[s] the evidence in the light most favorable to the party in whose favor the jury returned a verdict and draw[s] all reasonable inferences in [its] favor," "a reasonable inference cannot be supported by only threadbare conclusory statements instead of significant probative evidence."  *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802 (9th Cir. 2009) (reversing JMOL denial).

***Expert Testimony***:  This Court reviews a district court's decision to admit expert testimony for abuse of discretion.  *See United States v. Valencia-Lopez*, 971 F.3d 891, 897 (9th Cir. 2020).  "If the district court improperly admitted the expert testimony, [this Court] appl[ies] harmless error review to determine whether its decision must be reversed."  *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 461 (9th Cir. 2014) (en banc).

*New Trial and Remittitur*:  This Court reviews orders denying new trials and/or remittitur for abuse of discretion.  *Oracle Corp. v. SAP AG*, 765 F.3d 2014, 1086 (9th Cir. 2014).

## ARGUMENT

## I.  MILLERCOORS WAS ENTITLED TO SUMMARY JUDGMENT ON ITS LACHES DEFENSE

### A.  SBC's 7.5-Year Delay Establishes A Strong Presumption That Laches Bars Its Trademark Infringement Claim

SBC chose not to move for summary judgment on MillerCoors's laches defense (despite so moving on its own laches defense), but the district court granted it summary judgment anyway, without providing the notice required by Rule 56(f).  That result is not just procedurally wrong; it is wrong on the merits.

To establish that laches bars a Lanham Act claim, a defendant "must 'prove both an unreasonable delay by the plaintiff and prejudice to itself.'"  *Eat Right*, 880 F.3d at 1115 (affirming summary judgment to defendant on laches).  The "length of delay … is measured from the time the plaintiff knew or should have known about its potential cause of action," *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002) (affirming summary judgment to defendant on laches), and "with reference to the limitations period for the analogous action at law," *id.* at 835, which, for Lanham Act claims arising in California, is "California's four-year statute of limitations for trademark infringement actions," *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1025 (9th Cir.

2018) (affirming judgment to defendant on laches). If SBC "filed within that period, there is a strong presumption against laches," but if SBC "filed outside that period, the presumption is reversed." *Tillamook*, 465 F.3d at 1108 (affirming summary judgment to defendant on laches); *accord Pinkette*, 894 F.3d at 1025.

Here, laches is strongly presumed to apply because SBC's laches clock started ticking by 2010 but SBC delayed filing suit for 7.5 years—3.5 years after expiration of the analogous four-year limitations period. SBC became aware of its potential trademark infringement claim against MillerCoors no later than April 2010, when it demanded that MillerCoors cease and desist "use of 'STONE,' 'STONES,' and 'HOLD MY STONES' for beer" because it is "likely to cause consumer confusion in the trade and among the purchasing public." 10-ER-2181-2183; *see* 5-ER-901-902. In response, MillerCoors repeatedly confirmed in 2010 that it will "not make any changes in its promotion of Keystone Light beer" (10-ER-2184-2188) and that it will not "discontinue its current use of 'STONES" (10-ER-2189-2192)—leaving no doubt the supposed infringement would continue. And MillerCoors in fact continued to use STONE and STONES—as it had since early 1990s—to sell Keystone Light, and made significant additional financial investments in, among things, a multi-year advertising "Keith Stone" campaign in 2010-2013. *See supra*, Statement Sections D-E. Yet SBC sat on its rights and waited until 2018 to sue. That delay was unreasonable. *See, e.g.*, *Eat Right*, 880

30

F.3d at 1115 ("Finding that laches bars a trademark claim is appropriate where 'the trademark holder knowingly allowed the infringing mark to be used without objection for a lengthy period of time'"); *Jarrow*, 304 F.3d at 838-39 (plaintiff's "seven-year delay" from learning "of its potential cause of action" was "unreasonable"); *Golden West Brewing Co. v. Milonas & Sons*, 104 F.2d 880, 881-82 (9th Cir. 1939) (three-year delay without explanation unreasonable).

In ruling otherwise, the district court improperly wound the clock forward and started to "measure[] delay from the time plaintiff knew or should have known of the allegedly infringing ***conduct***" at issue in its lawsuit—MillerCoors's 2017 packaging refresh. 1-ER-66 (emphasis added). But, contrary to that ruling, SBC cannot avoid laches by limiting its claim to conduct that fits within the analogous limitations period for several reasons.

*First*, as mentioned, the laches clock started when SBC first knew or should have known of a potential ***claim*** for trademark infringement—not the specific ***conduct*** as to which it has chosen to sue. *See, e.g.*, *Tillamook*, 465 F.3d at 1108. "[T]he presumption of laches is triggered if *any part of the claimed wrongful conduct* occurred beyond the limitations period. To hold otherwise would 'effectively swallow the rule of laches, and render it a spineless defense." *Jarrow*, 304 F.3d at 837 (emphasis added). That rule is particularly necessary for Lanham

Act claims, where it is common for "the alleged violations [to be] ongoing, *i.e.*, the wrongful acts occurred both within and without the limitations period." *Id.*

*Second*, it is thus immaterial that SBC opted to limit its Lanham Act claims to the 2017 refresh of Keystone Light's packaging. A plaintiff's "obligation to bring suit" is not suspended while it waits for its claim to "crystalize" or for "the likelihood of confusion to loom large." *Grupo Gigante*, 391 F.3d at 1103 (affirming summary judgment to defendant on laches). It "cannot simply wait without explanation to see how successful the defendant's business will be and then" seek "to take away good will developed by defendant in the interim." *Id.* at 1102-03.

*Third*, SBC's claim is not saved by the limited exception for progressive encroachment. Under that doctrine, "the trademark owner need not sue in the face of *de minimis* infringement by the junior user. The owner may wait until 'the junior user of a mark moves into direct competition … selling the same 'product' through the same channels and causing actual market confusion.'" *Tillamook*, 465 F.3d at 1110. Progressive encroachment is not triggered by a mere redesign, rebranding, or normal business growth resulting in increased use of the mark. *Id.* The defendant must use the mark in a *new context*—in a new market or with a new product—so as to excuse the plaintiff's failure to protect its rights earlier. *Id.*

("Common methods of encroachment are the junior user's expansion of its business into different regions or into different markets").

Here, it is undisputed that MillerCoors's use was not *de minimis* in 2010 (*see supra*, Statement Sections C-D), and the 2017 packaging refresh did not constitute a move toward direct competition (*see supra*, Statement Section E). MillerCoors did not aspire, with its 2017 packaging refresh, to encroach on craft-beers markets. It did the opposite: Keystone Light remained an economy beer that aimed to stand out among other economy beers in the grocery store aisle. 5-ER-930-1012; 6-ER-1014-1075; 6-ER-1182-1244. The packaging retained the "Keystone Light" mark and made "insignificant changes" to give the same branding a modern look. 6-ER-1076-1125; 5-ER-914-929; 3-ER-506-507 (Robberson); 2-ER-261 (Wexelbaum); *see Tillamook*, 465 F.3d at 1110 (no progressive encroachment where "redesign" kept same phrase and emphasis from its previous design and adopted "insignificant changes" like "new font and color scheme"). The kind of packaging update that MillerCoors undertook—which did not make the new packaging "more similar to [the plaintiff's] packaging"—is "no[t] progressive encroachment." *Id.*; *see Grupo Gigante*, 391 F.3d at 1103 (no progressive encroachment where defendant "has not changed" its use of mark); *RSI Corp. v. IBM Corp.*, 2012 WL 3277136, *14 (N.D. Cal. Aug. 9, 2012) (similar).

33

**B.    SBC's 7.5-Year Delay Was Highly Prejudicial To MillerCoors**

"Even where a defendant establishes that a plaintiff delayed unreasonably in filing suit, laches will not bar a claim unless that delay prejudiced the defendant." *Eat Right*, 880 F.3d at 1119.    "A defendant can establish prejudice by demonstrating that during the plaintiff's delay, 'it invested money to expand its business or entered into business transactions based on its presumed rights' in a disputed mark." *Id.* (quoting *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 999 (9th Cir. 2006) (per curiam)).    That is exactly what MillerCoors did here by investing significant resources in its Keystone brand, for example through expenditures in Keystone Light advertising, packaging, and national campaigns such as the "Keith Stone" television advertisements.    *E.g.*, 10-ER-2193-2204; 6-ER-1014-1075 (previously SJ exhibits); 2-ER-281-282; 2-ER-287-288; 2-ER-301-302.  And it was undisputedly "an expensive endeavor."  2-ER-270-271; 2-ER-79-271 (Wexelbaum); *see supra*, Statement Section E.

Where a defendant "has continued to build a valuable business around its trademark during the time that the plaintiff delayed the exercise of its legal rights," as MillerCoors did here, it "ma[de] the requisite showing of prejudice."  *Grupo Gigante*, 391 F.3d at 1105 (eight-year delay); *see, e.g.*, *Pinkette*, 894 F.3d at 1028 (prejudice established where "Pinkette continued to invest in its LUSH label" and "Pinkette built its business by pursuing trade shows and advertising'"); *Jarrow*,

304 F.3d at 839 (prejudice established where "Nutrition Now has invested enormous resources in tying PB8's identity to the challenged claims" and had "Jarrow filed suit sooner, Nutrition Now could have invested its resources in shaping an alternative identity for PB8").

For these reasons, SBC cannot lie in wait for 7.5 years and seize on MillerCoors's investment in 2017 to extract damages from a party that reasonably believed SBC was not pursuing a claim. That is the very conduct laches bars.[5]

## II. MILLERCOORS WAS ENTITLED TO JMOL ON SBC'S TRADEMARK INFRINGEMENT CLAIM

"To prevail on a claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, a party 'must prove: (1) that it has a protectible ownership interest in the mark; and (2) … that the defendant's use of the mark is likely to cause consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (vacating injunction for insufficient showing

---

[5] Although the presumption of laches and prejudice is sufficient to conclude that laches bars SBC's Lanham Act claims, *see, e.g.*, *Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*, 779 F. App'x 471, 473-74 (9th Cir. 2019), other factors that courts have applied in assessing laches also favor MillerCoors. *First*, as discussed below, the STONE mark is neither arbitrary nor fanciful, and so is a weak mark. *See Grupo Gigange*, 391 F.3d at 1102. *Second*, that "the two companies successfully coexisted" for over twenty years negates any harm to SBC if it cannot pursue its claim due to laches. *Pinkette*, 894 F.3d at 1027. *Third*, MillerCoors repeatedly informed SBC of its intent to use the STONE mark, and so acted in good faith. *See id.* at 1028. *Fourth*, the parties sell beers that target different customers and do not compete, so that application of laches would not be unfair. *See id.* at 1028.

of likely confusion). No reasonable jury could conclude SBC satisfied either element. The district court's contrary ruling in denying JMOL is erroneous.

### A. MillerCoors's Prior Use Of The STONE Mark Precludes Infringement As A Matter Of Law

"It is axiomatic in trademark law that the standard test of ownership is priority of use." *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996). The party claiming ownership "must have been the first to actually use the mark in the sale of goods or services," not merely the first to register the mark. *Id.*; *accord* 2 McCarthy on Trademarks and Unfair Competition ("McCarthy") § 16:18.50 (5th ed.). "The first to use a mark is deemed the 'senior' user and has the right to enjoin 'junior' users from using confusingly similar marks in the same industry and market or within the senior user's natural zone of expansion." *Brookfield Comm'cns, Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999).

Here, no reasonable jury could conclude that SBC had priority of use of the STONE mark. The undisputed evidence showed that, by the time SBC filed an application to register the STONE mark in 1996 (9-ER-1970-1971), MillerCoors had been using "Stone(s)" to market and advertise its Keystone Light beer for at least five years—before SBC's formation. Moreover, it had continued to do so until trial, including by placing "STONES" on packaging for its Keystone 30-pack no later than 1995. *See, e.g.*, *supra* Statement Sections A, D-E; 2-ER-122-216

36

(compiling historical use of "Stone(s)" in Keystone marketing); 10-ER-2205-2240 (similar); 2-ER-122-216 (similar); 4-ER-740 (Harris) (MillerCoors was "consistently using the term 'Stone" on 30 'Stones packaging on 30-packs from 1995 to current times); 2-ER-264-266 (Wexelbaum) (personal knowledge of "stones" on Keystone packaging and advertising beginning in 1995); 4-ER-753-754) (Whitley) (packaging with "six extra" with 1995 copyright was introductory 30-pack). And MillerCoors's use of the mark to promote and sell Keystone Light was continuous from the early 1990s through present.[6]

SBC did not proffer any evidence rebutting this showing, and thus no reasonable jury could have found other than that MillerCoors was the senior user of the STONE mark. Yet, the district court declined to grant JMOL in favor of MillerCoors because it supposedly had not continuously used the mark on ***both*** its product and its marketing materials. 1-ER-32-33. That is the wrong legal standard; the inquiry must be based on "the evidence as a whole, as if each piece of evidence were part of a puzzle, which, when fitted together establishes prior use." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1158 (9th Cir. 2001).[7] Given the

---

[6]   *See also* 2-ER-221-222, 2-ER-251, 2-ER-256 (Hattersley); 4-ER-747-748 (Whitley); 2-ER-122-216; 2-ER-281-282, 2-ER-287-288, 2-ER-307-308, 2-ER-301-302 (Wexelbaum).

[7]   The court also stated that the jury could have concluded Keystone Light's 1995 packaging using the STONE mark had not gone to the market because of a missing signature, disregarding testimony that the final proof of other packaging from the

overwhelming evidence of MillerCoors's prior and continuous use of the STONE mark, from the early 1990s to the present, MillerCoors cannot be liable for trademark infringement as a matter of law.

## B. The Evidence Of Likelihood Of Source Confusion Was Insufficient As A Matter Of Law

Even if a reasonable jury could conclude that MillerCoors was not the senior user of the STONE mark, the district court erred in declining to grant JMOL to MillerCoors on likelihood of consumer confusion.

Likelihood of consumer confusion is "the *sine qua non* of trademark infringement," *Network Automation*, 638 F.3d at 1142, and exists where "a reasonably prudent consumer in the marketplace is likely to be confused as to the origin of the good … bearing one of the marks," *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 630 (9th Cir. 2005). In *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979), this Court identified eight nonexhaustive factors for determining source confusion.[8] A plaintiff must make "strong showings … with respect to some of [those factors]" sufficient to support an inference that source

---

archive omitted the approval signature as well. 2-ER-324-325 (Wexelbaum). In any event, any deficiencies in the record on this issue would only reinforce that laches bars SBC's claims. *See Eat Right*, 880 F.3d at 1120 (evidentiary prejudice).

[8] The eight *Sleekcraft* factors are: "[1] strength of the mark; [2] proximity of the goods; [3] similarity of the marks; [4] evidence of actual confusion; [5] marketing channels used; [6] type of goods and the degree of care likely to be exercised by the purchaser; [7] defendant's intent in selecting the mark; and [8] likelihood of expansion of the product lines." 599 F.2d at 348-49.

confusion is likely, not just merely possible. *Surfvivor*, 406 F.3d at 631; *accord*, *M2 Software, Inc. v. Madacy Enter. Corp.*, 421 F.3d 1073, 1085 (9th Cir. 2005); 6 McCarthy, *supra*, § 23:3. SBC did not do so.

Evaluating the *Sleekcraft* factors, the district court concluded that the evidence was sufficient to support the jury's finding of likely consumer confusion because there was not "zero" evidence of actual confusion, and at least two factors—similarity of the marks and related goods—weighed in favor of likelihood of confusion. 1-ER-14-15. But the non-zero evidence of actual consumer confusion were social media posts SBC solicited for litigation, out-of-context images of supposed retailer or distributor confusion, and studies and surveys with fatal "structural flaws"—a mere scintilla of evidence at most. And the district court's assessment of the similarity of the marks and related goods rests on legal error.

Indeed, the district court's deference to the jury's finding of likely confusion despite the overwhelming differences here goes against decisions of this Court and other courts of appeals in cases involving comparable records. *See, e.g.*, *Surfvivor*, 406 F.3d at 629, 634 (affirming summary judgment to defendant where plaintiff could not proffer "any complaints from confused customers, and a survey" showed "fewer than two percent" of the respondents were "confused by the marks"); *H&R Block, Inc. v. Block Inc.*, 58 F.4th 939, 951 (8th Cir. 2023) ("clear error" in finding

"likelihood of confusion" where plaintiff only provided "thin evidence" of actual confusion and similarity of marks); *One Industries LLC v. Jim ONeal Distributing Inc.*, 578 F.3d 1154, 1162-64 (9th Cir. 2009) (no likelihood of confusion where marks were "visually dissimilar"); *Aliign Activation Wear, LLC v. Lululemon Athletica Canada, Inc.*, 2022 WL 3210698, *2 (9th Cir. 2022) (same); *Falcon Stainless Inc. v. Rino Cos.*, 572 F. App'x 483, 486 (9th Cir. 2014) (same). This Court should follow those decisions and reverse here.

## 1. No Actual Confusion

SBC did not present evidence that even a single consumer was actually confused into thinking SBC was the source of Keystone Light—which is not at all surprising given the stark differences between the parties' beers. Contrary to SBC's argument that MillerCoor's packaging refresh diminished the value of its STONE mark, the evidence at trial showed that, since MillerCoors launched its modernized Keystone Light packaging in 2017, SBC has not lost customers to Keystone and Keystone has not picked up customers from SBC—two things one would expect if consumers were confused about the source of the products. 6-ER-1129-1130; 7-ER-1369-1370; 4-ER-714-715 (Distler). Indeed, SBC co-founder Wagner testified he was not aware of data showing SBC lost any business to Keystone Light. 3-ER-528. SBC's damages expert Distler likewise conceded "there may not necessarily be substitution between the two products." 4-ER-721.

All SBC offered to show actual confusion were social media posts it solicited for this litigation, a handful of out-of-context images involving retailers and distributors, and surveys with doctored images of Keystone Light that were not found in the marketplace. None provides substantial evidence of actual confusion.

*First*, the social media posts are not probative of actual confusion. These posts were prompted by SBC's announcement of this lawsuit, which its co-founder Koch sent to his thousands of followers and asked for help. 3-ER-389 3-ER-394-395 (Koch); 8-ER-1808; 8-ER-1809; 8-ER-1803-1804; 9-ER-1960. SBC fans who made social media posts *in response to* an announcement about this lawsuit necessarily cannot be confused about the source of Keystone Light. The fan submissions are not evidence of actual confusion. *See Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1147 (9th Cir. 2009) (testimony by "[plaintiff's] employees or personal friends of [plaintiff's] founder" cannot constitute "evidence of actual confusion"); *Kibler v. Hall*, 843 F.3d 1068, 1078-79 (6th Cir. 2016) (no reasonable jury could find likelihood of confusion based solely on a few instances of social media confusion).

In fact, on their face, the social media posts show a *lack* of confusion. For the example, the statement that "Man, I hope I don't mistake this for a Keystone Light" is followed by a laughing emoji, showing the post was a joke. 3-ER-435. Others posts show the poster knew Keystone Light was not produced by SBC. *See*

3-ER-424-425 (Koch) (using hashtag "#TrueStoneVsKeystone" to show they are from different sources). The district court agreed these social media comments "do not provide much evidence of actual confusion." 2-ER-111. In fact, they provide none. *See H&R Block*, 58 F.4th at 949 (no evidence of actual confusion where plaintiff did not offer single customer who purchased product because they were confused, and plaintiffs' articles and social media posts were "unreliable, de minimis, and showed inattentiveness" rather than actual confusion).

*Second*, none of the out-of-context images involving retailers and distributors shows actual confusion. 1-ER-14; *see supra*, Statement Section G.2. Unlike in *Americana Trading Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1289 (9th Cir. 1992)—on which the district court relied—SBC did not offer any admissible testimony from a retailer, distributor, or customer claiming to be confused. And even if these images reflected source confusion, "[a] single retailer and a single customer mist[aking]" Keystone Light for SBC's product is "scant evidence of actual confusion" and does not support likely confusion. *Surfvivor*, 406 at 633.

*Third,* SBC's surveys also do not show consumer confusion; instead, they confirm that no source confusion exists. SBC's initial *Squirt* survey skewed the result in favor of confusion by displaying the Keystone beer can to hide the term "Key" and show only the word "Stone." 8-ER-1574-1735; 3-ER-598. SBC's experts admitted the presentation was inaccurate and not how Keystone Light

appears in the marketplace. 4-ER-670 (Stewart) (stimuli shown with shadowed-out parts); *see* 3-ER-598 (Palmatier) (image did not reflect can found in marketplace). When the same expert re-did the survey using an accurate image of a Keystone Light can, net confusion was around 4-5%, which is not sufficient evidence of likely confusion. 8-ER-1574-1735; 4-ER-632-642 (Palmatier); *see* 6 McCarthy, *supra*, § 32:189 (confusion "not likely" when below 10%); *accord Surfvivor*, 406 F.3d at 629; *Edge Wireless, LLC v. U.S. Cellular Corp.*, 2004 WL 16619992, *14 (D. Or. July 23, 2004).

With the conventional *Squirt* survey with a proper stimulus showing the opposite of what SBC wanted to prove, SBC offered results from other surveys that did not even ask about source confusion. These "association" and "recognition" surveys also presented inaccurate images of MillerCoors's products to the respondents that skewed the data in SBC's favor. For example, they displayed extreme close-up photographs of a Keystone Light can with shadows that obscured all wording except "Stone." 8-ER-1757; *see* 3-ER-598, 4-ER-628-629, 4-ER-647, 4-ER-651-654 (Palmatier). Surveys that do not reflect actual marketplace conditions are not probative of actual confusion. *See, e.g.*, *M2*, 421 F.3d at 1087.

43

### 2.  Marks Are Not Similar

No reasonable jury could find the marks were similar.  The relevant analysis is not a comparison of the marks in isolation (as the district court undertook, *see* 1-ER-13, 1-ER-52), but requires "analyzing each mark within the context of other identifying features," including its surrounding context, as it is encountered in the marketplace.  *Surfvivor*, 406 F.3d at 633; *see Lindy Pen Co. v. Bic Pen Corp.*, 725 F.2d 1240, 1245 (9th Cir. 1984) (even where marks are identical, "their similarity must be considered in light of the way the marks are encountered in the marketplace and the circumstances surrounding the[ir] purchase").

When properly contextualized as consumers would encounter them in the marketplace, the STONE and KEYSTONE LIGHT marks are not similar.  The KEYSTONE LIGHT mark appears in the marketplace in the context of Keystone's historic blue, white, and silver color scheme, featuring the Coors Brewing Company heritage symbol in contrasting in yellow-gold.  *See* 3-ER-521-522 (Robberson); 2-ER-233-235 (Hattersley).  The mark is set against Keystone's signature mountain imagery, reflecting the ski resort from which Keystone draws its name.  *See* 5-ER-907-913; 5-ER-914-929; *see supra*, Statement Sections A, E. By contrast, SBC's STONE mark appears in the marketplace with SBC's Gargoyle "icon," and in a relatively small font in packaging that is designed to emphasize the word "IPA" to denote a craft beer.  3-ER-449-450 (Koch) (agreeing "gargoyle"

image was "an icon that would look different right off the bat to somebody wandering down the beer aisle, looking at six-packs"). That packaging has a different color scheme of darker and bold colors like the green and white letters against a black background. 9-ER-1887-1893. The marks simply do not look alike:



6-ER-1126; 6-ER-1267; 9-ER-1887-1893.

In ruling otherwise, the district court stated that "the marks STONE and 'STONE are nearly identical." 1-ER-14-15. But the marks at issue are ***not*** STONE and 'STONE. Indeed, MillerCoors used the full KEYSTONE LIGHT mark—and not just STONE—on its cans or packaging. *E.g.*, 6-ER-1126; 2-ER-122-216. MillerCoors's marketing materials likewise always included the full KEYSTONE LIGHT mark. *E.g.*, 4-ER-730733 (Reischauer) (billboards and social media always used Keystone name). MillerCoors also included its house mark— the Coors Brewing Company heritage seal—to identify the source of Keystone Light, but the district court improperly ignored that too. *See, e.g., Cohn v.*

45

*Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002) (house mark "has the potential to reduce or eliminate likelihood of confusion"); *Lindy Pen*, 725 F.2d at 1245 (similarity of identical marks negated by prominent display of house marks); *Norm Thompson Outfitters, Inc. v. General Motors Corp.*, 448 F.2d 1293, 1298 (9th Cir. 1971) (consumer confusion less likely where "the name of the company invariably accompanied the [trademark]"); *H&R Block*, 58 F.4th at 948 (marks not similar because defendant made clear it was a different company); 4 McCarthy, *supra*, § 23:43 ("Conflicting marks must be compared in their entirety, including any 'house mark' which one party may append to its mark").

### 3. Distinct Customer Bases

The trial evidence showed that Stone IPA, a craft beer, costs 3-4 times the price of Keystone Light economy beer (7-ER-1381-1382) and serves a different market segment than Keystone Light. *See* 6-ER-1190; 3-ER-486 (Stipp) (SBC's closest competitors are other craft brewers); 6-ER-1172 (Keystone's performance is compared against other economy beers). As discussed below, Stone IPA and Keystone Light's distinct and non-overlapping customer bases mean no reasonable jury could conclude that three of the *Sleekcraft* factors—proximity of the goods, marketing channels, and types of goods and degree of case—weigh in favor of likely consumer confusion.

***Proximity of the Goods (related goods)***:  The district court legally erred in treating the fact that both products are "beer" as "very powerful evidence" of likely confusion.  1-ER-14-15.  The proximity of the goods is "measured by whether the products are: (1) complementary; (2) ***sold to the same class of purchasers***; and (3) similar in use and function."  *Network Automation*, 638 F.3d at 1150 (emphasis added).  Stone IPA and Keystone Light are not sold to the same class of purchasers.  Although both products are beer, they are priced to target different beer-drinking populations: craft-beer drinkers and economy-beer drinkers.  Given these distinctions, this factor ***at most*** weighs only slightly in favor of SBC.  *See M2*, 421 F.3d at 1082 (proximity of goods for music CDs "weighs in [plaintiff's] favor, but only slightly because the genres of the music CDs are very significantly different").

***Marketing Channels***:  In *M2 Software*, this Court held that the marketing-channels factor weighed against likely source confusion where the trademark owner and the alleged infringer's musical CDs were sold through distinct marketing channels:  "specialty music industry publications" versus "retail outlets."  421 F.3d at 1084-85.  The evidence here similarly established that 30-40% of Stone IPA is sold for consumption on premises (*e.g.*, restaurants), as opposed to only 2% of Keystone Light beer (which is principally sold in the economy beer grocery aisle).  2-ER-339 (Koch); 3-ER-497-498 (Stipp).  As with

47

*M2 Software*, the marketing channels here are distinct—specialty breweries versus retail grocery stores—and no reasonable jury could conclude otherwise.

**Types of Goods and Degree of Care**:  This factor examines the degree of care that a consumer is likely to exercise, because confusion is less likely if the buyer can be expected to exercise greater care.  "[G]reater care" is expected "when the goods are expensive" and when "the buyer has expertise in the field."  *Network Automation*, 638 F.3d at 1152.  As noted, Stone IPA is 3-4 times more expensive than Keystone Light beer.  7-ER-1381-1382.  And SBC itself presented evidence that its customers are "[c]raft die-hard customers" who are discerning about buying high-quality craft beer and are willing to pay for its higher price.  7-ER-1350-1354.  As such, they are unlikely to be confused that SBC is the source of Keystone Light.  It does not matter whether the beer-drinking population generally may be confused if the "relevant consumers"—craft-beer buyers that SBC targets—are more discerning.  *Network Automation*, 638 F.3d at 1152; *see, e.g.*, *Toyota Motor Sales, U.S.A. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010) ("[u]nreasonable, imprudent and inexperienced web-shoppers are not relevant" where targeted consumers are sophisticated and look for expensive products online).  The district court identified no basis on which a reasonable jury could find otherwise.

### 4. Other Factors

A reasonable jury could not find any of the remaining *Sleekcraft* factors—strength of the mark, intent, and expansion of product lines—support consumer confusion. Indeed, the district court did not rely on them in upholding the verdict.

***Strength of the Mark***: The STONE mark is indisputably a weak mark—both conceptually and commercially—and that weighs against likelihood of confusion.

As to conceptual strength, a "stone" mark for beer is weak. Many breweries and beers incorporate the term, including LIONSTONE, FREESTONE, FIRESTONE, STONE SOUP, TOMBSTONE, STONECLONE, STONE & WOOD. *See* 2-ER-350-368, 3-ER-454-455 (Koch); 7-ER-1436; 7-ER-1371; 7-ER-1374; 7-ER-1376. That is because the term "stone" describes a common brewing method that is used in myriad beer and brewery names. 7-ER-1436-1462; 7-ER 1544; 3-ER-454-455. Such a descriptive (or at best, a suggestive) mark is "conceptually weak," *M2*, 421 F.3d at 1081, and entitled to only "some protection," *Surfvivor*, 406 F.3d at 632.

Nor did SBC provide evidence sufficient to permit a reasonable jury to find the STONE mark is commercially strong. SBC CEO Stipp conceded that at least "half the beer market out there didn't even know who [SBC] was" in 2017 just

before this litigation, and SBC itself believed it was "not a broadly known brand." 3-ER-466 (Stipp); 3-ER-502 (Stipp).[9]

***Defendant's Intent***:  There is no evidence that MillerCoors modernized Keystone Light's packaging with an intent to leverage SBC's STONE mark, or to confuse consumers as to the source of Keystone Light.  The evidence shows the opposite:  MillerCoors modernized the packaging to remain faithful to Keystone Light's valuable brand assets and stand out in the economy beer aisle to compete against its primary competitors, Anheuser Busch's Natural Light and Busch Light. *See supra*, Statement Section E.  The jury itself found that MillerCoors did not act willfully.  2-ER-217.

***Likelihood of expansion of product lines***:  *SBC* presented evidence that it did *not* intend to expand into economy beer.  2-ER-332-334 (Koch); 3-ER-440-442 (Koch).  No reasonable jury could conclude otherwise.

## III.  ALTERNATIVELY, MILLERCOORS WAS ENTITLED TO A NEW TRIAL ON SBC'S TRADEMARK INFRINGEMENT CLAIM

If the Court does not reverse the judgment for any of the foregoing reasons, it should vacate the judgment and remand for new trial because the district court

---

[9]  This admission negates the district court's erroneous reference to "recognition and awards received by the brewery."  1-ER-30.  The court also disregarded that "the sophistication of the consumers of the product may also play a role" in assessing a mark's strength.  *Network Automation*, 638 F.3d at 1150; *see* 7-ER1350-1354.

wholly abdicated its gatekeeping role and allowed the jury to hear improper and highly prejudicial expert testimony.

### A. The District Court Abused Its Discretion By Not Undertaking A Pretrial *Daubert* Assessment For SBC's Marketing Experts

MillerCoors repeatedly requested that the district court perform its gatekeeping role to assess and exclude SBC's methodologically unsound and irrelevant survey evidence and Palmatier's junk science "brain node" and regression analysis. The court declined to do so, even though "the trial court's broad latitude to make the reliability determination does *not* include the discretion to abdicate completely its responsibility to do so." *Valencia-Lopez*, 971 F.3d at 898.

As to Palmatier, the district court summarily rejected MillerCoors's request for an opportunity to file a *Daubert* motion on his "new opinions" that "didn't exist before" and "weren't at issue" with respect to Stewart (*see* 10-ER-2071-2073) in a text order: "No new *Daubert* motions will be allowed." 1-ER-38. This refusal to permit a *Daubert* motion and "the failure to make any findings regarding the efficacy of [the proposed] expert opinions constituted an abdication of the district court's gatekeeping role, and necessarily an abuse of discretion." *City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1069 (9th Cir. 2017).[10]

---

[10] The district court addressed Palmatier's new opinions in its Rule 59 order (1-ER-22-23), but that belated (and perfunctory) discussion does not cure its failure to

The district court also summarily denied MillerCoors's *Daubert* motion concerning SBC's survey evidence. The court erroneously stated that "the images portray the rebranded can and packaging materials as they are found in the marketplace" (though it later recognized they do not (2-ER-111)), and, without analysis, simply stated that: "After thoughtful consideration, the Court finds that Stewart's [association and recognition surveys] were conducted according to acceptable principles." 1-ER-102-103; *see* 1-ER-104 (same for in-person survey). The court's failure to conduct a reliability analysis and explain its findings was an abuse of discretion. *See Valencia-Lopez*, 971 F.3d at 898; *Pomona*, 866 F.3d at 1072; *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014). All the court did was pass on that responsibility to the jury by erroneously characterizing the reliability question as going to "weight." 1-ER-102-104. That too was error. *See, e.g.*, *Barabin*, 740 F.3d at 464.

These gatekeeping errors were not harmless. SBC, as "the beneficiary of the error[s]," must rebut the presumption of prejudice by showing "it is more probable than not that the jury would have reached the same verdict even if the evidence had not been admitted." *Barabin*, 740 F.3d at 465. If it cannot do so, it must "suffer a reversal of his erroneously obtained judgment." *Id.*

---

perform its pre-trial gatekeeping role. *See, e.g.*, *Mukhar v. Cal. State Univ., Hayward*, 319 F.3d 1073, 1074 (9th Cir. 2003) (recognizing "undue risk of post-hoc rationalization" in a "post-verdict analysis" of expert opinions).

SBC cannot rebut the presumption because "[p]rejudice is at its apex when"—as here—"the district court erroneously admits evidence that is critical to the proponent's case." *Barabin*, 740 F.3d at 465. Stewart and Palmatier's testimony "went to the crux of the case" and addressed the central issues in the case on liability and damages. *Pomona*, 866 F.3d at 1071-72. And as the district court determined in denying JMOL, given the weakness of SBC's other evidence of confusion, the jury had to rely on SBC's survey evidence to find in SBC's favor. 1-ER-31 ("[p]resumably the jury found [SBC]'s survey evidence convincing enough to find a likelihood of confusion."). Indeed, SBC's other evidence of supposed confusion—social media posts that SBC solicited—was so unconvincing it caused the jury to laugh. 3-ER-418-419, 2-ER-422.

Thus, a new trial is warranted regardless of whether these opinions were relevant or reliable. *See, e.g.*, *United States v. Bacon*, 979 F.3d 766, 769 (9th Cir. 2020) (en banc) (new trial for non-harmless *Daubert* error permissible where "limited remand for an evidentiary hearing would create an 'undue risk of post-hoc rationalization'") (quoting *Mukhar*, 319 F.3d at 1074).

### B. The Testimony Of SBC's Marketing Experts Was Inadmissible

Even if the district court did not abdicate its gatekeeping responsibility, a new trial is still warranted because Stewart and Palmatier's testimony was inadmissible.

### 1. The Survey Evidence Should Have Been Excluded

The district court's "gatekeeping role" to vet proposed expert testimony for relevance and reliability, *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), is especially critical in trademark infringement cases, where survey evidence often provides key circumstantial evidence in determining likelihood of confusion, *see, e.g.*, *Jack Daniel's Properties, Inc. v. VIP Prods. LLC*, 599 U.S. 140, 163 (2023) (Sotomayor J., concurring).  Here, the district court determined both that SBC's surveys had serious "structural flaws" and that "[p]resumably the jury found [SBC]'s survey evidence convincing enough to find a likelihood of confusion."  1-ER-31; *see* 2-ER-111 (noting "seriously flawed survey methodology").  These flaws, however, were so serious that the surveys and the related expert testimony should have been excluded.  And because, as the district court recognized, the survey evidence took center stage at trial and informed the verdict, MillerCoors is entitled to a new trial.

*First*, SBC's surveys—the *Squirt* consumer confusion surveys and association and recognition surveys—all presented altered stimuli of Keystone cans that prominently feature the word "Stone," unlike how they appear in the marketplace:

| Keystone Light Can (9-ER-1880) | SBC's *Squirt* Survey (8-ER-1574-1735) | SBC's Association Survey (8-ER-1736-1762) |
|---|---|---|
| | | |

SBC's expert admitted that those images were inaccurate. *See* 3-ER-598 (Palmatier). A re-do of the *Squirt* survey with accurate stimuli showed **no** consumer confusion and confirms the unreliability of the survey's methodology. *See* 4-ER-637-641.

These deficiencies in survey methodology do not simply go to weight, as the district court wrongly ruled. 2-ER-111. Rather, these surveys were not relevant in "help[ing] the trier of fact to understand the evidence or to determine a ***fact in issue***." Fed. R. Evid. 702 (emphasis added). The fact in issue was whether the marketing and packaging of Keystone Light, "considered in their entirety and as they appear in the marketplace," creates consumer source confusion. *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1392 (9th Cir. 1993); *see M2*, 421 F.3d at 1087 (similar). Any confusion a fake Keystone Light beer can might cause could not "assist the trier of fact to understand or determine a fact in issue."

*Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007). These made-up stimuli, which did not approximate Keystone Light as it appears in the marketplace, also rendered the studies unreliable. *See, e.g.*, *M2*, 421 F.3d at 1087.

*Second*, not only did these surveys omit "Keystone Light" and other brand assets like the Colorado mountain imagery, they also omitted the house mark identifying the source of Keystone Light. The presence of house marks "has the potential to reduce or eliminate likelihood of confusion," *Cohn*, 281 F.3d at 842, so SBC's survey results should have been excluded for this reason too, *see, e.g.*, *Water Pik, Inc. v. Med-Sys., Inc.*, 726 F.3d 1136, 1146-47, 1157 (10th Cir. 2013) ("failing to include the … house mark" in survey stimuli "exaggerated the similarities between the two marks, likely increasing the confusion of the respondents").

*Third*, the "association" and "recognition" studies were inadmissible for an additional reason: they were not relevant to the live claim at trial—trademark **infringement**. These studies asked respondents to "Please select from this list the three words or phrases that most stand out/come to mind when viewing the product." 8-ER-1574-1640; 8-ER-1736-1762; 8-ER-1763-1802; *see* 4-ER-645, 4-ER-655, 4-ER-660 (Palmatier). These questions do not implicate source confusion; they concern trademark **dilution**, an abandoned claim that was not presented to the jury. *See* 6 McCarthy, *supra*, § 32:176 ("word association survey"

is "irrelevant because 'calling to mind is far removed from 'likelihood of confusion,'" and may be useful to "proving a claim alleging likelihood of dilution"); *see also Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1090 (9th Cir. 2010) ("Dilution isn't confusion; quite the contrary. Dilution occurs when consumers form new and different associations with the plaintiff's mark."); *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 805 (9th Cir. 2002) (dilution "works its harm not by causing confusion").

The district court stated that these product association and name recognition surveys "were conducted according to accepted principles," 1-ER-103, but even if that were so, it would not make them admissible in an infringement case. *See, e.g.*, *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 800-01 (9th Cir. 1970) ("validity of the survey" showing association is immaterial because there was no "confusion survey"); *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999) (affirming exclusion of survey evidence that "did not test or demonstrate likelihood of consumer confusion" as "not relevant").

Moreover, none of the three cases on which the district court relied hold that associating "negative attributes" of the defendant's mark with the plaintiff's mark establishes source confusion. 1-ER-16. Rather, each case distinguished the palming off of the junior user's goods as being sourced from the senior user in a typical trademark infringement case, like this one, from the unwanted

"association" of the junior user's goods with the senior user's goods in a reverse confusion case, which was not asserted here. *See Ironhawk Techs. v. Dropbox*, 2 F.4th 1150, 1160 (9th Cir. 2021); *Marketquest Grp. v. BIC Corp.*, 862 F.3d 927, 932 (9th Cir. 2017); *Dreamwerks Prod. Grp. v. SKG Studio*, 142 F.3d 1127, 1129-31 (9th Cir. 1998).

## 2. Palmatier's "Brain Node" And Regression Testimony Should Have Been Excluded

The district court also abused its discretion in permitting Palmatier to testify on brain science topics as to which he was not qualified and which were both irrelevant and unreliable. 1-ER-38; 10-ER-2071-2073.

***"Brain Node" Opinion.*** Palmatier's "brain node" testimony did not address the question of ***confusion*** among customers, but rather concerned whether customers might ***associate*** alleged lesser attributes of Keystone Light with SBC's products. *See, e.g.*, 3-ER-552-553 (Palmatier) ("Stone attributes start getting linked to the attributes from the Keystone and get linked to Stone"); 3-ER-551-554 (testifying at length about the "nodes" and association of attributes theory). These opinions—even if they met all other aspects of Rule 702 and *Daubert* standard— implicate dilution, not confusion. *See supra*, Section III.B.1.

Further, the so-called "brain node" analysis is pseudoscience. Palmatier testified that seeing the word "Stone" in Keystone Light's packaging will subconsciously "link" the two disparate products together in the consumer's mind.

3-ER-564.  He then opined that MillerCoors's Keystone refresh has subconsciously programmed the "nodes" in consumers' brains to "link" SBC's beers with attributes like "low quality."  3-ER-547-549, 3-ER-553, 3-ER-558-559 (Palmatier). This opinion is not based on any acceptable, reliable methodology.  Fed. R. Evid. 702(b)-(d); *Valencia-Lopez*, 971 F.3d at 897-98.  In fact, there seemed to be ***no*** methodology at all.  3-ER-593.  Palmatier did not explain what these "nodes" were: whether they were referring to certain physiological structures in the brain, based on psychophysics modeling of the brain, or anything other than a made-up concept.  All Palmatier did was to put on an expert's hat and state, in technical jargon, that MillerCoors caused the consumers to link the two products together. The district court should have "screen[ed] the jury from unreliable nonsense opinions."  *Pyramid*, 752 F.3d at 813.[11]

In fact, Palmatier was not qualified to offer an opinion on the supposed "set of nodes with links" in the brain and how they are programmed.  3-ER-547 (Palmatier).  Because Palmatier offered opinions about how the human brain makes ***neural*** impressions and connections, his testimony was well outside the subject matter that the district court determined he was qualified to address:  how

---

[11]  Contrary to the district court's post-trial ruling (1-ER-23), MillerCoors was not obligated to conduct in effect a FRE 702 examination in front of the jury; the court had that obligation before trial.  *See Barabin*, 740 F.3d at 462-64.

companies can "establish relationship with customers and improve their brand" (1-ER-22-23).

***Regression***: Palmatier's ad hoc regression "methodology" for concluding Keystone's marketing spending correlated with SBC's declining sales was also unreliable and should have been excluded. 3-ER-569 (Palmatier). When Palmatier's regression model failed to show greater correlation between Keystone marketing and SBC's sales than Keystone marketing and Florida rainfall, Palmatier resorted to incorrect and rudimentary math, "play[ed] around with some other things," and improperly used "cumulative advertising" as a metric. 4-ER-759-760 (MillerCoors damages expert Hosfield). The absence of any discernible, testable methodology is a "very significant fact" that weighs against the reliability of expert testimony. *Daubert v. Merrell Dow Pharms, Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). The district court should have excluded Palmatier's "regression" analysis for that reason, and it was error to justify its admission simply based on what Palmatier said he considered, without examining his haphazard regression methodology (1-ER-21-24; 1-ER-38). *See, e.g.*, *Grasshopper House, LLC v. Clean & Sober Media, LLC*, 2021 WL 3702243, *1 (9th Cir. Aug. 20, 2021) (affirming exclusion of regression analysis that "was so fundamentally flawed that it should not be presented to the jury").

***

For the reasons already discussed, the court's errors in admitting these irrelevant and unreliable expert opinions on central liability and damages issues was not harmless. A new trial is warranted.

## IV. AT THE VERY LEAST, THE $56 MILLION DAMAGES AWARD SHOULD HAVE BEEN REDUCED

If the Court declines to reverse or vacate the judgment as to liability, it should vacate the $56 million compensatory damages award, which reflects legally and factually uncoverable sums, and direct the district court either to enter judgment under Rule 50 for a reduced amount or, alternatively, to grant a new trial under Rule 59 unless SBC accepts a remittitur to the maximum amount of damages "the evidence would support," *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 825 (9th Cir. 2001); *Oracle*, 765 F.3d at 1094. The district court legally erred or otherwise abused its discretion in allowing this excessive award to stand.[12]

### A. SBC Cannot Recover Past Lost Profits

Any award of past lost-profits here would improperly reflect SBC's supposed harm from the ***association*** of its brand with the negative qualities with Keystone Light economy beer—not any harm SBC suffered due to source

---

[12] It is not possible to know the amounts the jury awarded for each category of damages, but any inferences should not be in SBC's favor because it objected to MillerCoors's proposed verdict form breaking out "corrective advertising" and lost profits. 10-ER-2067-2068; 10-ER-2055.

*confusion*.  As such, it is based not on a theory of trademark ***infringement*** but on a theory of trademark ***dilution***, which cannot provide substantial evidence of damages here, *see supra*, Section III.B.1.

SBC's experts confirmed that the purported association between SBC's product and Keystone Light is the basis for SBC's claimed damages.  SBC's damages expert Distler testified that "the harm that is occurring to Stone is that its brand is being impacted by a ***negative association***," and that "the brand is harmed and generating less sales ***as a result of that association***."  4-ER-721; *see* 4-ER-721 (consumers do not want to buy Stone "[o]nce it's been associated with Keystone"). SBC's marketing expert Palmatier similarly testified that the purported harm to the Stone IPA brand was based on the "linkages" between the "way down here" Keystone brand with "really bad attributes" and the "way up here" Stone Brewing brand, such that Keystone's "bad attributes are mapped on to Stone."  3-ER-579-580; *see* 3-ER-559 (similar).  Palmatier's "brain nodes" studies likewise turned on negative associations.  3-ER-579-580.  And SBC's CEO testified that the alleged harm was caused by purported tarnishment, ***not*** a likelihood of confusion.  3-ER-470 (Stipp) ("[Y]ou have an economy brand taking a super premium beer brand's name and putting it on their can …. It[] just … erodes it.").

SBC's witnesses also conceded that any harm SBC experienced was not because of source confusion.  Whereas Distler was more circumspect in stating that

"there may not necessarily be substitution between the two products," ER-4-721 (Distler), Palmatier stated that "most of the effect we're talking about isn't being done because someone goes into the store to buy a Keystone and they just grab a stone," 3-ER-584.

But even if some award of lost profits were permissible, the maximum amount would be $26,240,000—a 20% reduction from SBC's calculation of $32.8 million to account for sales attributable to Stone's "Arrogant Bastard"-branded beers. *See* 4-ER-762 (Hosfield). Arrogant Bastard is "sold as a separate brand" (ER-481 (Stipp)) and does not use the STONE mark. SBC did not claim (or offer any evidence at trial) that there is likelihood of confusion between Keystone and Arrogant Bastard products. Therefore, it was improper for SBC to base its lost-profits calculation on sales for all SBC beers (4-ER-684). *See Lindy Pen*, 982 F.2d at 1407-08 (damages calculation was "irreparably flawed" where it "contained items in which no likelihood of confusion existed").

### B. SBC Cannot Recover Future Lost Profits

Under the Lanham Act, the district court, "in its discretion" and "subject to the principles of equity," may award "any damages sustained by the plaintiff." 15 U.S.C. § 1117(a)(2). Although damages awarded under section 1117(a) are not restricted to particular categories, they must comport with traditional tort law principles, such as the requirement that "damages which result from [infringement]

must be established with reasonable certainty" and the prohibition on "remote and speculative" damages. *Lindy Pen*, 982 F.2d at 1407-08; *accord McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 361 (9th Cir. 1996). Therefore, although trademark plaintiffs may recover ***past*** lost profits, which are reasonably forecasted profits, no court has awarded the speculative ***future*** lost profits that SBC sought here.

SBC's request for $141.5 million of so-called future lost profits until the end of time was not based on reasonably forecasted profits that SBC would have incurred but for MillerCoors's infringement. SBC's damages expert Distler provided no supporting evidence or even explanation for her contention that SBC would lose $84 million in profits from the time of trial through 2031. She testified only that she "fix[ed] the last barrelage," without specifying what that barrelage was, on what basis it was selected, or why it was entitled to any weight. 4-ER-689-690. She then testified that she "calculate[d] the revenue, and the profits" for SBC, without providing any explanation as to the basis for those calculations. 4-ER-689-690. She then "appl[ied] a discount factor to control for … what will those dollars be worth … today," without specifying the discount factor or why it was proper. 4-ER-689-690. And she tacked on another $57 million in purported damages that was purportedly generated from a "standard formula for calculating a terminal value for the ongoing losses after 2031." 4-ER-691.

In *Lindy Pen*, this Court rejected evidence like SBC's evidence here, holding that trademark-infringement damages must be based on a reasonable estimate of plaintiff's "loss caused by [defendant's] wrongdoing," rather than defendant's non-infringing conduct. 982 F.2d at 1408. And in *McClaran*, 97 F.3d 347, this Court again held that a plaintiff who can only make a speculative showing is not entitled to a lost-profits award under the Lanham Act. *See id.* at 361-62; *cf. Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004) (reversing denial of JMOL where jury's actual damages award under Copyright Act was based on plaintiff's "too 'pie-in-the-sky'" damages theory). Indeed, SBC's attempt to recover decades of future, hypothetical damages, based on its business plan to use the STONE mark does not establish with reasonable certainty that SBC will actually use the mark, or that it would lose future profits ***because of*** MillerCoors's continued sale of Keystone Light. *Cf. AECOM Energy & Construction, Inc. v. Morrison Knudsen Corp.*, 851 F. App'x 20, 22 (9th Cir. 2021) (press releases announcing future projects insufficient to prove infringer's profits under section 1117(a)).

The district court nonetheless ruled that an award of future lost profits was permissible here because SBC's damages expert purported to give a "conservative" estimate of the future harm. 1-ER-19. The issue, however, is not any particular "amount" of damages, but whether the jury had sufficient basis to award future lost

profits at all. It did not. Given the speculative nature of the claimed damages, "select[ing] an arbitrary percentage of total sales" and attributing that to the infringing conduct, as Distler seems to have done in her "conservative" approach, cannot render the calculation non-speculative. *Lindy Pen*, 982 F.2d at 1408; *cf. Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704, 712 (9th Cir. 1999) (rejecting plaintiff's "suggestion" to limit damages to "thirty percent" of infringer's profit). Any award of future lost profits here would thus be improper as a matter of law.

### C. SBC Cannot Recover Corrective Advertising Expenses Above The 25% Cap

The district court also erred in failing to cap corrective advertising damages at $10,467,500—25% of MillerCoors's alleged advertising expenditures. *See* 4-ER-691 (Distler). The Tenth Circuit first recognized that "a dollar-for-dollar expenditure for corrective advertising is unnecessary to dispel the effects of confusing and misleading advertising," and adopted, for Lanham Act claims, the 25% cap that originated with the Federal Trade Commission. *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1375-76 (10th Cir. 1977). Since then, numerous courts have applied that cap in Lanham Act cases. *See, e.g., W. Des Moines State Bank v. Hawkeye Bancorporation*, 722 F.2d 411, 211 (8th Cir. 1983); *Marketquest Grp.*, 2018 WL 1756117, at *5; *HM Elecs., Inc. v. R.F. Techs., Inc.*, 2015 WL 1757804, *3-4 (S.D. Cal. Apr. 17, 2015); *see also* 5

McCarthy, *supra*, § 30:81 ("the courts of appeals felt that a 'dollar-for-dollar' measure was too much and adopted the 25% ratio"). And this Court has "acknowledged" the FTC "rule requiring businesses who engage in misleading advertising to spend 25% of their advertising budget on corrective advertising," and that "courts have awarded ***a percentage*** of the advertising amount spent infringing on the plaintiff's mark." *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 989 n.2 (9th Cir. 1996) (emphasis added).

Notwithstanding this authority, the district court declined to apply the 25% cap—or any other cap—on corrective advertising costs, instead allowing SBC to obtain up to a "dollar-for-dollar" recovery on corrective advertising. 1-ER-16-20. In so ruling, the court relied on *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1041 (9th Cir. 1986), and reasoned that any cap should apply only to prospective advertising fees, where the plaintiff did not provide the "*actual* corrective advertising expenditures" it incurred. But that is this case. SBC's request for $41.87 million in corrective advertising damages was what SBC claims it will spend on corrective advertising based on ***MillerCoors's*** historic advertising spend and not ***SBC's*** "actual" spending. Palmatier testified that MillerCoors's marketing "spen[d] so far … is $42 million." 3-ER-579. Distler "rel[ied] on Dr. Palmatier," and adopted that figure, even though she had previously applied a 25% cap to a total of $22.5 million and calculated $5.56 million for corrective advertising. 4-

ER-696-697, 4-ER-702-703. Nor was it reasonable for the district court to assume that the jury already discounted SBC's request (1-ER-20), given that the $56 million verdict exceeds the requested $45 million in corrective advertising, and SBC objected to an itemized damages award.

***

In sum, because much of the damages award is legally and/or factually unsupportable, the Court should, at a minimum, reduce or remit the judgment as follows:

| The Original Award | $56 million |
|---|---|
| **The Reduced Award** | |
| 0% or 80% of SBC's requested past lost profits | $0 or $26,240,000 |
| 0% of SBC's requested future lost profits | $0 |
| 25% of MillerCoors's advertising expenditures | $10,467,500 |
| **Total** | **$10,467,500 or $36,947,500** |

**<u>CONCLUSION</u>**

The Court should reverse the judgment (Parts I-II); or, alternatively, vacate and remand the case for new trial (Part III); or, alternatively, vacate and reduce or remit to either $10,467,500 or $36,947,500 (Part IV).

68

Dated:  February 15, 2024                Respectfully submitted,

                                         *s/ William B. Adams*

Kathleen M. Sullivan                       William B. Adams
Moon Hee Lee                             QUINN EMANUEL URQUHART
QUINN EMANUEL URQUHART                       & SULLIVAN, LLP
   & SULLIVAN, LLP                        51 Madison Avenue, 22nd Floor
865 S. Figueroa Street, 10th Floor        New York, NY  10010
Los Angeles, CA 90017                     (212) 849-7000
 (213) 443-3000

                                          Jonathan C. Bunge
                                          Daniel R. Lombard
                                          QUINN EMANUEL URQUHART
                                             & SULLIVAN, LLP
                                          191 North Wacker Drive, Ste 2700
                                          Chicago, IL  60606
                                          (312) 705-7400

                      *Counsel for Defendant-Appellant*

## REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests that this Court hear oral argument in this appeal.

Dated: February 15, 2024      *s/ William B. Adams*
                                    William B. Adams

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)**
23-3142 & 23-3355

The undersigned attorney or self-represented party states the following:

[ **X** ]   I am unaware of any related cases currently pending in this court.

[  ]  I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[  ]  I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

*s/ William B. Adams*                                   February 15, 2024
**Signature**                                                      **Date**
*(use "*s/[typed name]*" to sign electronically-filed documents)*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____

23-3142 & 23-3355

       I am the attorney or self-represented party.

       **This brief contains 13997 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

       I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ **X** ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

*s/ William B. Adams*                                    February 15, 2024
**Signature** _____ **Date** _____
*(use "*s/[typed name]*" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                                                                   *Rev. 12/01/22*

72

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing Brief for Appellant and accompanying Excerpts of Record with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: February 15, 2024      <u>*s/ William B. Adams*</u>
                                      William B. Adams