Nos. 23-3142 & 23-3355

# United States Court of Appeals

*for the*

## Ninth Circuit

————❖————

STONE BREWING CO., LLC,

*Plaintiff-Appellee,*

v.

MILLERCOORS, LLC,

*Defendant-Appellant*

On Appeal from the United States District Court
For the Southern District of California
Case No. 3:18-cv-331-BEN (Hon. Roger T. Benitez)

## APPELLEES'S CORRECTED ANSWERING BRIEF

**BRAUNHAGEY & BORDEN LLP**
J. Noah Hagey, Esq.
Jeffrey M. Theodore, Esq.
Kory DeClark, Esq.
J. Tobias Rowe, Esq.
Yekaterina Kushnir, Esq.
351 California Street, 10th Floor
San Francisco, California 94104
Tel.: (415) 599-0210
*Attorneys for Plaintiff-Appellee*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff/Appellee Stone Brewing Co., LLC certifies that as of this date, 10% or more of its stock is indirectly owned by Sapporo Holdings, Ltd., a publicly held company in Japan.

# <u>TABLE OF CONTENTS</u>

CORPORATE DISCLOSURE STATEMENT ........................................................ i

INTRODUCTION ................................................................................................ 1

JURISDICTIONAL STATEMENT ...................................................................... 8

ISSUES PRESENTED.......................................................................................... 8

STATEMENT OF THE CASE............................................................................. 9

      A.    Stone Brewing and STONE® ............................................................. 9

      B.    MillerCoors Markets Keystone Beer as "KEYSTONE" ................. 11

      C.    MillerCoors Abandons Efforts to Trademark "STONES" and "HOLD MY STONES" ..................................................................... 13

      D.    Keystone's Declining Sales ............................................................. 14

      E.    In 2017, MillerCoors Rebrands Keystone as "STONE".................. 15

      F.    Keystone Sales Skyrocket ............................................................... 20

      G.    MillerCoors's Infringement Causes Catastrophic Injury to Stone... 20

      H.    The Proceedings Below................................................................... 23

SUMMARY OF ARGUMENT........................................................................... 25

STANDARD OF REVIEW ................................................................................ 27

ARGUMENT ..................................................................................................... 29

I.    THE DISTRICT COURT PROPERLY FOUND THAT LACHES DOES NOT BAR STONE'S TRADEMARK CLAIMS ............................................... 29

      A.    Stone's Laches Clock to Challenge the Rebrand Did Not Start Seven Years Before the Rebrand Launched .................................... 30

            1.    Laches is Triggered by The Conduct at Issue in the Complaint............................................................................... 30

2.     MillerCoors's Alleged Earlier Use of "Stone" Could Not Have Triggered the Laches Clock ........................................... 31

B.     Suing In Response to the Rebrand Was Not Unreasonable ............ 36

C.     MillerCoors Was Not Prejudiced ..................................................... 36

D.     The Laches Ruling Was Confirmed Post-Trial ................................ 39

II.     THE DISTRICT COURT PROPERLY DENIED MILLERCOORS'S MOTION FOR JUDGMENT AS A MATTER OF LAW ........................ 39

A.     The Jury Rightly Found that Stone Had Priority ............................ 40

1.     MillerCoors Failed to Show that It Used "Stone" in Commerce before 1996 ........................................................... 41

2.     MillerCoors Failed to Show that it Used "Stone" Continuously in Commerce ........................................................ 43

3.     MillerCoors Did Not Use STONE *as a Trademark* Until 2017 .......................................................................................... 43

4.     "OWN THE STONE" Does Not "Tack" Onto Alleged Pre-1996 Use ........................................................................ 44

B.     The Jury Was More Than Justified in Finding Confusion .............. 44

1.     The Marks are Identical ........................................................ 45

2.     The Goods are the Same ........................................................ 51

3.     Consumers Were *Actually* Confused ................................... 51

4.     Stone and Keystone Share the Same Marketing Channels .... 56

5.     Consumers' Degree of Care ................................................... 56

6.     Strength of the Mark ............................................................. 57

7.     Defendant's Intent ................................................................. 57

8.     Expansion of Product Lines ................................................... 58

III.     THE DISTRICT COURT PROPERLY DENIED A NEW TRIAL ........... 58

ii

A. The District Court Evaluated the *Daubert* Challenges MillerCoors Made ................................................................. 59

1. MillerCoors Waived its Objections ......................................... 59

2. The District Court Considered and Rejected MillerCoors's Survey Challenges .......................................... 61

B. Dr. Palmatier's Testimony Was Admissible ................................. 62

1. Dr. Palmatier's Survey Testimony Was Admissible ............. 62

2. Dr. Palmatier's Marketing-Science Testimony Was Admissible ............................................................................. 66

3. Dr. Palmatier's Regression Testimony Was Proper .............. 68

4. Any Purported Error Was Harmless ....................................... 69

IV. THE DISTRICT COURT PROPERLY DECLINED TO REDUCE THE DAMAGES AWARD .................................................................... 69

A. Stone Is Entitled to Past Lost Profits .......................................... 71

B. Stone Is Entitled to Lost Future Profits ...................................... 74

C. Stone Is Entitled to Corrective Advertising with No Cap ............ 76

CONCLUSION ......................................................................................... 78

REQUEST FOR ORAL ARGUMENT ..................................................... 80

iii

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adray v. Adry-Mart*,
   76 F.3d 984 (9th Cir. 1995) ................................................................. 77, 78

*Albino v. Baca*,
   747 F.3d 1162 (9th Cir. 2014) ...............................................................39

*Americana Trading v. Russ Berrie & Co.*,
   966 F.2d 1284 (9th Cir. 1992) ...............................................................52

*AMF v. Sleekcraft Boats*,
   599 F.2d 341 (9th Cir. 1979) ............................................................ 45, 52

*Anheuser-Busch v. Customer Co.*,
   947 F. Supp. 422 (N.D. Cal. 1996) ........................................................56

*Au-Tomotive Gold v. Volkswagen of Am.*,
   457 F.3d 1062 (9th Cir. 2006) .......................................................... 45, 53

*Brookfield Commc'ns v. West Coast Ent.*,
   174 F. 3d 1036 (9th Cir. 1999) ..................................... 40, 44, 46, 50

*Casual Corner Assocs. v. Casual Stores of Nev.*,
   493 F.2d 709 (9th Cir. 1974) ................................................................40

*City of Pomona v. SQM N. Am. Corp.*,
   866 F.3d 1060 (9th Cir. 2017) ...............................................................62

*Clicks Billiards v. Sixshooters*,
   251 F.3d 1252 (9th Cir. 2001) ...............................................................62

*Cohn v. Petsmart*,
   281 F.3d 837 (9th Cir. 2002) ................................................................65

*Covertech Fabricating v. TVM Bldg. Prods.*,
   855 F.3d 163 (3d Cir. 2017) .................................................................34

*CSX Transp. v. Hensley*,
   556 U.S. 838 (2009) ......................................................................... 73, 74

iv

*Danjaq v. Sony*,
   263 F.3d 942 (9th Cir. 2001) ...................................................................36

*Dreamwerks Prod. Grp. v. SKG Studio*,
   142 F.3d 1127 (9th Cir. 1998) ..................................................................65

*E.E.O.C. v. Go Daddy Software*,
   581 F.3d 951 (9th Cir. 2009) ....................................................................40

*Eat Right Foods v. Whole Foods*,
   880 F.3d 1109 (9th Cir. 2018) ............................................................ 27, 28

*Elvis Presley Enterprises v. Capece*,
   141 F.3d 188 (5th Cir. 1998) ....................................................................34

*Estate of Barabin v. AstenJohnson*,
   740 F.3d 457 (9th Cir. 2014) ....................................................................62

*Evergreen Safety Council v. RSA Network*,
   697 F.3d 1221 (9th Cir. 2012) ..................................................................30

*Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing*,
   897 F.3d 413 (2d Cir. 2018) .....................................................................34

*Fifty-Six Hope Rd. Music v. A.V.E.L.A.*,
   778 F.3d 1059 (9th Cir. 2015) ..................................................................28

*Fleischmann Distilling v. Maier Brewing*,
   314 F.2d 149 (9th Cir. 1963) .............................................................. 51, 56

*Fortune Dynamic v. Victoria's Secret Stores Brand Mgmt.*,
   618 F.3d 1025 (9th Cir. 2010) ........................................................... passim

*Fuddruckers v. Doc's B.R. Others*,
   826 F.2d 837 (9th Cir. 1987) ....................................................................50

*Gasperini v. Center for Humanities*,
   518 U.S. 415 (1996) ....................................................................................5

*Grasshopper House v. Clean & Sober Media*,
   Nos. 19-56008, 19-56072, 2021 WL 3702243 (9th Cir. Aug. 20, 2021) ............68

*Grupo Gigante v. Dallo & Co.*,
 391 F.3d 1088 (9th Cir. 2004) ...................................................................38

*Hana Financial v. Hana Bank*,
 735 F.3d 1158 (9th Cir. 2013) ..................................................................44

*Hokto Kinoko v. Concord Farms*,
 738 F.3d 1085 (9th Cir. 2013) ..................................................................58

*Holloway v. Bristol-Myers Corp.*,
 485 F.2d 986 (D.C. Cir. 1973)...................................................................77

*Indep. Nail & Packing Co. v. Stronghold Screw Prod.*,
 205 F.2d 921 (7th Cir. 1953) ....................................................................36

*Internet Specialties W. v. Milon-DiGiorgio Enterprises*,
 559 F.3d 985 (9th Cir. 2009)........................................................... passim

*Ironhawk Techs. v. Dropbox*,
 2 F.4th 1150 (9th Cir. 2021) ................................................... 50, 58, 66

*Jarrow Formulas v. Nutrition Now*,
 304 F.3d 829 (9th Cir. 2002) ........................................... 27, 29, 30, 38

*Jules Jordan Video v. 144942 Canada*,
 617 F.3d 1146 (9th Cir. 2010) ..................................................................69

*Kendall-Jackson Winery v. E.&J. Gallo Winery*,
 150 F.3d 1042 (9th Cir. 1998) ..................................................................57

*Kode v. Carlson*,
 596 F.3d 608 (9th Cir. 2010) ....................................................................28

*Krechman v. County of Riverside*,
 723 F.3d 1104 (9th Cir. 2013) ................................................... 39, 41, 54

*Landes Const. Co. v. Royal Bank of Canada*,
 833 F.2d 1365 (9th Cir. 1987) ......................................................... 71, 78

*Los Angeles Mem'l Coliseum Comm'n v. NFL*,
 791 F.2d 1356 (9th Cir. 1986) ..................................................................70

*Marbled Murrelet v. Babbitt,*
   83 F.3d 1060 (9th Cir. 1996) ................................................................61

*Marketquest v. BIC,*
   862 F.3d 927 (9th Cir. 2017) ................................................................65

*McClaran v. Plastic Industries,*
   97 F.3d 347 (9th Cir. 1996) ................................................................76

*Mead Johnson & Co. v. Baby's Formula Serv.,*
   402 F.2d 19 (5th Cir. 1968) ................................................................35

*Mukhtar v. Cal. St. Univ., Hayward,*
   319 F.3d 1073 (9th Cir. 2003) ................................................................61

*Obrey v. Johnson,*
   400 F.3d 691 (9th Cir. 2005) ................................................................68

*One Indus. v. Jim O'Neal Distrib.,*
   578 F.3d 1154 (9th Cir. 2009) ................................................................44

*Oracle v. SAP,*
   765 F.3d 1081 (9th Cir. 2014) .................................................... passim

*Oriental Fin. Grp. v. Cooperativa de Ahorro y Credito Oriental,*
   698 F.3d 9 (1st Cir. 2012) ................................................................35

*Polar Bear Productions v. Timex,*
   384 F.3d 700 (9th Cir. 2004) ................................................................76

*Pinkette Clothing v. Cosm. Warriors,*
   894 F.3d 1015 (9th Cir. 2018) ........................................... 29, 39

*Primiano v. Cook,*
   598 F.3d 558 (9th Cir. 2010) ................................................................67

*Pyramid Techs. v. Hartford Casualty Ins.,*
   752 F.3d 807 (9th Cir. 2014) ........................................... 62, 67

*Quicksilver v. Kymsta,*
   466 F.3d 749 (9th Cir. 2006) ................................................................44

*Rearden v. Rearden Commerce*,
  683 F.3d 1190 (9th Cir. 2012) .................................................................51

*Reno Air Racing v. McCord*,
  452 F.3d 1126 (9th Cir. 2006) ................................................................35

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
  59 F.3d 902 (9th Cir. 1995)....................................................................32

*Seller Agency Council v. Kennedy Ctr. for Real Est. Educ.*,
  621 F.3d 981 (9th Cir. 2010)...................................................................37

*Sengoku Works v. RMC Int'l*,
  96 F.3d 1217 (9th Cir. 1996)........................................................... 40, 41

*Skydive Arizona v. Quattrocchi*,
  673 F.3d 1105 (9th Cir. 2012) ............................................... 29, 61, 70

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) .................................................................67

*Stone Creek v. Omnia Italian Design*,
  875 F.3d 426 (9th Cir. 2017) ........................................................ passim

*Surfvivor Media v. Survivor Prods.*,
  406 F.3d 625 (9th Cir. 2005) ...................................................................53

*Thane Int'l v. Trek Bicycle Corp.*,
  305 F.3d 894 (9th Cir. 2002) ...................................................................44

*Tillamook Country Smoker v. Tillamook Cnty. Creamery Ass'n*,
  465 F.3d 1102 (9th Cir. 2006) ............................................... 27, 34, 35

*U-Haul Int'l v. Jartran*,
  793 F.2d 1034 (9th Cir. 1986) .................................................................76

*United States v. Bacon*,
  979 F.3d 766 (9th Cir. 2020) (en banc)...................................................61

*United States v. Hinkson*,
  585 F.3d 1247 (9th Cir. 2009) (en banc)..................................................29

*United States v. McLeod*,
   755 F. App'x 670 (9th Cir. 2019) .......................................................................69

*United States v. Sanmina Corp.*,
   968 F.3d 1107 (9th Cir. 2020) ...........................................................................37

*United States v. Valencia-Lopez*,
   971 F.3d 891 (9th Cir. 2020) .............................................................................67

*Water Pik v. Med-Sys.*,
   726 F.3d 1136 (10th Cir. 2013) .........................................................................65

*Wendt v. Host Int'l*,
   125 F.3d 806 (9th Cir. 1997) .............................................................................63

## Statutes

15 U.S.C. § 1115(b) ............................................................................................40

15 U.S.C. § 1117(a) ...................................................................................... 70, 74

15 U.S.C. § 1125(a)(1)(A) .................................................................................65

## Rules

Federal Rule of Appellate Procedure 26.1 ............................................................ i

## Other Authorities

3 McCarthy on Trademarks and Unfair Competition § 23:12 (5th ed.) .................52

4 McCarthy on Trademarks and Unfair Competition § 31:19 (5th ed.) .................34

6 McCarthy on Trademarks and Unfair Competition § 31:12 (5th ed.) .................37

Restatement (Third) of Unfair Competition § 31 (1995)........................................36

## **INTRODUCTION**

The jury's $56 million verdict only begins to redress the catastrophic damage MillerCoors did to Stone Brewing Co.'s once-thriving brewery when it rebranded Keystone as "STONE" and infringed its incontestable STONE® trademark.

Starting in 1996, Stone—one of the country's most heralded craft brewers—had an unbroken, two-decade run of market-leading growth under its incontestable STONE® mark. Everything Stone did was calculated to establish STONE® as the signifier of its irreverent craft beers. By 2017, Stone's beer sales topped $120 million a year across 50 states.

That year, however, MillerCoors rebranded its failing Keystone beer as "STONE," causing mass confusion. MillerCoors's stated aim was to "reinvent" a brand that stood for nothing. Working with focus groups, Keystone rebranded itself as "STONE" under a campaign to "OWN THE STONE":

**Pre-Rebrand**



**Post-Rebrand**



1















Starting in April 2017, MillerCoors swamped Stone with billions of new "STONE" cans, packaging, and advertising in an effort to make "STONE" "come to represent" Keystone. Keystone had never before used "STONE" as a brand signifier or trademark, and MillerCoors's supposed prior uses of "STONES" never went to market. After "Own the Stone", however, consumers began to think of Keystone as "STONE", speculating that Stone had partnered with MillerCoors or launched a "lite" beer. Experienced industry participants mistook the brands.

3

The infringement devastated Stone, a craft brewery known for its independent ethos and hailed by *Beer Advocate* as the "All-Time Top Brewery on Planet Earth." With the STONE® brand swamped by Keystone's mass-market beer, Stone's sales collapsed. Customers fled to competitors and Stone lost more than 10,000 retail locations and other points of distribution. Its revenue dropped by 25%. For the first time, it underperformed other craft brands. Keystone, meanwhile, experienced a sudden turnaround in sales.

After four years of litigation, Stone tried its infringement claims to a jury over twelve days. MillerCoors was represented by three national law firms and more than twenty attorneys. The jury saw hundreds of exhibits and testimony from sixteen witnesses showing that Keystone's "Own the Stone" rebrand had caused widespread confusion and long-term damage to Stone's mark and business. During trial, MillerCoors failed to object to Stone's experts or their opinions, instead spending hours on cross-examination. The district court entered rulings that gave MillerCoors evidentiary and time limit advantages, routinely (and sometimes harshly) cross-examined Stone's witnesses, and adopted jury instructions favorable to MillerCoors.

Nonetheless, after considering the evidence and deliberating for three days, the jury unanimously found infringement and awarded Stone $56 million in damages—one quarter of the amount calculated by Stone's expert. The district

court, who "consider[ed] the evidence in the living courtroom context" rather than on a "cold paper record," concluded that "the jury's verdict is supported by evidence on the record." *Gasperini v. Center for Humanities*, 518 U.S. 415, 438 (1996); 1-ER-33.

On appeal, MillerCoors does not challenge the jury instructions or any of the law applied below. Instead, it seeks to undo the verdict by misrepresenting the record, omitting key facts, and reweighing and rewriting the evidence.

***First***, MillerCoors argues that laches and purported "prior uses" of "'STONES" allowed it to misappropriate STONE®. MillerCoors asserts that its "Own the Stone" rebranding was the "same" (OB33) as its prior uses of "'STONES" but omits the contrary evidence.

MillerCoors corporate representatives admitted that, before 2017, MillerCoors *never* separated "KEY" from "STONE", used "STONE" on its cans and primary packaging, "centered its Keystone branding around the word STONE", or called Keystone beers anything other than "KEYSTONE." MillerCoors festooned its packaging with ™ and ® symbols, but not next to STONES, and did not pursue its trademark application for STONES after rejection by the U.S.P.T.O. MillerCoors shows images of alleged pre-1997 Keystone materials with variations of "STONES" but omits that none actually went into market.

5

MillerCoors's consumer research showed in 2005 that *fewer than 1%* associated the beer with "STONES" or "STONE". The same was true in 2016, when consumer testing for the rebrand showed that "no one recognized [Stones] as a nickname" or "referred to Keystones as 'stones (even the loyalists)." "But everyone seemed to get it and express that they can see the nickname catching on after 'Own the Stone'."

MillerCoors's marketers concluded that the brand was a "blank slate" that they could "reinvent[]" by "establish[ing]" "STONE" as its "most iconic asset," the "center of attention", and "single heroic element."



6

*Second*, MillerCoors asserts that there was insufficient confusion evidence to support a verdict—a quintessential jury issue. The jury heard testimony and saw hundreds of documents establishing every *Sleekcraft* factor—evidence MillerCoors now ignores. MillerCoors also tells the Court that the record of confusion was limited to post-suit social media (OB20), even though distributors, retailers, and consumers all confused the products.

Anyone who attended trial would know that the parties' beers are not "sold in different parts of the country" (OB1) and that Stone IPA is not "sold primarily in restaurants" (OB11). The beers are sold in the same channels and stores across the country. MillerCoors's own internal data reveal that rebranded Keystone began to compete with upscale craft brands, while STONE® beer encountered competition with down-market economy beers—hard evidence of reverse confusion.

*Third*, MillerCoors alleges it was denied leave to file a *Daubert* motion regarding Stone's marketing expert, but its challenges to the surveys were rejected, and it never brought others. To avoid waiver, MillerCoors omits that, when the district court asked if it objected at trial, it responded, "it's fine, Your Honor." MillerCoors thereafter made no objection to his testimony, which was scientific and probative. Following trial, the district court analyzed MillerCoors's *post-hoc* critiques on the merits and rejected them.

***Fourth***, the evidence supports a damages award far above $56 million. MillerCoors's infringement reversed Stone's sales growth, stole its ability to achieve super-premium pricing, and reduced revenues by $30 million a year. The loss of retailers, customers, and points of distribution means those injuries will continue long into the future. Stone's damages expert—unchallenged on appeal— conservatively concluded that Stone lost more than $200 million from the infringement. Because "a remittitur must reflect 'the maximum amount sustainable by the proof,'" the district court would have abused its discretion had it reduced damages. *Oracle v. SAP*, 765 F.3d 1081, 1094-95 (9th Cir. 2014). The jury had innumerable ways to reach $56 million based on the evidence. The district court did not commit an abuse of discretion in upholding the verdict.

The jury's verdict should be affirmed.

## JURISDICTIONAL STATEMENT

Stone agrees with MillerCoors's Jurisdictional Statement.

## ISSUES PRESENTED

1.     Whether the district court abused its discretion by rejecting MillerCoors's laches defense where Stone filed suit less than a year after Keystone's 2017 "Own the Stone" rebrand.

2.     Whether the district court committed clear error by denying MillerCoors's motion for judgment as a matter of law where (a) MillerCoors

8

offered no credible evidence that it was the first to use "STONE" as a trademark, and (b) the *Sleekcraft* factors support a finding of confusion.

3. Whether the district court abused its discretion by denying a new trial where (a) MillerCoors waived its evidentiary objections, (b) Stone's expert offered probative scientific evidence, and (c) the district court analyzed MillerCoors's issues when presented and again in post-trial opinions.

4. Whether the district court abused its discretion by denying remittitur.

## STATEMENT OF THE CASE

### A. Stone Brewing and STONE®

For decades, Stone has been one of the country's leading independent craft brewers, (4-SER-800:14-813:16; 4-SER-818:1-842:8), twice named the "All-Time Top Brewery on Planet Earth" by *Beer Advocate*. (*Id.*; 11-SER-2271.) Its STONE® beers have received dozens of awards reflecting its unique quality. (4-SER-804:5-9; 4-SER-808:12-18; 4-SER-809:10-22; 4-SER-812:25-813:16; 4-SER-824:20-825:10.)

Friends Greg Koch and Steve Wagner founded Stone in 1996. They picked STONE® because it embodied the strong and simple character of the brewery they aimed to build (4-SER-756:2-762:6; 4-SER-765:10-766:1), and was not associated with any other brewery or beer. (4-SER-767:2-768:17; 4-SER-770:25-771:15; 5-SER-983:16-985:10.) Wagner performed extensive diligence—including hand-

reviewing the register of trademarks at his local library. Stone then applied to register STONE® with the U.S.P.T.O. in April 1996, establishing priority and notifying all would-be users of the mark. (9-ER-1970.)

Greg and Steve began using STONE® immediately. They brewed and sold their first batch of IPA by July 1996. (4-SER-763:15-764:3; 4-SER-784:14-24.) In 1997, the STONE mark was published for opposition nationwide. (9-ER-1985; 10-SER-2187; 4-SER-768-773.) No party, including MillerCoors's predecessor, Coors Brewing Company, objected. (9-ER-1987; 4-SER-773-74.) Stone then submitted proof of use in commerce to the U.S.P.T.O. (9-ER-1995-98; 4-SER-774-76.)

In June 1998, the STONE® mark was published in the official register of trademarks. (9-ER-2001; 10-SER-2136; 4-SER-776-77.) Stone continued to file proofs of use. (9-ER-2003-08, 2031-40; 4-SER-776-84.) In 2004, Stone filed its declaration of continuous use since 1996, causing the U.S.P.T.O. to declare the STONE® mark "incontestable." (9-ER-2003-08, 2011-12; 4-SER-777-80.)

Stone invested in its brand, and the STONE® product line expanded. (9-ER-1887-93; 4-SER-830:23-833:5.) While Stone's cans, bottles, and packaging have varied, one thing has remained constant: all prominently display its incontestable STONE® mark. (9-ER-1970; 9-ER-1887-93.)

10

Stone experienced 20 years of unbroken growth. (11-SER-2327.) It consistently outperformed craft brewer peers and received dozens of awards. (*See* 11-SER-2331; 4-SER-895:1-896:13.) By 2017, Stone was producing over 350,000 barrels a year, with beer sales exceeding $120 million. (11-SER-2327; 11-SER-2388-89; 5-SER-990:5-991:9.)



### B. MillerCoors Markets Keystone Beer as "KEYSTONE"

MillerCoors is one of two national beer conglomerates. (4-SER-691:24-670:17.) Keystone Light, MillerCoors's largest "economy beer," is pale, light, and "easy-drinking." (7-SER-1357-58.) Keystone is MillerCoors's third largest brand with sales of approximately $350 million a year. (8-SER-1571.)

Until 2017, Keystone used KEYSTONE® to identify its brand. (5-SER-1151:23-1152:3; 5-SER-1155:4-8; 7-SER-1249; 7-SER-1238; 7-SER-1251; 7-SER-1318; 7-SER-1259; 7-SER-1260.) MillerCoors never broke apart KEY and

STONE, never displayed "STONE" on its cans, never used "STONE" as the primary graphic element on packaging, never focused its marketing or branding around the word "STONE," and never referred to Keystone beers as anything other than "Keystone" in marketing or advertising materials. (4-SER-658:16-659:10; 5-SER-979:3-980:4; 5-SER-1154:11-1155:3; 5-SER-1151:23-1152:3; 5-SER-1154:8-10; 5-SER-1155:4-8.) MillerCoors's pre-2017 internal marketing documents did not list "STONE" or "STONES" as a brand asset. (9-SER-1916.) The brand slogan was "Always Smooth." (*Id.*; 7-SER-1228; 7-SER-1312; 7-SER-1283.)

MillerCoors claimed at trial that it had promotional materials using the term "STONE" in the 1990s. But all lacked markings showing that they had gone into market. (*See* 8-SER-1578; 4-SER-663:2-665:1; 5-ER-776; 5-SER-777; 5-SER-1149:17-21.) Coors maintained historical catalogs of materials that did go into market (5-SER-1150:3-25; 5-SER-1151:19-22), but they displayed no materials bearing "STONE" or "STONES." (*Id.*) Moreover, Coors discontinued these materials by 1997, and no evidence shows that MillerCoors used "STONE" or "STONES" in its marketing between 1997 and 2010. (1-ER-33.)

In 1997, after Stone's application for STONE® and after Stone had been in market for a year, Coors began using "30 **'STONES**" as a shorthand for the number of beers in 30-packs, alongside the primary KEYSTONE® mark. MillerCoors

12

admits it did not use "STONE" as the name of its brand or beer. (5-SER-1151:23-1152:3; 5-SER-1154:8-10; 5-SER-1155:4-8.)

MillerCoors also did not apply a "TM" symbol to "STONES" or any other STONE-formative language on its materials, despite liberally applying that symbol to other phrases and design elements on the same items. (11-SER-2386; 11-SER-2321-22; 11-SER-2323-25; 4-SER-708:23-712:13; 5-SER-1156:6-10.) The sole exception was a brief use of a TM symbol on "30 'Stones" in 2007, which it removed after losing on its attempts to register the marks "STONES" and "HOLD MY STONES" with the U.S.P.T.O. (4-SER-743:6-744:6; 4-SER-748:4-749:18; *infra*, C.)

### C. MillerCoors Abandons Efforts to Trademark "STONES" and "HOLD MY STONES"

In 2007, after Stone's STONE® trademark had become incontestable, MillerCoors attempted to trademark "STONES", claiming first use in 2004. (10-SER-2153-2154.) The U.S.P.T.O. rejected the application and found confusion with STONE® "extremely likely." (10-SER-2160-63.) MillerCoors did not challenge the decision, which its own trademark expert acknowledged *was correct*. (5-SER-1167:25-1170:25; 5-SER-1168:1-17 (Cissel).)

In March 2010, MillerCoors applied to register "HOLD MY STONES." (10-SER-2138-39.) Stone sent a cease-and-desist letter, explaining that confusion would result from any attempt to use "STONE" and "STONES" as a trademark. (5-

ER-901.) MillerCoors responded that, because it used "STONES" and "HOLD MY STONES," but not the word "STONE," confusion was unlikely. (5-ER-903.) It also claimed that Keystone's primary tagline "ALWAYS SMOOTH" would prevent confusion. (*Id.*) Disclaiming any usage of the singular word "STONE," MillerCoors stated that it would "not make any changes in its promotion of Keystone Light beer." (*Id.*)

Following these exchanges, MillerCoors abandoned its application for "HOLD MY STONES" and removed the TM symbol that briefly appeared on its "30 Stones" packaging. (10-SER-2150; 4-SER-752:5-753:11; 4-SER-745:15-19; 4-SER-748:4-99:14; 5-ER-800; 11-SER-2359-62; 5-ER-793-94.)

### D. Keystone's Declining Sales

Keystone's brand was then "consistently inconsistent." (10-SER-2036; 4-SER-675:4-676:8.) It lacked a distinctive identity and was not identified with "STONE." (*Id.*) MillerCoors's research in 2016 found that "[p]erceptions of Keystone Light as a brand" were "almost non-existent" because "consumers don't know who we are, what we stand for, where we come from." (7-SER-1260-61.) Focus group research established that "people haven't heard Stones as an existing nickname for Keystone," that "No one recognized this as a nickname," and that "No one said that they referred to Keystones as 'stones (even the loyalists)." (7-

14

SER-1251-58; 7-SER-1318-20; 7-SER-1249-50; *see also* 7-SER-1238; 7-SER-1259; 7-SER-1260-61.)

Keystone's sales declined until, by 2016, MillerCoors was selling *$96 million less* Keystone beer than in 2011. (10-SER-2255; 4-SER-672:9-24; 4-SER-673:5-20; 4-SER-674:4-25; 4-SER-653:17-653:10; 4-SER-656:10-17.) The decline was "twice the rate" of its competitors. (4-SER-652:17-653:3; 4-SER-657:15-18.) If MillerCoors "didn't do something to slow the decline," it would risk losing its economy portfolio, a "doomsday scenario" that would imperil the business as a whole. (4-SER-653:4-10; 4-SER-654:19-57:1.)

### E.     In 2017, MillerCoors Rebrands Keystone as "STONE"

Keystone's decline threatened MillerCoors's entire portfolio because of reduced economies of scale and because Keystone is made from the dregs of its flagship beer, Coors Light. MillerCoors hired Boston Consulting Group to analyze the problem, with resulting directive from company management to revamp Keystone lest it lose the brand entirely. (*Id*.; 9-SER-1896.)

Keystone's marketing team decided that they had "plenty of latitude" to remake the brand, which they considered a "blank slate." (7-SER-1260-61; 7-SER-1318-20.) After hiring consultants, market research firms, and marketing agencies, MillerCoors decided to "revolution[ize]" and "reinvent[]" Keystone as "STONE".

(7-SER-1321; 7-SER-1323; 11-SER-2338; *see also* 7-SER-1410; 7-SER-1414; 7-SER-1326.)

The result was the "OWN THE STONE" campaign. MillerCoors broke "KEYSTONE" into "KEY" and "STONE" for the first time ever, and it rebranded the Keystone can so that its dominant facing simply read "STONE." (4-SER-658:16-659:10; 5-SER-979:3-980:4; 5-SER-1151:23-1155:10.)

MillerCoors vowed to "establish" "STONE" as a name that would "come to represent" Keystone. (8-SER-1581; 7-SER-1415-16.) The new marketing principles were laid out in Keystone's self-described brand "bible[s]": the revised Keystone Brand ID Fundamentals and the revised Keystone Brandbook. (8-SER-1579; 8-SER-1626.)



As MillerCoors put it: "STONE … is what it's all about." STONE became Keystone's "most iconic asset," the "center of attention," and the "single heroic element" that MillerCoors sought to "establish" in its Keystone branding.



(8-SER-1640; 8-SER-1599, -1604; *see also* 8-SER-1436; 8-SER-1594, -1597, -1602; 7-SER-1249; 7-SER-1415-16; 7-SER-1420-22.)

Beginning in April 2017, MillerCoors swamped the market with Keystone cans, billboards, case stacks, print advertisements, and social media posts that advertised Keystone as STONE.

17



  

  

  

18

  

(8-SER-1452; 8-SER-1453; 8-SER-1450; 8-SER-1440; 8-SER-1447; *see also* 8-SER-1454; 8-SER-1439; 8-SER-1441; 8-SER-1442; 8-SER-1443; 8-SER-1444; 8-SER-1445; 8-SER-1446; 8-SER-1449; 8-SER-1455.)

MillerCoors boasted that the "OWN THE STONE" campaign was a "revolutionary" break from prior branding. (7-SER-1249; 7-SER-1323; 11-SER-2338, -2350.) MillerCoors's Chief Marketing Officer told distributors that it was "fully revamping the [Keystone] brand" with the goal of "brand recognition as [t]he Stone." (10-SER-2026.) And its customer research showed that there was a "perception of trying to be a new beer." (7-SER-1318.)

MillerCoors carefully taught consumers the new name. It did so in a three-phrased approach:



MillerCoors first put up billboards to connect STONE to Keystone ("A"). Then, it rotated to "B" and "C", where the Keystone name fell away, once "consumers … ha[d] come to know that board as Keystone." (10-SER-2030.)

###### F.    Keystone Sales Skyrocket

After the Rebrand, Keystone sales grew dramatically, while its competitors' sales declined. (8-SER-1570; 8-SER-1571; 8-SER-1567.) In all, Keystone earned over $100 million dollars in additional profits. (5-SER-1115:14-1119:14; 1-SER-176.)

###### G.    MillerCoors's Infringement Causes Catastrophic Injury to Stone

MillerCoors executed the 2017 Keystone Rebrand in direct proximity to Stone. Keystone appears next to Stone in the same stores on the same shelves and the same aisles:



(7-SER-1220; *see also* 7-SER-1218-25.)

Stone received an avalanche of notices from distributors, retailers, and consumers, who were confused when they saw Stone and Keystone cans on the same store shelves. Consumers on social media asked whether MillerCoors was now "partners with Stone" or whether MillerCoors "bought them out." (8-SER-1447; *see also* 8-ER-1808; 8-ER-1809; 8-SER-1455.) Stone received consumer inquiries regarding "Stone lite" beer. (10-SER-2129; 10-SER-2329.)

Industry participants were also confused. One distributor expressed surprise that Stone was "making big cans now." (8-ER-1806.) Others put Keystone in the stocking areas for Stone. (10-SER-2130.)

 

MillerCoors's marketing team found the two companies' identical branding humorous. They mocked up billboards on the road outside Stone's Escondido headquarters that read "HI, STONE. WE'RE STONE TOO" and "GREAT MINDS STONE ALIKE."



(9-SER-1850-52.)

Less funny was the catastrophic decline in Stone's business as consumers came to believe that Stone—once known for its premium IPAs—was affiliated with a watery, mass-market economy beer.

After years of market-leading growth, Stone sustained year-over-year losses of sales, culminating in Stone IPA declining by 40% and Stone overall declining by 25%. (11-SER-2332-2336; 4-SER-850:2-855:6; 4-SER-856:4-857:14.) Stone lost thousands of points of distribution and saw its price premium over competing beers evaporate. (5-SER-903:2-904:22; 5-SER-914:8-15; 5-SER-915:10-16; 3-ER-

475:25-476:5; 3-ER-477:3-15; 3-ER-479:20-24; 3-ER-480:4-7; 5-SER-937:6-15; 5-SER-949:5-17.)

Stone went from consistently beating to underperforming its peer competitors in the craft industry, including other craft brands that it distributed—by its own employees, on its own trucks, and on its own routes, side by side with STONE®. (5-SER-941:8-94; 4-SER-895:1-896:13; 4-SER-935:9-936:2; 5-SER-939:14-940:14; 5-SER-1126:24-1127:19; 11-SER-2337.)

### H. The Proceedings Below

Stone filed suit on February 12, 2018, ten months after MillerCoors launched its "OWN THE STONE" campaign.

*Preliminary Injunction Ruling*. Stone moved for a preliminary injunction, which the district court denied, despite finding that Stone had a likelihood of success on the merits. (2-SER-574.)

*Discovery Rulings*. MillerCoors withheld unfavorable material from its historical archive on which it later relied for claims of prior use. The district court sanctioned MillerCoors but did not allow Stone to inspect the archive. (12-SER-2391; 2-SER-350.) The district court similarly denied Stone access to undisclosed document repositories, including MillerCoors sales databases where emails and reports of market confusion were most likely to be found. (12-SER-2408; 1-SER-234.) And the district court denied Stone's motions to require MillerCoors to

23

produce "privileged" documents regarding its understanding of Stone's trademark rights and infringement, while allowing MillerCoors to testify to its purported belief in its "common law rights." (1-SER-107; 4-SER-680:7-19; 4-SER-741:13-742:15.)

**_Summary Judgment Rulings_**: The Court granted summary judgment to Stone on laches because Stone filed suit within ten months of the challenged "OWN THE STONE" campaign. The Court found it was a "close call" whether to grant summary judgment for Stone on confusion but decided it should be submitted to the jury. (1-ER-60.) The Court denied MillerCoors's summary judgment motion regarding priority and willfulness. (1-ER-66-73; 1-ER-80.)

**_Motions to Exclude Experts_**: The Court considered and denied all _Daubert_ challenges, including MillerCoors's _Daubert_ challenge to the surveys presented by Stone's marketing expert, Dr. Robert Palmatier, a distinguished professor at the University of Washington. MillerCoors did not file any other _Daubert_ motion against Stone's marketing experts. At trial, MillerCoors did not object to Dr. Palmatier's qualifications, testimony, or opinions. (3-SER-645:25-646:5; 10-ER-2071:15-2073:25; 12-ER-2441-42; 5-SER-994:9-16.)

**_Three-Week Jury Trial_**: The case was tried to an eight-person jury in March 2022. After twelve days of trial, 16 witnesses, 641 exhibits, and three days of deliberation, the jury reached its verdict on March 25, 2022, finding for Stone on

every question but willfulness. (2-ER-217.) It awarded Stone $56 million in damages.

***Post-Trial Briefing***: The district court denied all post-trial motions, including MillerCoors's motions for judgment as a matter of law and a new trial (1-SER-222, 1-SER-209), MillerCoors's Rule 52 motion on its equitable defenses of waiver and estoppel (1-SER-83), and Stone's motions for a permanent injunction, disgorgement of profits, trebling of damages, and attorneys' fees (1-SER-178, 1-SER-105).

## SUMMARY OF ARGUMENT

**I.**    The district court did not abuse its discretion by granting summary judgment on MillerCoors's equitable laches defense. Stone timely brought suit against the "OWN THE STONE" campaign less than a year after its launch. The laches clock could not have started before 2017 because Keystone's new STONE-centric cans, packaging, and marketing had not yet been created, much less entered the market. MillerCoors omits or misstates key facts about Keystone's "consistently inconsistent" prior uses of "STONES." MillerCoors also could not have been prejudiced by Stone's alleged delay because it had never used or established STONE as a trademark before 2017, and its own witnesses testified that they did not consider "Stone" at all when rebranding.

The Court again rejected the same arguments post-trial when it considered and rejected MillerCoors's equitable defenses of waiver and estoppel, which MillerCoors does not appeal.

**II.** The district court did not commit clear error by denying MillerCoors's motion for judgment as a matter of law. Ample evidence supported the jury's conclusion that Stone had priority because Stone applied for STONE® in 1996, began selling that year, and MillerCoors did not use the mark in commerce before that. MillerCoors's uses were, in any event, inconsistent, ever-changing, and not as a *trademark*.

The jury's finding of confusion was reasonable because evidence regarding all *Sleekcraft* factors weighed heavily in Stone's favor. The marks (STONE® and "STONE") and products (beer) are identical. Stone presented evidence of actual confusion, including among consumers, distributors and retailers. The U.S.P.T.O. found that trademark use of "STONES" was likely to cause confusion with STONE®.

**III.** The district court did not abuse its discretion by denying MillerCoors's motion for a new trial. MillerCoors waived any objection to Dr. Palmatier by failing to object. The district court performed the analysis MillerCoors seeks and found Dr. Palmatier's testimony admissible. That ruling had ample support. Dr. Palmatier testified about surveys that showed how Keystone

26

actually appeared in the market and explained textbook marketing science concerning source confusion. MillerCoors's criticisms go to weight, not admissibility.

**IV.** The district court did not abuse its discretion by declining to reduce the jury's damages award. Abundant evidence showed that Stone lost enormous past and future profits based on source confusion, not dilution, calculated in a manner that, as the district court found, was "purposefully conservative." This Court awards lost future profits and does not cap damages for corrective advertising. Ultimately, MillerCoors cannot show, as it must, that no combination of damage categories supports a $56 million award. The evidence supported a far larger award.

## STANDARD OF REVIEW

*Laches.* After "summary judgment," "'application of the laches doctrine to the facts' is reviewed for abuse of discretion." *Eat Right Foods v. Whole Foods*, 880 F.3d 1109, 1115 (9th Cir. 2018); *Jarrow Formulas v. Nutrition Now*, 304 F.3d 829, 834 (9th Cir. 2002) (following summary judgment, "application of the laches factors is entitled to deference, not to be reviewed de novo"). MillerCoors claims that selection of the starting date for laches should be reviewed de novo (OB27), but its case, *Tillamook Country Smoker v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102, 1109 (9th Cir. 2006), contravened circuit precedent. *See Internet*

*Specialties W. v. Milon-DiGiorgio Enterprises*, 559 F.3d 985, 990 (9th Cir. 2009)

(*Tillamook* created "an intracircuit conflict"). Subsequent cases—including cases

MillerCoors cites elsewhere but omits on this point—review the laches starting

date for "abuse of discretion." *E.g.*, *Eat Right*, 880 F.3d at 1117.

>    ***JMOL on Likelihood of Confusion and Damages.*** While the Court reviews

denial of JMOL *de novo*, *Fifty-Six Hope Rd. Music v. A.V.E.L.A.*, 778 F.3d 1059,

1068 (9th Cir. 2015), it reviews "findings and determination of no likelihood of

confusion for *clear error*." *Stone Creek v. Omnia Italian Design*, 875 F.3d 426, 431

(9th Cir. 2017), *abrogated on other grounds by San Diego Cnty. Credit Union v.

Citizens Equity First Credit Union*, 60 F.4th 481, 500 (9th Cir. 2023). The Court

"must sustain the verdict unless 'the evidence, construed in the light most

favorable to the nonmoving party, permits only one reasonable conclusion …

contrary to the jury's verdict.'" *Fifty-Six Hope*, 778 F.3d at 1068. The Court

"do[es] not weigh the evidence," "disregard[s] all evidence favorable to the

moving party that the jury is not required to believe," and "draw[s] … all

reasonable inferences in the favor of the non-mover." *Id.* at 1068-69.

>    ***New Trial/Expert Testimony***. Denial of a new trial motion and admission of

expert testimony are reviewed for abuse of discretion. *Kode v. Carlson*, 596 F.3d

608, 611 (9th Cir. 2010).

*New Trial/Remittitur*. Where a district court has upheld a jury's damages award, this Court reviews for abuse of discretion. *Oracle*, 765 F.3d at 1086–87. Such rulings are "virtually unassailable." *Skydive Arizona v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012). Factual findings are affirmed unless they are "illogical, implausible or without support in inferences that may be drawn from the record." *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc).

## <u>ARGUMENT</u>

## I.   THE DISTRICT COURT PROPERLY FOUND THAT LACHES DOES NOT BAR STONE'S TRADEMARK CLAIMS

Because Stone filed this lawsuit challenging MillerCoors's 2017 "OWN THE STONE" campaign less than a year after its launch, "the strong presumption is that laches is inapplicable." *Jarrow*, 304 F.3d at 835; *see also Pinkette Clothing v. Cosm. Warriors*, 894 F.3d 1015, 1025 (9th Cir. 2018) (presumption per "most analogous state statute of limitations"—California's four-year trademark limit).

MillerCoors cannot flip the presumption by asserting that Stone should have filed suit in response to dramatically different, earlier advertising campaigns that nobody has contended were infringing. And even if the laches clock started earlier, MillerCoors does not even attempt to show that Stone's "delay" was "unreasonable" and cannot show that it was prejudiced. *Internet Specialties*, 559 F.3d at 990.

29

### A. Stone's Laches Clock to Challenge the Rebrand Did Not Start Seven Years Before the Rebrand Launched

As the district court found (1-ER-66), no reasonable jury could find Stone's timing unreasonable. MillerCoors violated Stone's trademark "in connection with its Keystone Light refresh in [April] 2017." (1-ER-66.) Stone filed suit in February 2018, creating "a strong presumption against … laches." (1-ER-66.) MillerCoors has not provided a single case where a one-year delay was found unreasonable.

Because MillerCoors cannot meet its burden, it asks the Court to start the laches period in 2010—seven years before the infringement at issue. (OB30-31.) That fails as a matter of law.

#### 1. Laches is Triggered by the Conduct at Issue in the Complaint

The laches period is triggered by the "allegedly infringing conduct"—that is, the conduct the Complaint challenges. *Evergreen Safety Council v. RSA Network*, 697 F.3d 1221, 1226 (9th Cir. 2012); *see also Jarrow*, 304 F.3d at 837 (laches "triggered if any part of the *claimed wrongful conduct* occurred beyond the limitations period" (emphasis added)); 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.06, at 12–124.16 (1999) (laches "measures from the time of *the act of infringement that is being sued upon*") (emphasis added).

Here, Stone's claim is based on MillerCoors's 2017 rebrand, "not any prior use of [Stone's] mark." (1-ER-66.) That is clear from, among other things, Stone's Complaint, which does not concern Keystone's earlier use of "Stone" (11-ER-

2334-41), and Stone's interrogatory responses, which did not claim any pre-2017 infringement. (3-SER-590-91.)

### 2. MillerCoors's Alleged Earlier Use of "Stone" Could Not Have Triggered the Laches Clock

MillerCoors argues that Stone should have filed suit as early as 2010. But the prior use was fundamentally different, non-trademark use. And even MillerCoors does not contend its early use was infringing, as required to sustain its argument.

**Different Usage**. MillerCoors's laches argument rests on the misrepresentation that its use of "STONE" had been the "same" "since [the] early 1990s." (OB30, 33.) MillerCoors's internal documents and admissions by its witnesses show that MillerCoors had never before used "STONE" or "STONES" as a trademark, never displayed STONE or STONES on Keystone cans, never broke "KEYSTONE" into "KEY" and "STONE," never centered its branding around the word "Stone," and never called Keystone anything other than "Keystone" on packaging, marketing, or advertising materials. (*Supra*, B-D; 5-SER-1151:23-52:3, 1154:8-1155:8; 12-SER-2447-63; 13-SER-2774:6-9; 13-SER-2928:16-2929:17; 13-SER-3011:24-3012:5; 14-SER-3119-3120.)

**Non-Trademark**. MillerCoors's large in-house counsel and intellectual property teams did not consider "STONES" a protectable brand asset. MillerCoors did not use the "TM" symbol for "STONE" on its Keystone packaging and

31

marketing (with one brief exception), despite liberally applying it with other design elements on the same items. (*See Supra*, 13-14; 11-SER-2386; 11-SER-2321; 11-SER-2323; 4-SER-708:23-712:13; 5-SER-1156:6-10; 12-SER-2440-2444.) *See Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 906-07 (9th Cir. 1995) (failure to apply "TM" symbol precluded finding that a word was used as a trademark).

**Abandonment of Trademark Application and Assurances to Stone.**

MillerCoors also assured Stone that it was not making trademark use of STONE, a point mischaracterized in MillerCoors's brief. (OB30.) In 2010, after MillerCoors filed an application to register HOLD MY STONES, Stone sent a cease-and-desist letter. MillerCoors's lawyer responded by emphasizing that MillerCoors was not using the *singular* "STONE", something confirmed under oath at her deposition. (5-ER-903; 1-SER-59:2-62:18.) Instead, she explained that there was no likelihood of confusion and no infringement because Keystone was building its branding around "Always Smooth." (5-ER-903.)

After back-and-forth, MillerCoors agreed to discontinue its U.S.P.T.O. application to avoid an opposition and assured Stone that it would "not make any changes in its promotion of Keystone Light beer." (10-ER-2185-86.) MillerCoors then removed the TM symbol it had briefly placed next to "STONES" on certain packages, confirming that it had abandoned any intention to use "STONES", much

less "STONE" as a brand name. (4-SER-748:4-749:18; 11-SER-2362; 11-SER-2386.)

**No Brand Identity as STONE**. MillerCoors's own evidence and witnesses repeatedly admitted that Keystone's prior inconsistent uses of "'STONES" did nothing to establish a brand identity. MillerCoors's consumer research just prior to the Rebrand showed that "[p]erceptions of Keystone Light as a brand" were "almost non-existent" because "consumers don't know who we are, what we stand for, where we come from" and that "the term 'stones' is not part of [the Keystone] consumer's brand lexicon." (7-SER-1260; 13-SER-2679; 12-SER-2667; 12-SER-2714.) These conclusions echo those from Keystone's prior consumer studies of the brand, which found no association between Keystone and "STONES" or "STONE" in 2005, despite MillerCoors's supposed earlier uses of the terms. (10-SER-2114-15.)

Keystone's 2017 "OWN THE STONE" campaign changed everything. MillerCoors "reinvent[ed]" the brand to make "STONE" the "center of attention" and "establish" the nickname so that "STONE" would "*come to* represent" Keystone, resulting in the avalanche of confusion described above. (*Supra*, E; 7-SER-1321; 7-SER-1323; 7-SER-1415; 8-SER-1640; 8-SER-1599-1604; 12-SER-2531; 13-SER-2713; 13-SER-2907; 14-SER-2946; 14-SER-2964-69; 14-SER-3138.)

33

These admissions show that Stone was not required to file suit before 2017 against Keystone's inconsistent and non-trademark uses of STONE-formative words. A plaintiff is not obligated to sue until it "knew or should have known ... that [it] had a provable infringement claim." *Tillamook*, 465 F.3d at 1108, 1110. Thus, a "[n]oninfringing use of a mark is not relevant to a defense of laches." *Elvis Presley Enterprises v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998). There has been no contention from either party that MillerCoors's isolated and inconsistent uses of "STONES" were enough to cause confusion, and MillerCoors *withdrew* its trademark application. MillerCoors does not identify a single instance of confusion that would have put Stone on notice to sue.[1]

And even if some of MillerCoors's post-2010 use were infringing, Stone's suit would be timely. Under the doctrine of "progressive encroachment," a party "need not sue in the face of *de minimis* infringement" and can wait until a qualitative change in an infringer's use of a mark begins "causing actual market confusion." *Tillamook*, 465 F.3d at 1108, 1110; 4 McCarthy § 31:19 (5th ed.) (laches measured from "infringing use sufficient to require legal protest") (citing

---

[1] Other circuits agree. *See, e.g.*, *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing*, 897 F.3d 413, 419 (2d Cir. 2018) (clock starts not when infringer "was using the potentially offending mark" but when "provable infringement claim"); *Covertech Fabricating v. TVM Bldg. Prods.*, 855 F.3d 163, 176 (3d Cir. 2017).

34

*Reno Air Racing v. McCord*, 452 F.3d 1126, 1139 (9th Cir. 2006) (lawsuit not expected over "mere handful of limited [t-shirt] sales")); *id* § 31:21 ("plaintiff [may] tolerate de minimis or low-level infringements" so long it "act[s] promptly when a junior user … suddenly … changes its mark."); *Mead Johnson & Co. v. Baby's Formula Serv.*, 402 F.2d 19, 21-22 (5th Cir. 1968) (starting clock based on new packaging with trademark "more conspicuous[ly]," despite defendant's "long years of non-infringing use").

The cases MillerCoors relies on say no different. (*See* OB30-31.) All three find, unremarkably, that a lengthy delay in filing is unreasonable, but none addresses, much less decides, whether a qualitative change in an infringer's use of a mark can trigger the laches clock.

Nor is it relevant that MillerCoors did not enter "a new market" or offer "a new product." (OB32.) Those are "[c]ommon methods" of encroachment, not exclusive ones. *Tillamook*, 465 F.3d at 1110. MillerCoors's claim (OB32) that "a mere redesign, [or] rebranding" cannot trigger progressive encroachment is false. *See, e.g.*, *Oriental Fin. Grp. v. Cooperativa de Ahorro y Credito Oriental*, 698 F.3d 9, 22 n.9 (1st Cir. 2012) (explaining that "changes in [a] mark" can establish progressive encroachment and collecting cases). MillerCoors's case found no encroachment only because the redesign made "an insignificant change" that did "not in any way" make its product "more similar to" the plaintiff's. *Tillamook*, 465

35

F.3d at 1110. Here, MillerCoors's change made it a "new beer." (7-SER-1318.) In response, Stone was entitled to bring suit.

### B.    Suing In Response to the Rebrand Was Not Unreasonable

Even if MillerCoors's 2010 infringement had been actionable, MillerCoors has not explained how Stone's decision to file in 2018 was unreasonable. It has therefore waived this point, which is essential for it to prevail. Lengthy filing delays may be excused where "[c]hanges by the defendant in the appearance … of the mark … increase the threat to the plaintiff's trademark rights." Restatement (Third) of Unfair Competition § 31 (1995). *Indep. Nail & Packing Co. v. Stronghold Screw Prod.*, found a seven-year delay reasonable where the defendant's redesigned emphasis on the word "Stronghold" caused "most of the confusion" in the market. 205 F.2d 921, 927 (7th Cir. 1953); *see also Danjaq v. Sony*, 263 F.3d 942, 954 (9th Cir. 2001) (delay excused based on "cost of litigation"). For the reasons above, Stone was more than entitled to accept inchoate use of "STONES" but file suit in response to the sea-change of the OWN THE STONE campaign.

### C.    MillerCoors Was Not Prejudiced

Laches also fails because MillerCoors cannot show prejudice.

*First*, MillerCoors admitted that Stone had no bearing on its thinking. (*See* 14-SER-3225 (MillerCoors "never once" considered Stone during "development of

the Keystone refresh"); 14-SER-3189; 4-SER-689:17-690:4.) That alone dooms MillerCoors's argument, for "in the case of laches, undue prejudice requires at least some reliance on the absence of a lawsuit." *Seller Agency Council v. Kennedy Ctr. for Real Est. Educ.*, 621 F.3d 981, 989 (9th Cir. 2010). Moreover, MillerCoors withheld the legal communications that would show whether it relied. (*Supra*, H.) Just as a litigant cannot assert a claim that puts privileged materials at issue and then rely on that privilege to withhold them, *United States v. Sanmina Corp.*, 968 F.3d 1107, 1117 (9th Cir. 2020), MillerCoors cannot assert its reliance on Stone's forbearance after withholding the very documents Stone needs to dispute its claim.

*Second*, laches does not recognize the type of prejudice MillerCoors alleges. MillerCoors complains that, between 2010 and 2017, it "invest[ed] significant resources in its Keystone brand" through "advertising, packaging, and national campaigns." (OB34.) But if prejudice "could consist merely of expenditures in promoting the infringed name, then relief would have to be denied in practically every case of delay." *Internet Specialties*, 559 F.3d at 991 (citation omitted). Laches only protects the infringer who has "buil[t] a valuable business *around its trademark*" and established "an important reliance *on the publicity of [its] mark*." *Id.* at 991–92 (quoting 6 McCarthy § 31:12).

Here, before 2017, MillerCoors did not even consider "STONE" a brand asset and never treated it as a trademark. (*Supra*, B-D; 12-SER-2437; 12-SER-

2446; 12-SER-2531.) Its own study showed that virtually no consumers had ever referred to Keystone beers as "Stones" or heard anyone else refer to them that way. (7-SER-1249; 7-SER-1238; 7-SER-1251; 7-SER-1318; 7-SER-1259; 7-SER-1260; 10-SER-2114-15; 12-SER-2579; 12-SER2659; 12-SER-2713.) "Perceptions of Keystone Light as a brand" were "almost non-existent" because, MillerCoors concluded, "consumers don't know who we are, what we stand for, where we come from." (7-SER-1260; 12-SER-2713.) As late as December 2017, consumers were "still becoming familiar with [Stone] nickname." (14-SER-2938.) Because Keystone was a "blank slate," it could not have been prejudiced by Stone's delay. *See Internet Specialties*, 559 F.3d at 992 (seven-year delay created no prejudice where infringer's advertising "create[d] little to no brand awareness" using trademark).

MillerCoors's authorities (OB34-35) are distinguishable. As *Internet Specialties* observes, the eight-year delay in *Grupo Gigante* was prejudicial because, during that time, the defendant grocer used the mark to cement "the public association of [the] grocery store" with "its [infringing] name." 559 F.3d at 993 (citing *Grupo Gigante v. Dallo & Co.*, 391 F.3d 1088, 1105 (9th Cir. 2004)). Similarly, in *Jarrow*, during the plaintiff's delay the defendant invested "enormous resources" to make the challenged health claims "a central part" of its marketing campaign. *Id.* at 992-93 (quoting *Jarrow*, 304 F.3d at 839). And in *Pinkette*, the

defendant had been using the trademark as its brand name, "buil[ding] its business" through "trade shows and advertising," 894 F.3d at 1028, and "develop[ing] an identity as a business based on its mark," *Internet Specialties*, 559 F.3d at 992. By contrast, MillerCoors's narrow, sporadic use of "Stone" from 2010 to 2017 built no brand recognition around that mark.

### D. The Laches Ruling Was Confirmed Post-Trial

Summary judgment on laches may also be affirmed on the ground that the district court considered and denied the same arguments on a full post-trial record of testimony and evidence in connection with MillerCoors's related equitable defenses of wavier and estoppel. Laches is an equitable issue for the district court, which reiterated its "laches" ruling at that time. (1-ER-33-36.)

Finally, MillerCoors claims it lacked proper notice the district court might grant summary judgment for Stone. (OB29.) But "where the party moving for summary judgment has had a full and fair opportunity to prove its case, but has not succeeded in doing so, a court may enter summary judgment sua sponte for the nonmoving party." *Albino v. Baca*, 747 F.3d 1162, 1176 (9th Cir. 2014).

## II. THE DISTRICT COURT PROPERLY DENIED MILLERCOORS'S MOTION FOR JUDGMENT AS A MATTER OF LAW

To set aside Stone's verdict through a Rule 50 motion, MillerCoors was required to show that there was "no legally sufficient basis for a reasonable jury to find" for Stone. *Krechman v. County of Riverside*, 723 F.3d 1104, 1109 (9th Cir.

2013). The court cannot "make credibility determinations or weigh the evidence." *E.E.O.C. v. Go Daddy Software*, 581 F.3d 951, 961 (9th Cir. 2009). Having seen that evidence, the district court rightly found for Stone.

### A. The Jury Rightly Found that Stone Had Priority

As MillerCoors concedes, Stone applied for the STONE® mark on April 4, 1996 and its mark became incontestable in 2004. Registration is "prima facie evidence" of ownership, *Sengoku Works v. RMC Int'l*, 96 F.3d 1217, 1219 (9th Cir. 1996), *as modified*, 97 F.3d 1460 (9th Cir. 1996), and an incontestable registration is "conclusive evidence," 15 U.S.C. § 1115(b).

MillerCoors argues, nevertheless, that *it* owns the STONE mark because it was the first to use it in commerce. (OB36.) To prevail on that claim, MillerCoors had to show that: (1) it "adopted and used 'STONE' as a trademark to identify the source of origin of its Keystone beer prior to April 4, 1996, and has done so continuously to the present," and (2) its "current use of 'STONE' is indistinguishable from any claimed historical uses …, creates the same continuing commercial impression, and does not materially differ from or alter the character of the claimed prior uses." (6-SER-1206:2-1210:14); *see Casual Corner Assocs. v. Casual Stores of Nev.*, 493 F.2d 709, 712 (9th Cir. 1974); *Brookfield Commc'ns v. West Coast Ent.*, 174 F. 3d 1036, 1048 (9th Cir. 1999).

MillerCoors failed to carry its burden. *Sengoku*, 96 F.3d at 1219 (burden on non-registrant to overcome presumption). It argues that Keystone used "Stone(s)" to "market and advertise" since 1991 and "continued to do so until trial," mainly by "placing 'STONES' on packaging for its Keystone 30-pack no later than 1995." (OB36.) But the jury was entitled to conclude that MillerCoors's pre-1996 packaging "never made it to market," and that, even if it had, MillerCoors's "use of 'STONE' or 'STONES' … was not continuous." (1-ER-32-33.) Nor did MillerCoors establish that it used STONE *as a trademark* before 2017. And, plainly, MillerCoors's 2017 use of STONE was radically different from before. The district court rightly denied MillerCoors's motion. *See Krechman*, 723 F.3d at 1109.

### 1. MillerCoors Failed to Show that It Used "Stone" in Commerce before 1996

MillerCoors asserts that "STONES" appeared on 30-pack artwork starting in 1995. (OB8-9.) But it fails to advise that the key packaging images on which it relies never made it into market and omits from both its brief and its excerpts of record the portions of the packaging that show blank lines for key approval signatures.

Evidence and testimony at trial proved that Keystone packaging that went to market had comprehensive approval signatures from MillerCoors's team. But, as the district court recognized (1-ER-33), the early Keystone "STONES" 30-packs

on which MillerCoors relies had blank signature lines. (*See* 4-SER-662:8-669:21; 8-SER-1578; 5-ER-776-777 (STONES packaging without approval signatures); 10-SER-2117; 8-SER-1576; 8-SER-1574 (non-STONES packaging with full signatures sets).) Heidi Harris, MillerCoors's corporate representative and lead witness on this (OB37), admitted that she had seen no packaging artwork from before 2000 that used "Stone" or "Stones" and contained a full set of signatures. (5-SER-1157.) Harris also admitted that the copyright dates MillerCoors uses to date its packaging did not match the year of release or establish that the packaging was released. (5-SER-1157:6-1158:20.)

Stone's CEO Maria Stipp testified that, earlier in her career, she designed planograms to accommodate the initial release of the Keystone 30-pack (allegedly bearing 30 'STONES). This occurred after she moved to Utah, which was in 1997—the year *after* Stone's priority date. (5-SER-945:11-948:10.)[2] MillerCoors's own packaging agency "could not confirm the use of a '30 STONES' package being used in the marketplace before 1996." (1-ER-33; 11-SER-2304; 11-SER-2307; 5-SER-1158:22-1160:4.)

---

[2] The jury was entitled to reject the testimony of a MillerCoors witness who claimed to remember (thirty years later) that Keystone 30-packs came out during his sophomore, rather than junior, year in college. (OB37.)

MillerCoors also failed to show it used STONE or STONES on marketing material pre-1996. Its corporate representative admitted: (1) that she did not know whether historical Keystone items with "Stone" or "Stones" were released into commerce (5-SER-1148:11-17); (2) that, unlike other items, no pre-1996 Keystone material referring to "Stone" or "Stones" had markings so indicating (5-SER-1149:17-21); and (3) that Coors presented commercially available marketing materials in catalogs, which were preserved in the Archive; no catalog contained any Keystone materials with STONE or STONES. (5-SER-1150:3-25, 1151:19-22).[3]

### 2.    MillerCoors Failed to Show that it Used "Stone" Continuously in Commerce

The district court emphasized the total "lack of evidence … that MillerCoors used the word 'Stone' or 'Stones' in its marketing any time between 1997 and 2010." (1-ER-33; *see also* 4-SER-675:4-676:8.) This alone is sufficient to reject prior use.

### 3.    MillerCoors Did Not Use STONE *as a Trademark* Until 2017

Nor could MillerCoors prove that it used STONE before 1996 *as a trademark*. MillerCoors did not use the "TM" symbol for "STONE", abandoned its

---

[3] The jury was free to disbelieve Scott Whitley—a late-disclosed MillerCoors loyalist—who could not remember particular historical advertising campaigns or dates. (5-SER-1163:24-1164:6, 1165:19-1166:3.)

STONES application, did not identify "STONE" as a brand asset, and did not cause consumers to identify the mark with Keystone. (*Supra*, B-D; I.A.2.)

### 4. "OWN THE STONE" Does Not "Tack" Onto Alleged Pre-1996 Use

MillerCoors also was required to show that its rebranded use of Stone's mark was "indistinguishable" from its early use and "create[ed] the same continuing commercial impression." *Brookfield*, 174 F.3d at 1048. The standard for this "tacking" is "exceedingly strict." *Hana Financial v. Hana Bank*, 735 F.3d 1158, 1164 (9th Cir. 2013); *see, e.g.*, *One Indus. v. Jim O'Neal Distrib.*, 578 F.3d 1154, 1160–61 (9th Cir. 2009) (no tacking of "rounded" letter O to "angular" letter O); *Quicksilver v. Kymsta*, 466 F.3d 749, 760 (9th Cir. 2006) ("'QUIKSILVER ROXY' and 'ROXY'"). MillerCoors has not come close to satisfying this standard. (*Supra*, B-E.)

### B. The Jury Was More Than Justified in Finding Confusion

MillerCoors argues that the district court should have cast aside the jury's verdict, credited MillerCoors's version of the facts, drawn inferences in its favor, and concluded that consumer confusion was unlikely. (OB38-50.) But "[l]ikelihood of confusion is a factual determination," *Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir. 2002), and "should be answered as a matter of fact by a jury, not as a matter of law by a court," *Fortune Dynamic v. Victoria's Secret Stores Brand Mgmt.*, 618 F.3d 1025, 1031 (9th Cir. 2010).

MillerCoors's argument proceeds from the fiction that its rebrand did not focus on the word "STONE." But the evidence showed just the opposite: MillerCoors sought to make "STONE" its "most iconic asset" and the "center of attention." (8-SER-1640; 8-SER-1599, -1604.)

**OLD**          **NEW**



Every factor identified by this Court in *AMF v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979) weighed in favor of confusion, and it is not necessary to prove every or even most to show confusion. *Stone Creek*, 875 F.3d at 436.

MillerCoors harps on a supposed absence of evidence of actual confusion. But there was unusually strong such evidence. And "difficulties in gathering evidence of actual confusion make its absence generally unnoteworthy." *Automotive Gold v. Volkswagen of Am.*, 457 F.3d 1062, 1077 (9th Cir. 2006).

### 1.     The Marks are Identical

Of the *Sleekcraft* factors, "similarity of the marks and the proximity of the goods" are "particularly probative." *Stone Creek*, 875 F.3d at 432. Similarity of marks is evaluated based on "sight, sound, and meaning," with "similarities

45

weighed more heavily than differences." *Brookfield*, 174 F.3d at 1054. The marks here, STONE® and "STONE", are identical.

Ignoring the identical sound or meaning of the marks, MillerCoors relies on alleged visual differences, telling the Court that it never used "STONE" standing alone on packaging or marketing materials. (OB45.)

To read MillerCoors's brief, one would never know that MillerCoors sought to establish "STONE" as Keystone's new brand by isolating "STONE" on primary and secondary packaging and highlighting "STONE" as its "most iconic asset" and the "heroic loner that always needs to be the center of attention." (8-SER-1640; 8-SER-1599, -1604.)

MillerCoors similarly ignores its use of "STONE" to advertise Keystone—on cans and boxes, on MillerCoors's website, in social media posts, and on promotional materials, with "KEYSTONE" relegated to the bottom corner in smaller type.

Even where it showed "KEYSTONE," the flat, colorless "KEY" faded into the background behind a textured, highlighted, three-dimensional "STONE" can, under the principle that "Stone always leads." (8-SER-1604.) As the district court said, MillerCoors "cannot deny or downplay the [e]ffect of de-emphasizing the full 'Keystone' mark in favor of emphasizing 'a single, heroic element.'" (12-ER-2434.)

46

**Packaging**




**Billboards**









## Social Media



**Promotional Materials**



**Front Page of Keystone Light Website**



(8-SER-1453, 8-SER-1454, 8-SER-1450, 8-SER-1440, 8-SER-1447, 8-SER-1446, 8-SER-1442, 8-SER-1445, 8-SER-1452.)

Using "STONE" as a standalone mark *was the point*. MillerCoors's Brand ID Fundamentals emphasized "STONE" as the "heroic element": "[A]ll of the guidelines around the 'Stone are meant to emphasize one simple thing—the 'Stone is a heroic loner that always needs to be the center of attention." (8-SER-1604.)

49

MillerCoors's Brand World Book for Keystone explained that "STONE" was now Keystone's "brand ambassador, and our most iconic asset. Where it flies, so does our brand." (8-SER-1640.) MillerCoors told its teams: "Everything we've done in our redesign and branding has been centered around owning the 'Stone.'" (8-SER-1600.)

MillerCoors argues that the jury should have focused on alleged differences in colors and imagery. (OB44-45.) But the jury was more than justified in focusing on the "single, heroic element" "STONE", especially given that "similarities [are] weighed more heavily than differences." *Brookfield*, 174 F.3d at 1054.

MillerCoors invokes the small "Coors" "house mark." (OB45.) But "in a reverse confusion case [like this one,] … use of a house mark can also aggravate confusion by reinforcing the association between the mark and the junior user [MillerCoors]." *Ironhawk Techs. v. Dropbox*, 2 F.4th 1150, 1164 (9th Cir. 2021). Whether it does "is properly part of the factual determination left to the jury." *Fuddruckers v. Doc's B.R. Others*, 826 F.2d 837, 846 n.13 (9th Cir. 1987).

MillerCoors accuses the district court of "ignor[ing]" the Coors mark (OB45), but the court bent over backwards for MillerCoors. It departed from the model jury instructions and the above law to add language that "house marks" "may weigh against" confusion. (6-SER-1211.) MillerCoors *still* failed to persuade the jury.

### 2. The Goods are the Same

A jury also is entitled to find confusion based *solely* on the parties' identical marks for identical products. *Stone Creek*, 875 F.3d at 432 ("[I]dentical marks paired with identical goods can be case-dispositive."). Here, the goods not only use the same name "STONE", they compete in the same category: beer.

MillerCoors's CEO admitted that both companies sell products in the "beer space." (4-SER-695:24-697:7.) When MillerCoors sought to register "STONES" in 2007, it applied in Class 32, the same category as STONE®, for "beers and ales." (4-SER-686:16-697:11.) The goods are so closely related that they appear near one another on beer aisles and in stores throughout the country. (7-SER-1218-1225.)

MillerCoors argues that the parties' beers are priced differently. (OB47.) But products are related if they "would be reasonably thought by the buying public to come from the same source if sold under the same mark." *Rearden v. Rearden Commerce*, 683 F.3d 1190, 1212-13 (9th Cir. 2012). That is true for beer. *See Fleischmann Distilling v. Maier Brewing*, 314 F.2d 149, 159-60 (9th Cir. 1963) ("beer and Scotch whisky" related). If MillerCoors's view of the law were adopted, Merecedes would be powerless to stop Kia from launching a low-priced "Mercedes."

### 3. Consumers Were *Actually* Confused

The jury also saw exceptional evidence of actual confusion. Such evidence is rare because confused consumers do not speak up to admit they are confused, so

"[p]roving actual confusion is difficult." *Sleekcraft*, 599 F.2d at 352. "Persons who are truly confused will often never be aware of the deception. Others … will often not bother to report the fact." 3 McCarthy on Trademarks and Unfair Competition § 23:12 (5th ed.). For this reason, "such evidence is not necessary for a finding of likelihood of confusion, but … is particularly potent." *Stone Creek*, 875 F.3d at 433.

As if to prove this point, after trial, Stone received an unsolicited email from "a craft beer connoisseur" who read press coverage and wrote "to let you know I in fact purchased Coors' Stone at the time not knowing it wasn't related to Stone Brewing" and "would be happy to testify if needed[.]" (1-SER-2.)

Even without that evidence, Stone introduced at trial dozens of pieces of evidence of confusion among consumers, retailers, distributors, survey participants – and even in MillerCoors's own internal documents.

***Confusion in the Trade***. There was even evidence of confusion among industry participants. One distributor sent a picture of a Keystone can and expressed surprise that Stone was "making big cans now." (8-ER-1806.) Another mistakenly stocked Keystone in the "Stone Brewing" spot. (10-SER-2130.) This evidence easily supports actual confusion. *See Americana Trading v. Russ Berrie & Co.*, 966 F.2d 1284, 1289 (9th Cir. 1992) (one letter from confused consumer).

MillerCoors suggests this evidence was not "admissible" (OB42), but it did not preserve this objection and does not pursue it on appeal. MillerCoors also asserts the evidence is "scant," but that is the sort of weighing Rule 50 forbids. MillerCoors's case, *Surfvivor Media v. Survivor Prods.*, is distinguishable because the plaintiff there presented no evidence of reverse confusion, its sole theory. 406 F.3d 625, 633 (9th Cir. 2005).

***Social Media****. After the rebrand, consumers on social media asked whether MillerCoors was now "partners with Stone Brewery or bought them out." (8-SER-1447; *see also* 8-ER-1808; 8-ER-1809; 8-SER-1455.) Another post showed that a retailer had placed a sign on Keystone that read "not a beer from Stone Brewing" to dispel confusion. (8-ER-1805.) Another asked about a supposed Stone "lite" beer, the same misspelling that MillerCoors uses for "Miller Lite." (10-SER-2129; 10-SER-2329.)

Again, MillerCoors fails to grapple with this evidence. It argues that all social media evidence should be disregarded because some appeared after the lawsuit. (OB41.) But it is hardly surprising that media coverage of the litigation prompted consumers to come forward. Buyers of low-priced goods often fail to report trademark confusion in real time, or at all. *See Au-Tomotive Gold*, 457 F.3d

53

at 1077. Re-weighing this evidence would have been reversible error. *Krechman*, 723 F.3d at 1110.[4]

***Survey Evidence***. The jury had a wide variety of surveys, including from MillerCoors's internal research, that showed confusion. Even before launching the rebrand, MillerCoors's consumer testing showed that "using the 'Stone nickname can be confusing" and that the "'split' execution" of the Keystone "wordmark can feel confusing." (7-SER-1251; 9-SER-1924.) MillerCoors's consumer experts recommended changes to "more effectively transition" between "KEY" and "STONE" and to make the word "Keystone" "more seamless and recognizable at shelf." (9-SER-1924; 4-SER-700:12-701:5; 4-SER-702:22-703:14.) MillerCoors ignored that guidance and went with the version separating "STONE." (4-SER-702:22-703:14.)

Stone's surveys also demonstrated confusion. The first showed a "39 percentage point increase in brand association." (5-SER-1011:12-1013:9.) The second showed that 75% of consumers thought new Keystone taglines were associated with STONE®, "a classic type of confusion." (3-ER-559:15-560:6.) The third and fourth showed that STONE® IPA was selected "30 percent less often

---

[4] None of MillerCoors's cases at OB41-42 overturned a jury infringement verdict for absence of actual confusion evidence or criticized evidence analogous to Stone's.

than before the rebranding" when consumers were asked to "pick up a Stone" and consumers expressed confusion as to which product to choose. (5-SER-1015:7-1020:19; 3-ER-564:7-566:1.) The fifth "visual confusion" study showed that "25[%] more consumers thought Keystone was linked to Stone." (5-SER-1026:2-1028:1.)

MillerCoors argues that the surveys should have used different images. (OB42-43.) But Stone's images reflected marketplace reality by including the "STONE" imagery from MillerCoors's *own* branding and packaging. By contrast, MillerCoors engineered its surveys so respondents would inspect individual packages in an unrealistic environment divorced from MillerCoors's STONE-centric marketing. (5-SER-1017:3-12, 1018:4-9, 1032:19-1035:11; 5-SER-1107:16-1109:25.) Even then, 22% and 27% of consumers "did not know" whether Keystone was affiliated with STONE®, which is "unreasonably high." (5-SER-1029:2-1031:15.)

The district court was right to find that the jury had ample reason to reject MillerCoors's criticisms. *See Fortune Dynamic*, 618 F.3d at 1037-38 (whether survey "failed to replicate real world conditions" "go[es] to the weight of the survey rather than its admissibility").

***Switching Reports***. MillerCoors's own consumer analytics showed reverse confusion. Prior to rebranding, Keystone competed with other economy light beers,

while Stone took customers from craft and super-premium. (6-ER-1129 (2017 switching report).) After 2017, this changed. Stone began losing customers to craft brewers and showing linkages to economy beers. (7-ER-1368 (2019 switching report).)

### 4.     Stone and Keystone Share the Same Marketing Channels

Stone and Keystone share identical marketing channels, distributors, and retailers, and their products sit side by side on store shelves. (7-SER-1218, 7-SER-1220, 7-SER-1222, 7-SER-1223, 7-SER-1224, 7-SER-1225; 4-SER-843:11-845:23.)

MillerCoors misinforms the Court that Stone IPA (one of many STONE® beers) is "sold primarily in restaurants." (OB11.) This is false; most of Stone IPA sales are in retail stores, and total Keystone bar and restaurant sales exceed those of Stone IPA. (5-SER-980:5-9 (Robberson); 5-SER-918:9-13 (Stipp).) Both brands sell most of their beer in retail stores, next to or within a few feet of one another. (5-SER-929:14-930:1.) Both brands are also sold nationally, and there is not a single Stone market in which Keystone does not have equal or greater sales volume. (8-SER-1570.)

### 5.     Consumers' Degree of Care

Consumers exercise a low degree of care when buying low-priced consumer products like beer. *Fleischmann Distilling*, 314 F.2d at 156; *Anheuser-Busch v. Customer Co.*, 947 F. Supp. 422, 425 (N.D. Cal. 1996) (consumers "not likely to

use great care in selecting beer"). The evidence at trial confirmed that beer is a low-priced good for which consumers exercise a lower degree of care. (7-ER-1381 (Keystone pricing $9.99-$19.99); 11-SER-2385 (Stone pricing $10.99-$15.99).)

## 6. Strength of the Mark

STONE® is arbitrary and inherently distinctive because it does not describe or suggest anything about Stone's products. *See Kendall-Jackson Winery v. E.&J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998).

None of the alleged third-party registrations that "incorporate" STONE (OB49) used "STONE" as a brand name or standalone trademark. Stone systematically enforced its trademark rights against dozens of would-be infringers. (10-SER-2263.) And MillerCoors has no evidence that Stone or anyone uses the demised "stone brewing" method or that any consumer understood such meaning. (OB49; 2-ER-355:9-19.)

Regarding commercial strength, Stone is among the most recognized craft brewers with extensive awards and press. (4-SER-800:9-813:16; 4-SER-818:1-842:8 (Koch).)

## 7. Defendant's Intent

MillerCoors knew that the rebrand would infringe. MillerCoors executives and counsel supervising the rebrand were aware that Stone owned the STONE® mark. (4-SER-688:13-16 (CEO Hattersley); 4-SER-715:10-716:8 (other personnel); 4-SER-717:6-11 (legal department).) MillerCoors was aware of the

57

U.S.P.T.O.'s decision in 2007 that confusion with STONE® was "extremely likely" if Keystone adopted "STONES" as a trademark. (10-SER-2161; 4-SER-718:12-734:16 (Hattersley); 4-SER-746:9-11; 747:3-19 (Wexelbaum).)

Nonetheless, MillerCoors launched a bottom-up redesign of Keystone "centered around owning the 'Stone.'" (8-SER-1600.) At trial, MillerCoors claimed it acted in good faith, but it withheld as privileged all attorney communications that would have revealed what it actually thought about its rights and the STONE® trademark. (4-SER-741:13-742:15.) Regardless, "choosing a designation with knowledge that it is another's trademark permits a presumption of intent to deceive." *Stone Creek*, 875 F.3d at 434 (citing *Hokto Kinoko v. Concord Farms*, 738 F.3d 1085, 1096 (9th Cir. 2013)).[5]

### 8. Expansion of Product Lines

This supports confusion because there is no need to "bridge the gap." (3-ER-487:4-13.)

## III. THE DISTRICT COURT PROPERLY DENIED A NEW TRIAL

MillerCoors argues that the district court abused its discretion by denying its new trial motion in connection with Stone's marketing expert, Dr. Palmatier.

---

[5] The non-willfulness verdict does not preclude intentional infringement because the instructions wrongly required specific intent to *profit*, thereby excluding reverse confusion. (6-SER-1212:22-1213:14.) "Intent can be shown through evidence that … the junior [user] knew of the mark … or otherwise culpably disregarded the risk of reverse confusion." *Ironhawk*, 2 F.4th at 1168.

MillerCoors waived its objections, and the district court was right to permit the testimony.

## A. The District Court Evaluated the *Daubert* Challenges MillerCoors Made

MillerCoors claims that the district court "summarily rejected" its request to file a *Daubert* motion and "summarily denied" its *Daubert* motion concerning survey evidence. (OB51-52.) But MillerCoors *never asked* to file a *Daubert* on the marketing science testimony, and the denial of MillerCoors's motion concerning the survey evidence was thorough and accurate.

### 1. MillerCoors Waived its Objections

MillerCoors suggests that the District Court prevented it from challenging Dr. Palmatier's opinions. (OB51.) This, as the district court euphemistically put it, is "somewhat misleading." (12-ER-2441.) MillerCoors never raised its challenges, failing to object *six times*, including when asked point blank at trial.

First, Dr. Palmatier's opinions were not "new". (OB51.) Stone's initial marketing expert, Dr. David Stewart,[6] explained how consumers associate brands with product attributes—what MillerCoors calls "brain nodes"—and MillerCoors's

---

[6] Dr. Palmatier replaced Dr. Stewart, himself a leading marketing scholar, after he withdrew for COVID-related health reasons. (5-SER-1027:23-1029:6; 10-ER-2075.)

*Daubert* motion never challenged those opinions. (*See, e.g.*, 2-SER-363-372, 388-394; 2-SER-511-516.)

Second, MillerCoors did not challenge Dr. Palmatier's rendition of these opinions in February 2021, after he substituted in, adopted Dr. Stewart's opinions, and served his supplemental report, including the "brain node" diagram from his leading textbook.

Third, MillerCoors failed to file any motion following Dr. Palmatier's May 2021 deposition, not referenced in its appeal.

Fourth, MillerCoors did not object to Dr. Palmatier at the July 2021 trial-setting conference, the conference underlying MillerCoors's argument on appeal. (*See* OB51.) MillerCoors asked to file a successive *Daubert* challenge only to Stone's *damages expert*, Carrie Distler. (10-ER-2072-73.) With trial approaching, the district court observed that the time for new *Daubert* challenges has "long, long gone by." (10-ER-2073; 12-ER-2441-2.)

Fifth, MillerCoors failed to object at trial when Stone qualified Dr. Palmatier on the stand and the court asked whether MillerCoors had "any objection" to admitting his testimony. MillerCoors responded "It's fine, your honor." (5-SER-994:9-16.)

60

Sixth, MillerCoors again failed to object when Dr. Palmatier offered the testimony and opinions MillerCoors now challenges. (3-ER-547:13-556:6; 3-ER-569:7-578:21.)

By failing to object, MillerCoors "evaded" the court's scrutiny and "denied [Stone] the opportunity to lay a better foundation." *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (9th Cir. 1996). MillerCoors therefore "waiv[ed] the right to raise objections to the substance of [the] testimony post-trial." *Skydive Arizona*, 673 F.3d at 1113.

MillerCoors also suffered no prejudice. The court *did* "address[] Palmatier's new opinions in its Rule 59 order" and found his opinions admissible. (12-ER-2441-44.) MillerCoors complains of "undue risk of post-hoc rationalization." (OB52 n.10.) But the case it cites—*Mukhtar v. Cal. St. Univ., Hayward*, 319 F.3d 1073 (9th Cir. 2003)—was overruled on this point. *See United States v. Bacon*, 979 F.3d 766, 767 (9th Cir. 2020) (en banc) (ordering *post hoc* evaluation of admissibility).

### 2. The District Court Considered and Rejected MillerCoors's Survey Challenges

MillerCoors also contends that the district court failed to perform a *Daubert* analysis of Stone's survey evidence. (OB51-52.) But the court's multi-page, detailed analysis analyzed MillerCoors's objections to several surveys, which it lumps together in this appeal. (1-ER-84-85, 100-104.) The Court found

MillerCoors's objections "meritless" because the survey image, which MillerCoors calls "doctored" (OB19), was sourced from MillerCoors's own marketing and the surveys were conducted according to accepted principles. (1-ER-102.)

The court's analysis does not resemble MillerCoors's cases (OB51-52), where courts failed to perform any inquiry at all. *See City of Pomona v. SQM N. Am. Corp.*, 866 F.3d 1060, 1069 (9th Cir. 2017) ("one-word ruling"); *Pyramid Techs. v. Hartford Casualty Ins.*, 752 F.3d 807, 814 (9th Cir. 2014) ("two conclusory sentences" without "explanation"); *Estate of Barabin v. AstenJohnson*, 740 F.3d 457, 464 (9th Cir. 2014) (no "indication that the [court] assessed, or made findings").

## B.     Dr. Palmatier's Testimony Was Admissible

In any event, Dr. Palmatier's testimony was proper. Dr. Palmatier is one of the world's leading marketing-science scholars. (3-ER-541-544.) He published the authoritative textbook on marketing research, edited two of the world's top marketing journals, and ranks among the top five most published and cited marketing scholars. (3-ER-541-543; 1-SER-279-294.) None of MillerCoors's challenges to his testimony has merit.

### 1.     Dr. Palmatier's Survey Testimony Was Admissible

Survey evidence is a "well-established feature of trademark practice," *Clicks Billiards v. Sixshooters*, 251 F.3d 1252, 1262 (9th Cir. 2001), and "should be

admitted 'as long as it is conducted according to accepted principles and is relevant,'" *Fortune Dynamic*, 618 F.3d at 1036. "'Technical inadequacies' in a survey, 'including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.'" *Fortune Dynamic*, 618 F.3d at 1036; *see also Wendt v. Host Int'l*, 125 F.3d 806, 814 (9th Cir. 1997) (same). MillerCoors does not dispute that Stone's surveys were scientific or were conducted according to accepted principles. It argues only that they were not relevant. Those arguments fail.

*First*, MillerCoors argues that the surveys presented "altered stimuli of Keystone cans … unlike how they appear in the marketplace[.]" (OB54-55.) Just the opposite, Stone's surveys reflected the marketing by which MillerCoors sought to make "STONE" its "most iconic asset" and "center of attention" for Keystone, and captured MillerCoors's *own* presentation of the Keystone can. (*Supra*, Section E.) Stone's surveys incorporated dozens of images, of which MillerCoors objects to two, and were far more reflective of marketplace reality than those of MillerCoors. (5-SER-1017:3-12, 1018:4-9, 1032:19-1035:11; 5-SER-1107:16-1109:25.)

  

   

(2-SER-400, 2-SER-406, 2-SER-437, 2-SER-456, 2-SER-508.)

MillerCoors's assertion that the surveys "fail[ed] to replicate real world conditions" "go to the weight of the survey rather than its admissibility." *Fortune Dynamic*, 618 F.3d at 1037-38. MillerCoors argued its objections to the images extensively at trial. (5-SER-1061:3-1070:17; 5-SER-1073:9-1086:7; 5-SER-1088:18-1106:6.) The jury was entitled to disagree.[7]

---

[7] MillerCoors's cases cited at OB55-56 either did not involve survey evidence or involved unqualified survey authors.

**Second**, MillerCoors complains that the surveys failed to emphasize MillerCoors's "house mark." (OB56.) This contradicts Keystone's stated intent to emphasize "STONE" and goes to weight.[8]

**Third**, MillerCoors argues that the surveys pertained to dilution rather than infringement because they tested "association" (but does not dispute that these studies were conducted according to accepted principles). (OB56-57.) But the text of the Lanham Act lists "association" as a form of confusion and imposes liability for conduct "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or **association**" of goods or sponsors thereof. 15 U.S.C. § 1125(a)(1)(A) (emphasis added).

This Circuit holds that creating a false association is an actionable form of confusion, particularly reverse confusion. *See Marketquest v. BIC*, 862 F.3d 927, 932 (9th Cir. 2017) ("[C]onsumers would experience reverse confusion … because they had come to **associate** the words 'All-in-One' with Defendants"); *Cohn v. Petsmart*, 281 F.3d 837, 841 (9th Cir. 2002) (that "consumers are likely to mistake Cohn's clinic as being **associated** with Petsmart … alleges a claim for reverse confusion"); *Dreamwerks Prod. Grp. v. SKG Studio*, 142 F.3d 1127, 1129-31 (9th

---

[8] In *Water Pik v. Med-Sys.*, 726 F.3d 1136, 1145 (10th Cir. 2013), the survey used typewritten marks, not the stylized form consumers saw. Stone used actual market images.

Cir. 1998) ("whether [customers] are likely to **associate** the conventions with DreamWorks the studio"); *Ironhawk*, 2 F.4th at 1160 ("reverse confusion" when consumer "mistakenly thinks that the senior user is the same as or is **affiliated** with the junior user") (emphases added). Stone's surveys assessed whether MillerCoors caused consumers to associate the STONE® mark with Keystone—the heart of Stone's infringement claims.

Recognizing this, MillerCoors baldly states that Stone did not "assert" any reverse-confusion claims. (OB58.) That is false, as the district court observed. (12-ER-2436.) Stone pursued reverse (and forward) confusion from Complaint through trial. (11-ER-2340 ¶ 62 (Complaint alleging consumers misled into believing STONE® beer originated with MillerCoors); 6-SER-1210:15-17 (jury instruction to "consider whether the Defendant's use of the trademark is likely to cause confusion about the source of the *Plaintiff*'s … goods").) Stone presented extensive evidence of reverse confusion, including damage to Stone's brand, sales, pricing power, and reputation. (*Supra*, G; II.B; *infra*, IV.A-B.) By conceding the surveys are relevant to reverse-confusion, MillerCoors concedes they were rightly admitted.

### 2. Dr. Palmatier's Marketing-Science Testimony Was Admissible

MillerCoors objects to Dr. Palmatier's testimony regarding how brands work, his so-called "brain node" diagram, claiming that he is not qualified because

66

he is not a neurologist. (OB21-22.) But Dr. Palmatier's testimony was basic

marketing science: how brands help consumers associate positive attributes with

products. (3-ER-545:20-556:8; 3-ER-551:14-553:5; 3-ER-567:13-568:11.) This is

well documented in marketing science literature, and Dr. Palmatier's "brain node"

diagram was a visualization from an actual textbook. (3-ER-547:13-551:13; 3-ER-

583:15-585:2.) His explanation of the standard view in the field is proper expert

testimony. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) ("publication in

peer reviewed literature, and general acceptance" favor admission under *Daubert*).

This is not the domain of a "neuroscientist." (OB21-22.) Dr. Palmatier did

not purport to describe biological brain phenomena. He explained how

infringement disrupts the mental associations created by brands. (3-ER-547:13-

556:6.) This was squarely within his expertise. *Southland Sod Farms v. Stover Seed

Co.*, 108 F.3d 1134, 1140-42 (9th Cir. 1997) (reversing exclusion of "marketing

research expert" whose testimony was "proffered to demonstrate how Defendants'

advertisements mislead the consuming public").[9]

---

[9] MillerCoors's cases are inapposite. *United States v. Valencia-Lopez*, barred
speculation about Mexican drug cartels for "lack of experience within Mexico, and
with no explanation of his methodology." 971 F.3d 891, 901 (9th Cir. 2020).
*Pyramid Techs. v. Hartford Cas. Ins. Co. reversed* exclusion where the expert had
"a reliable basis in the knowledge and experience." 752 F.3d 807, 815 (9th Cir.
2014).

### 3. Dr. Palmatier's Regression Testimony Was Proper

Finally, MillerCoors objects to Dr. Palmatier's regression analysis by misstating his work and selection of variables. (OB60.)

Dr. Palmatier identified six potential variables affecting Stone sales, including Keystone's infringing advertising and possible alternative factors, and tested them in a multiple regression analysis to isolate the effect of infringement. (3-ER-569:7-570:10; 3-ER-576:7-19.) Because the regressions accounted for these major factors, Dr. Palmatier's regressions were plainly admissible. This is the opposite of the expert in *Grasshopper House v. Clean & Sober Media*, who made zero attempt to test alternative causal factors. Nos. 19-56008, 19-56072, 2021 WL 3702243 at *1 (9th Cir. Aug. 20, 2021). Moreover, "objections to a study's completeness generally go to 'the weight, not the admissibility of the statistical evidence,'[] and should be addressed by rebuttal, not exclusion." *Obrey v. Johnson*, 400 F.3d 691, 695 (9th Cir. 2005).

MillerCoors's other critiques are frivolous. It asserts that there was no "greater correlation between Keystone marketing and [Stone's] sales than Keystone marketing and Florida rainfall." (OB60.) This is nonsense. That MillerCoors's expert Mark Hosfield separately crafted an incompetent regression with a spurious correlation has nothing to do with Palmatier's careful studies.

68

### 4. Any Purported Error Was Harmless

Any alleged error here would be harmless because "it is more probable than not that the jury would have reached the same verdict." *Jules Jordan Video v. 144942 Canada*, 617 F.3d 1146, 1159 (9th Cir. 2010).

The jury saw many forms of actual confusion evidence, of which survey evidence was only one. Meanwhile, actual confusion is just one of eight *Sleekcraft* factors and "not necessary." *Stone Creek*, 875 F.3d at 433. Given the extensive other confusion evidence, the jury would have reached the same verdict regardless. (*Supra*, II.B.)

Likewise, the marketing science testimony and regression analyses were not necessary given the unchallenged testimony on these subjects by Stone's co-founders and CEO and the testimony of Stone's damages expert. (*Infra*, IV.A-B.) *See United States v. McLeod*, 755 F. App'x 670, 674 (9th Cir. 2019) (error admitting expert testimony harmless when other witnesses "independently supported the reliability of the information in the [expert's] report").

## IV. THE DISTRICT COURT PROPERLY DECLINED TO REDUCE THE DAMAGES AWARD

The district court rightly denied MillerCoors's request to reduce the damages award, which falls far below the injury Stone suffered. Before the Rebrand, Stone was on an unbroken trajectory of growth; after, Stone's beer sales fell by more than $30 million *a year*, or more than 25%. (11-SER-2388-89; 11-SER-2332-36; 4-

69

SER-854:24-855:3.) Expert statistical analysis, a comparison with peer competitors, the timing of Stone's decline, witness testimony, and a multitude of other evidence showed Stone's decline was attributable to the Rebrand, not any other factor. (5-SER-914:16-919:5; 5-SER-1036:7-1047:5; 11-SER-2337; 5-SER-941:8-944:1; 5-SER-944:2-10; 5-SER-1143:1-6; 5-SER-987:20-988:10; 5-SER-960:24-961:22.)

A court "must uphold" a damages award unless it is "grossly excessive or monstrous, clearly not supported by the evidence, or only based on speculation or guesswork." *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 791 F.2d 1356, 1360 (9th Cir. 1986). After a district court has "upheld a jury award in denying a motion for a new trial," that ruling "is 'virtually unassailable.'" *Skydive Arizona*, 673 F.3d at 1113. "A mark holder is held to a lower standard in proving the exact amount of damages" and courts "accept 'crude' measures" so long as the "inferences are neither 'inexorable ... [nor] fanciful.'" *Skydive*, 673 F.3d at 1112.[10]

MillerCoors itself acknowledges (OB61) that "a remittitur must reflect 'the maximum amount sustainable by the proof.'" *Oracle*, 765 F.3d at 1094-95. Thus, in *Oracle*, this Court held it was an abuse of discretion to remit damages below the

---

[10] The Lanham Act does not permit reducing a jury's award of "damages sustained by the plaintiff" (as opposed to "defendants' profits"); a court may only "enter judgment … for any sum *above the amount* found as *actual damages*." 15 U.S.C. § 1117(a) (emphasis added).

maximum amount supported by the testimony of the plaintiff's damages expert. *See id*. Stone's expert calculated damages of $216 million: (1) past lost profits ($32.7 million); (2) future lost profits ($141.4 million); and (3) corrective advertising ($41.8 million). MillerCoors does not challenge the admissibility of that testimony, which supports an award *four times higher* than what the jury gave.

The $56 million verdict must be construed in favor of Stone and upheld if supportable by any possible combination of damages grounds. *See Landes Const. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1373–74 (9th Cir. 1987).[11] Here, the jury awarded $56 million for all damages, and the district court, who saw the evidence, found that it fully supported that award.

## A.    Stone Is Entitled to Past Lost Profits

MillerCoors does not challenge the overwhelming evidence that the Rebrand caused Stone injury between 2017 and 2022. Evidence at trial showed that Stone had been poised to continue its unbroken string of category-leading growth. After it

---

[11] Without support, MillerCoors asserts that questions about how the jury got to $56 million should be presumed in its favor because of Stone's purported objection to a verdict question regarding "corrective advertising." (OB61 n.12, 68.) But Stone objected to legal misstatements in MillerCoors's verdict form, not a separate damages question. (10-ER-2068.) MillerCoors failed to object when the Court issued a verdict form without special questions for individual damages items. (*See* 6-SER-1179:2-1204:6.) Regardless, "a trial court's decision whether to use a special verdict should not be reviewed," and where no special verdict form was used, "the verdict is to be construed as responsive to any and all material issues in the case, including the alternative theory of damages." *Landes*, 833 F.2d at 1373–74.

maxed out its brewing capacity in 2016, Stone opened a new brewing facility in 2017 and achieved 50-state distribution, allowing it to compete for national accounts. (4-SER-892:13-893:10, 898:9-899:17.) Instead, Stone sales went into decline, starting with Stone IPA, the beer most intimately connected to the STONE® brand immediately following the Rebrand (11-SER-2332), and then spreading to the remainder of Stone's business (11-SER-2336), as would be expected for this type of injury. (5-SER-1052:5-15.) Stone began losing ground to other craft beers – even those distributed by its own in-house distributing arm. In other words, Stone fell behind other craft beers distributed on the same trucks, in the same territories, to the same retailers, for the same customers, and by *Stone's own salespeople*. (5-SER-941:8-944:1; 11-SER-2337.)

The extraordinary speed and timing of the decline, regression analysis showing that the decline was correlated with rebranded Keystone marketing, comparison analysis with other craft brewers, that Stone performed worse in channels shared with Keystone, and exclusion of other factors all showed that the collapse was attributable to MillerCoors. (5-SER-914:16-919:5; 5-SER-1036:7-1047:5; 11-SER-2337; 5-SER-941:8-944:1; 5-SER-944:2-10; 5-SER-1143:1-6; 5-SER-987:20-988:10, 1050:21-1051:12; 5-SER-960:24-961:22 (testimony of Stipp, Wagner, and Palmatier).) Stone's damages expert, Carrie Distler, performed a rigorous analysis to "isolate" the effect of Keystone's rebrand while controlling for

other factors (like Stone's performance) and was thereby able to calculate Stone's lost profits. (5-SER-1123:22-1125:14, 1127:20-1128:5.)

Ignoring this evidence, MillerCoors argues that past lost profits are unrecoverable because they were based on dilution rather than source confusion. This bears no relationship to the evidence or how it was presented at trial. (*Supra*.) It also ignores that, as MillerCoors concedes, the jury was properly instructed regarding "confusion … as to the source" and resulting damages. (6-SER-1205:12-19; 1214:15-1215:2.) The jury is "presumed to follow the court's instructions." *CSX Transp. v. Hensley*, 556 U.S. 838, 841 (2009).

Stone's experts showed that damage was based on confusion. Dr. Palmatier explained that rebranding Keystone as "STONE" built linkages between Keystone and Stone in the minds of consumers, as MillerCoors confused them to believe that the STONE® mark referred to Keystone. (3-ER-547:13-553:5.)

The district court confirmed that Stone's theory was based on source confusion, not dilution: "Stone did not argue their mark became *less distinct* … but that … negative attributes of Keystone were transferred to Stone *from this confusion of source*." (12-ER-2436; *see also id*. at 2435.)

That MillerCoors can cherry-pick testimony that uses the word "association" is irrelevant. (*See* OB62.) *It is the essence source confusion* when consumers come to "associate" the STONE® mark with MillerCoors. (*Supra*, 66-67.) Both the text

73

of the Lanham Act and this Court's rulings recognize "association" as an aspect of confusion. (*Id.*)

Finally, there is no basis for 20% reduction in past damages for Arrogant Bastard. (OB63.) Stone is entitled to recover "any damages [it] sustained," 15 U.S.C. § 1117(a). Arrogant Bastard faltered because MillerCoors's infringement reduced Stone's retail and distribution points, where Arrogant Bastard too was sold. (*See, e.g.*, 3-ER-480:25-481:14; 5-SER-938:7-25.)[12] Moreover, MillerCoors made this argument at trial, and the jury already may have reduced damages on this point, since MillerCoors did not request a separate line on the verdict form. (10-ER-2055, 2066-68.)

## B. Stone Is Entitled to Lost Future Profits

MillerCoors's claim that lost future profits are not cognizable in infringement cases "falls flat." (12-ER-2438-89.) Indeed, the district court would have abused its discretion by omitting them. *Oracle*, 765 F.3d at 1094 (plaintiff lost "an ongoing stream of revenue"). Though it cites *Oracle* elsewhere, MillerCoors omits it from this section of its brief.

Stone's evidence showed massive lost future profits, conservatively calculated by Stone's expert. As a result of the infringement between 2017 and

---

[12] *Lindy Pen* (OB63) found the damages model "irreparably flawed" because it included sales this Court had excluded from damages. 982 F.2d 1404.

2022, Stone lost 25% of its sales, including 10,000 retail distribution points where competitors took its space on store shelves, tap-handles, delivery trucks, and the like. (3-ER-479:10-480:13; 3-ER-472:21-475:6; 3-ER-476:21-479:16, 479:22-481:14 (Stone went from "42,000 points of distribution in 2018 … to 32,000"); 1-SER-238-89.) Ceasing the infringement does not repair the damage or restore those points of distribution, so lost sales will continue even after infringement stops; Stone must go forward from a much lower sales and distribution base, including at least 10,000 fewer points of distribution. (*See* 3-ER-588:4-24; 5-SER-950:19-951:10.) That Stone would "suffer from the loss of those customers beyond the date" infringement ended is "common sense." *Oracle*, 765 F.3d at 1094-95.

Distler's future-damages calculation was "purposefully conservative." (12-ER-2439.) Once shelf-space and distribution slots are lost for poor sales, retailers and distributors are unlikely to allocate them back. (5-SER-930:10-16, 931:2-13.) Yet, Distler assumed that Stone would instantly regain its pre-infringement growth rate *premium* over its competitors (4-ER-688:15-691:24), though that is impossible for a company that needs to repair its brand identity, reverse its downward momentum, and claw back lost points of distribution. (4-ER-689:15-690:23; 1-SER-169-70; 5-SER-950:19-951:10; 3-ER-588:7-590:16.)

MillerCoors's cases are inapposite. (OB65.) The *Lindy Pen* plaintiff "declined to provide the court with *any* evidence of its loss" from the one channel

in which confusion had been found. 982 F.2d at 1404-08. In *McClaran v. Plastic Industries*, damages consisted of imaginary sales from a "business [plaintiff] never started" in a market he had never participated in. 97 F.3d 347, 361-62 (9th Cir. 1996). And in *Polar Bear Productions v. Timex*, the plaintiff sought to recover not just for infringement but also speculative profits on an unrelated project it claims it would have undertaken had it obtained seed money. 384 F.3d 700, 709-710 (9th Cir. 2004). Stone's collapse in sales and lost points of distribution are consistent with the lost revenue streams in *Oracle*, not the imaginary businesses in *McClaran* and *Polar Bear*.

### C. Stone Is Entitled to Corrective Advertising with No Cap

MillerCoors argues corrective advertising is capped at a quarter of the infringing expenditures. (OB66-67.) But the real value of the infringing advertising was far higher, after accounting STONE-centric store displays, package stackings, and billions of "STONE" cans. (3-ER-584:4-585:7.) And the evidence was that it will take "at least 100% of what Keystone spent" "to rebuild [Stone's] brand." (3-ER-589:21-590:11.)

No Ninth Circuit authority imposes a cap, and MillerCoors cites none. This Court approves awards capturing 100% of corrective advertising expenditures. *See, e.g.*, *U-Haul Int'l v. Jartran*, 793 F.2d 1034, 1041 (9th Cir. 1986) (permitting corrective advertising damages "more than twice … the original advertising

expenditures"). That is dispositive: The district court cannot have erred by failing to impose a cap that does not exist.

Below, MillerCoors tried to dismiss *U-Haul* because it concerned past rather than future corrective advertising. But MillerCoors's own case—*Adray v. Adry-Mart*, 76 F.3d 984, 989 & n.2 (9th Cir. 1995)—cuts against it. Reversing a refusal to award prospective advertising, this Court found "no reason to so limit the availability of essentially compensatory damage" to circumstances where the "corrective advertising campaign [occurred] before trial" and that the plaintiff was "entitled to a jury instruction permitting a prospective corrective advertising award … not [to] exceed the damage to the value of [the] mark." *Id.*[13]

The supposed "25%" FTC rule addresses false advertising, not infringement. And the rule is a floor, not a ceiling. *See Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 1000 (D.C. Cir. 1973) (noting FTC required "not less than 25% of advertising budget" be devoted to corrective advertisements).

MillerCoors does not dispute that Stone's $41 million demand was supported by the evidence. Nor could it. The evidence was that $41 million understates *both* the value of MillerCoors's efforts to advertise Keystone as

---

[13] The Court noted that some out-of-circuit courts had "awarded a percentage of the [infringing] advertising amount" and the FTC 25% requirement, but then imposed no such limit. 76 F.3d at 989 & n.2.

STONE *and* what it will cost Stone to "make [itself] whole," which is what corrective advertising "is intended [to do]." *Adray*, 76 F.3d at 988.

Finally, MillerCoors already argued to the jury that corrective advertising was no more than 25% of infringing spend. The jury may well have reduced corrective damages per MillerCoors's proposed cap. MillerCoors's response that the jury's *total* award exceeded Stone's corrective advertising request (OB68), makes no sense. The jury could have awarded nothing for corrective advertising and still arrived at its verdict.

"[T]he burden of any uncertainty in the amount of damages should be borne by the wrongdoer" and the verdict may be supported by any "alternative theory of damages." *Adray*, 76 F.3d at 989; *Landes*, 833 F.2d at 1373–74. The jury was not required to assign damages to any particular category, and MillerCoors has failed to show that its award is not supported by the evidence.

## CONCLUSION

The judgment should be affirmed.

78

Dated: May 16, 2024          Respectfully Submitted,

**BRAUNHAGEY & BORDEN LLP**

By: */s/   J. Noah Hagey*
        J. Noah Hagey

*Attorneys for Plaintiff/Appellee*
*Stone Brewing Co., LLC*

## <u>REQUEST FOR ORAL ARGUMENT</u>

Appellee respectfully requests that this Court hear oral argument in this appeal.

Dated: May 16, 2024        Respectfully Submitted,

**BRAUNHAGEY & BORDEN LLP**

By: *<u>/s/   J. Noah Hagey</u>*
          J. Noah Hagey

*Attorneys for Plaintiff/Appellee*
*Stone Brewing Co., LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-3142 & 23-3355

I am the attorney or self-represented party.

**This brief contains** | 13,851 | **words,** including | 50 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [            ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/J. Noah Hagey | **Date** | May 16, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form17instructions.pdf*

**9th Cir. Case Number(s)** | 23-3142 & 23-3355

The undersigned attorney or self-represented party states the following:

⦿ I am unaware of any related cases currently pending in this court.

○ I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

○ I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature** | s/J. Noah Hagey | **Date** | May 16, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 17** *New 12/01/2018*